UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
Jeffrey Solomon,                            )
    Plaintiff,                              )
                                            )        Complaint
vs.                                         )        Civil Action No.
                                            )
Annie Dookhan, Donald F. Keenan,            )
Commonwealth of Massachusetts,              )
Suffolk District Attorney's Office,         )
Norfolk District Attorney's Office,         )
    Defendants.                             )
_____ )

## I.    INTRODUCTION

This is an action for money damages for the violation of the Plaintiff's constitutional rights brought pursuant to 42 U.S.C. §1983 and M.G. L. c. 12, § 111. Plaintiff Jeffrey Solomon ["Solomon"] alleges that all Defendants acting under color of law contributed or conspired to deprive him of his constitutionally protected rights.

Specifically, once Solomon was arrested by members of the Boston Police Department Drug Control Unit ["DCU"] for selling a counterfeit substance, they forwarded the substances to the Department of Public Health's Hinton Laboratory ["Hinton Laboratory"] in Jamaica Plain, where former state chemist Annie Dookhan ["Dookhan"] falsified the results of the chemical tests. At that time, Dookhan was engaged in large-scale criminal and fraudulent conduct, including falsifying results, dry labbing, perjury, and forgery. Meanwhile, Sergeant Detective Donald F. Keenan ["Keenan"] of the DCU destroyed exculpatory evidence, obstructed justice, engaged in intimidation tactics, and committed perjury before the Grand Jury in order to assist the Suffolk County District Attorney's Office in their prosecution. Solomon was consequently indicted and threatened by the Boston Police Department and the Suffolk County District Attorney's Office

1

with two seven-year mandatory minimum sentences in the state correctional institution.

Contributing to the numerous violations of Solomon's civil rights, Secretary JudyAnn Bigby failed to properly supervise, train, investigate, and monitor the employees of the Department of Public Health and Hinton Laboratory which employed Dookhan.  Likewise, the Department of Public Health and its Commissioner Jon Auerbach failed to adequately supervise, train, and monitor the employees of Hinton Laboratory, and then engaged in a cover-up of the offenses.  Moreover, the Norfolk and Suffolk Counties District Attorneys' Offices failed to adequately supervise, train and monitor their Assistant District Attorneys, who communicated directly with Dookhan and other chemists during the pendency of their criminal matters, including Solomon's case.

These failures resulted in the deprivation of Solomon's state and federal constitutionally protected rights, including his procedural and substantive due process rights, and the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.

## II.     JURISDICTION

Jurisdiction is based upon 28 U.S.C. §§1331 and 1343, and on the pendent jurisdiction of this court to entertain a claim arising under state law and under the Constitution of the United States.

## III.     PARTIES

1. Plaintiff Jeffrey Solomon ["Solomon"] is a resident of Boston.

2. Defendant Annie Dookhan ["Dookhan"] was at all times relevant to this complaint a chemist employed by the Commonwealth of Massachusetts Department of Public Health,

and at all times relevant to the complaint acted under color of state law.  She is being sued in her individual as well as her official capacity with the Department of Public Health.

3. Defendant Donald F. Keenan ["Keenan"] was at all times relevant to this complaint a Drug Control Unit police officer employed by the City of Boston, is currently employed as a Sergeant Detective, and at all times relevant to the complaint acted under color of law.  He is being sued in his individual capacity as a police officer for the City of Boston.

4. Defendant Commonwealth of Massachusetts ["Commonwealth"] is a sovereign state within the United States of America.

5. The Suffolk District Attorney's Office ["Suffolk DA"] is the office responsible for the prosecution of state cases in Suffolk County.  It has a primary office in Boston, Massachusetts.  Its District Attorneys and Assistant District Attorneys prosecute criminal cases on behalf of the Commonwealth and act under color of state law.

6. The Norfolk District Attorney's Office ["Norfolk DA"] is the office responsible for the prosecution of criminal cases in Norfolk County.  It has a primary office in Canton, Massachusetts.  Its District Attorneys and Assistant District Attorneys prosecute criminal cases on behalf of the Commonwealth and act under color of state law.

### IV.   FACTS

1. On December 12, 2010, Keenan was working with other DCU officers when he engaged Solomon in an undercover buy of alleged crack cocaine.

2. Upon being arrested, Solomon told one of the DCU officers that the alleged controlled substance was counterfeit and not cocaine.  Using a "Narc Swipe," Keenan conducted a

preliminary field test on the substance for cocaine. If the substance sold was cocaine, the swipe and the substance would turn blue. Keenan swiped a piece of substance and noted no color change to either the substance or the swipe. Keenan determined the alleged cocaine to be counterfeit and charged Solomon with distribution of a counterfeit substance, a misdemeanor with a maximum penalty of one year in the house of correction.

3. Keenan then destroyed the "Narc Swipe" and threw away the piece of the substance that he field tested. Keenan forwarded the remainder of the substance to the State Department of Public Heath, Hinton Laboratory ["Hinton"] for chemical testing and analysis.

4. The alleged controlled substances were received by Hinton on December 16, 2010 and placed in its evidence safe. On February 28, 2011, the substances were released to chemist Dookhan, a Hinton employee.

5. On March 1, 2011, Dookhan falsely recorded that she conducted the following tests on the substances: a Cobalt Thiocynate spot test, a Gold Chloride Microcrystalline test, and a TLTA Microcrystalline test. In fact, Dookhan conducted no scientific testing on the substances. On the same date, Dookhan falsely recorded that the substances tested positive for cocaine.

6. Sometime between March 4 and March 7, 2011, chemist Corbett, a Hinton employee, allegedly conducted "confirmatory testing" of the substances. In fact, Corbett never conducted any testing. Moreover, Corbett was aware at that time that Dookhan was forging her initials on the resulting batch sheets. On March 7, 2011, Corbett recorded that she confirmed the presence of cocaine in the substances through testing by gas chromatography/mass spectrometry.

7. Two drug certificates issued, signed by Dookhan and Corbett, falsely certifying that the substances submitted by Keenan were cocaine. On March 10, 2011 the substances were returned to the Hinton safe.

8. On April 13, 2011, Attorney Jennifer Sanders ["Attorney Sanders"] of the Committee for Public Counsel Services ["CPCS"] and Assistant District Attorney Mingo of the Suffolk County District Attorney's Office met with Keenan at the Boston Municipal Court to inspect the evidence.

9. Keenan produced two bags of substances. Attorney Sanders inspected the substances and did not see any blue coloring on any of the seized substances.

10. Keenan stated that when he does field tests on substances, he throws the tested pieces on the ground, which is probably what happened to the piece that he allegedly swiped after he arrested Solomon. Keenan thereby admitted to destroying exculpatory evidence by failing to preserve or otherwise safeguard the results of the Narco Swipe field test.

11. Keenan then spoke privately with Attorney Sanders. Keenan began the conversation by saying he probably shouldn't say this, but that they had had a lot of problems with CPCS, and that they could make things easy or not.

12. Keenan told Sanders that Solomon had been around a long time and in Keenan's opinion, Solomon was not a good guy.

13. On July 1, 2011, Assistant District Attorney Tanya Platt ["ADA Platt"] of the Suffolk County District Attorney's office convened a grand jury hearing in which Keenan was the sole witness.

14. On that date, the Suffolk County District Attorney's Office elicited false testimony before the Grand Jury. Specifically, Keenan falsely testified in response to ADA Platt's questioning that because crack cocaine can be homemade, the mixture would not be consistent throughout the whole entire piece of crack cocaine. Keenan also falsely testified that although the preliminary field testing showed no color change consistent with cocaine, he later viewed the substance at an undisclosed date and observed a color change consistent with the presence of cocaine in the alleged substance.

15. At the request of the Suffolk County District Attorney's Office, Keenan introduced to the grand jury the two false certificates signed by Dookhan and Corbett.

16. At the request of the Suffolk County District Attorney's Office, and based on the evidence presented, the grand jury issued indictments against Solomon relevant to this complaint for Possession with Intent to Distribute a Class B Substance in a School Zone as a Subsequent Offense, and Distribution of a Class B Substance in a School Zone as a Subsequent Offense, such indictments carrying two mandatory minimum state prison sentences of seven years.

17. On October 7, 2011, ADA Platt received a letter from Dookhan responding to ADA Platt's request for discovery.

18. On November 17, 2011, ADA Platt provided Solomon with notice that she intended to call Dookhan and Corbett as expert witnesses should he intend to go to trial.

19. Along with the falsified analysis reports and certificates, Solomon was provided with a copy of Dookhan's Curriculum Vitae ["CV"] in which she falsely claimed to have received

her Master of Science Degree in Chemistry from the University Of Massachusetts.

20. On September 27, 2012, the Crime Laboratory of the State Police Department retested the substances that were field tested by Keenan and allegedly analyzed by Dookhan and Corbett. No controlled substances were detected.

21. On September 28, 2012, Det. Lt. Robert Irwin of the Mass. State Police filed a "Statement of Probable Cause" in which he described Dookhan's false report of cocaine in Solomon's case, and sought a complaint charging Dookhan with obstructing justice, among other charges.

22. On October 5, 2012, the Commonwealth filed a nolle prosequi in its case against the Plaintiff, citing the State Police investigation that divulged Dookhan's specific misconduct in the Plaintiff's case.

23. On December 17, 2012, Dookhan was indicted in the Suffolk Superior Court in a fifteen count indictment for charges including intentionally misleading a person who is furthering a criminal investigation pursuant to M.G.L. c. 268 § 13B.

24. JudyAnn Bigby ["Secretary Bigby"] was at all times material to the allegations in this complaint the duly appointed Secretary of Executive Office of Health and Human Services ["EOHHS"] of the Commonwealth of Massachusetts. As such, she was responsible for oversight of the Department of Public Health and acted under the color of state law.

25. Secretary Bigby was directly responsible for the policies, practices, and customs of the Hinton Laboratory employees, and for their supervision and training. Secretary Bigby was also the direct supervisor of the former Commissioner of Public Health, Jon Auerbach

["Commissioner Auerbach"].

26. Commissioner Auerbach was the duly appointed Public Health Commissioner at all times relevant to the complaint. As such, he oversaw the policies, customs and practices of the Hinton Lab and acted under color of state law.

27. At least by June 2011, Secretary Bigby was aware that Dookhan was testing and certifying substances at a rate that was fifty percent higher than any other chemist. She described Dookhan's extremely high productivity as, "a red flag that wasn't appropriately investigated."

28. Secretary Bigby and Commissioner Auerbach maintained outdated operating procedures for the Hinton Lab, and undertook no action toward independent accreditation.

29. As early as 2008, Auerbach met with one of Dookhan's supervisors to discuss the problems at Hinton lab.

30. Auerbach initiated an investigation of Dookhan's conduct in December 2011 which failed to produce the evidence of gross misconduct discovered by the State Police during their investigation months later.

31. At the time of Auerbach's investigation, the Hinton Lab was working from a grant with the State Police that required quarterly reports, including reports of gross misconduct. Auerbach therefore failed to notify the State Police of Dookhan's misconduct until several months later, while working out the wording of the gross negligence report.

32. In December, 2012, Commissioner Auerbach resigned from his post as Commissioner of the Department of Public Health. Upon his resignation, Auerbach issued this statement: "It

is clear that there was insufficient quality monitoring, reporting, and investigating on the part of supervisors and managers surrounding the former Department of Public Health drug lab in Jamaica Plain."

33. Linda Han ["Han"] was at all times relevant to this complaint employed by the Department of Public Health as the Director of Hinton Lab.  As such, she created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law.

34. Julie Nassif ["Nassif"] was at all times relevant to this complaint employed by the Commonwealth of Massachusetts Department of Public Health and was in charge of the Division of Analytical Chemistry, including that at Hinton Lab.  As such, she created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law.  Han was Nassif's direct supervisor.

35. Auerbach intentionally withheld the findings of his investigation from certain supervisors of the Hinton Laboratory, including Han and Nassif (although with their knowledge), so that they would not be subject to examination in court.

36. Hinton lab supervisors Han and Nassif failed to monitor Dookhan adequately, failed to alert their superiors to problems, and allowed her to continue to have access to substances, to test substances, and to testify in court even after the breach in June 2011.

37. Charles Salemi ["Salemi"] was at all times relevant to this complaint employed by the Department of Public Health as the supervisor of operations.  As such, he created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted

under color of state law.  He was supervised by Nassif.

38. Elizabeth O'Brien ["O'Brien"] was at all times relevant to this complaint employed by the Department of Public Health as a supervisory evidence officer at Hinton Lab.  As such, she created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law.  O'Brien was supervised by Nassif.

39. In September of 2012, the Attorney General's Office launched an investigation into the misconduct at Hinton.  Based on interviews of Hinton employees, including Dookhan, the State Police reported the following:

   A. Dookhan forged other chemists' and evidence officers' initials in an unknown number of instances, including on Quality Assurance and Quality Control documents.  She ignored lab procedures by loading and running her own samples on the GC/MS.

   B. Dookhan failed to properly run QC/QA test samples, instead purposefully making up test result numbers on the "Quality Control Daily Injector Test" on the GC/MS.

   C. Dookhan maintained a level of production of test results that concerned supervisors and co-workers, often analyzing more samples in a week than they did in a month.  She was submitting racks upon racks of sample vials to the confirmatory chemists, and leaving many samples out on her bench top.

   D. Dookhan exhibited a pattern of failing basic laboratory procedures , including documentation issues, failing to calibrate balances, and having a work space filled with numerous vials open to cross contamination.

E.  Dookhan was allowed to access the evidence office computers in order to enter and look up data even after she was suspended from lab duties.

F.  Dookhan engaged in the practice of "dry labbing," looking at the samples instead of testing them with the presumptive testing. Dookhan was not using the proper method of inspecting slides prepared for a microscope. This resulted in an unknown number of samples coming back as heroin when Dookhan had supposedly tested it and found it to be cocaine and vice versa. Dookhan would then alter these samples so that they would come out the way she wanted.

G.  Dookhan was contacted directly by ADAs about specific samples, which she would then "pull" for analysis, even out of order, despite lab policies forbidding both this contact and action.

H.  Dookhan accessed the labs numerous times while suspended and also many times without any supervision of the evidence room.

I.  Dookhan had a key and unfettered access to the evidence room and safe.

J.  The Laboratory had a culture of lax oversight, as many issues with Dookhan were allowed to continue for years, even having her responsible for training and for some QA/QC procedures.

K.  In 2010, Dookhan's work was audited due to concerns about her workload. However, samples were not retested. Rather, it appears paperwork was simply reviewed.

L.  The Department of Public Health did not retain records when a sample was

11

resubmitted and retested; the number of any retests was not tracked or audited in any manner.

M. Numerous lab personnel expressed concerns with Dookhan's workload, documentation errors, blatant forgeries, and questionable test results, but no action was taken against her.

N. The laboratory evidence room and evidence safe were accessible to an unknown amount of chemists and employees of the laboratory.

O. The procedures to restrict access to the evidence room were ignored and circumvented. The safe was found open and unattended, was left propped open when it was "busy," and was accessible by codes and keys that had not been changed in over a decade.

P. An unknown number of chemists had keys to the safe.

Q. The palm reader access point to the evidence room was not recording those who entered, or that information was not preserved properly, or was destroyed, and as of the date of this complaint the State Police Investigation has not uncovered any records of access to the evidence room via the palm reader.

R. In June 2011, Han and Nassif discovered Annie Dookhan had breached protocol and removed 90 samples from the evidence room without authorization.

S. Han and Nassif did not properly investigate the specific breach of protocol, her workload, her results, and/or her general lack of adherence to protocol. They also failed to make written findings of her resubmittals or other QC/QA issues that were

recorded.

T. The method of samples being checked in and out suffered from lack of oversight, as whole sets of numbers could be pulled by Dookhan without anyone noticing.

U. The evidence officer or officers had a pattern of laxity when it came to tracking samples and access to the evidence room and safe, computer terminals, and written logbooks.

V. On or around December 2011, when it was clear that an unknown number of keys opened the safe, Auerbach began an investigation into Dookhan.

W. Salemi started checking keys, and perhaps switching them out.

X. Although Nassiff began checking keys for Dookhan and a few others, no plan to check every key was made, nor to take an inventory of who had keys to the evidence room.

Y. The Hinton lab did not appear to have or to enforce any safeguards or policies to prevent assistant district attorneys and police officers from contacting a specific chemist about a specific case or cases.

Z. Dookhan lied about receiving a Master's Degree in Chemistry from University of Massachusetts as listed in her resume or curriculum vitae, which she gave to the Assistant District Attorney handling Solomon's case. This false information was used by the District Attorney's Office through the course of discovery in preparation for trial.

40. At all times relevant to the allegations contained in this complaint, Han, Nassif, Salemi and O'Brien created, maintained and/or implemented the policy, custom and practice of failing to conduct oversight, investigate complaints, report violations, enforce safeguards or policies, and ensure the integrity of the samples while stored at the Hinton Laboratory Evidence Room.

41. District Attorney Conley ["Conley"] was at all times material to the allegations in the complaint the duly elected District Attorney of Suffolk County and acted under color of state law.

42. District Attorney Michael W. Morrissey ["Morrissey"] was at all times material to the allegations in the complaint the duly elected District Attorney of Norfolk County and acted under color of state law.

43. William Keating ["Keating"] was at all times material to the allegations in the complaint either the duly elected District Attorney of Norfolk County or the former District Attorney of Norfolk County and acted under color of state law.

44. Secretary Bigby, Commissioner Auerbach, Conley, Morrissey and Keating all failed to prohibit direct contact between DPH chemists and prosecuting Assistant District Attorneys prior to testing the substances in the cases being prosecuted. They also failed to train their employees concerning any existing policies of communicating between Hinton lab and the District Attorneys' Offices. The Suffolk County District Attorney's Office failed to enact any internal policy concerning communications between chemists and assistant district attorneys. Rather, the policy, custom and practice provided for direct communication between the chemists and prosecuting assistant district attorneys prior to testing the alleged

substances.

45. Between 2009 and 2011, Norfolk Assistant District Attorney George Papachristos ["Papachristos"] and Dookhan corresponded by email of a personal nature on numerous occasions in violation of DPH policy.

46. In 2009, Papachristos reported the emails and his concern regarding the nature of his relationship with Dookhan to then Norfolk District Attorney Keating who took no action. Rather, Papachristos continued for two years to engage in and foster a personal relationship with Dookhan.

47. As a result of Keating's failure to supervise Papachristos and divulge and investigate the inappropriate contact between his employee and Dookhan discovered as early as 2009, Dookhan continued to demonstrate favoritism to Norfolk employee officers and prosecutors to the detriment of all cases she then handled and all future cases.

48. The Defendants' acts and omissions described throughout paragraphs 1-47 of this complaint directly and proximately caused or contributed to the deprivations of the Plaintiff's rights, thereby causing the plaintiff to suffer severe permanent personal and emotional injuries, including but not limited to loss of liberty, loss of income, humiliation, emotional distress and the loss of companionship.

## V.  CLAIMS

### COUNT I:
### VIOLATION OF 42 U.S.C. §1983 BY DEFENDANTS DOOKHAN, KEENAN, THE COMMONWEALTH OF MASSACHUSETTS, THE SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, AND THE NORFOLK COUNTY DISTRICT ATTORNEY'S OFFICE

49. The Plaintiff restates the allegations in paragraphs 1 through 47 and incorporates said paragraphs herein as paragraph 48.

50. By the actions described in paragraphs 1 through 47, all Defendant's to this action so named above, acting under color of law deprived the Plaintiff of due process of law, procedurally and substantively, in violation of 42 U.S.C. §1983 and the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and are jointly liable.

51. As a proximate result of these actions, Solomon has suffered damages in an amount to be determined at trial.

### COUNT II:
### VIOLATION OF 42 U.S.C. § 1983 CONSPIRACY BY DEFENDANTS ANNIE DOOKHAN, DONALD KEENAN, AND SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE

52. The Plaintiff repeats and restates the allegations in paragraphs 1 through 50 and incorporates said paragraphs herein as paragraph 52.

53. By the actions described in paragraphs 1 through 52, the Defendants so named in this count conspired together to deprive the Plaintiff of exculpatory evidence, a fair trial, and his procedural and substantive constitutional rights and are jointly liable.

54. As a proximate result of these actions, Solomon has suffered damages in an amount to be determined at trial.

### COUNT III:
### VIOLATION OF M.G.L. c. 12 §111 BY DEFENDANT'S KEENAN, SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, AND DOOKHAN

55. The Plaintiff restates the allegations in paragraph 1 through 54 and incorporates said

paragraphs herein as paragraph 55.

56. By the actions described in paragraphs 1 through 55, Defendants Donald Keenan, Suffolk County DA's Office, and Dookhan deprived the Plaintiff of his civil rights, secured by the Constitutions of the United States and the Commonwealth of Massachusetts, through the use of threats, intimidation, and coercion, in violation of M. G. L. c. 12, §111.

57. As a proximate result of these actions, Solomon has suffered damages in an amount to be determined at trial.

### COUNT IV:

### CONSPIRACY TO VIOLATE M.G.L. c. 12 §111 BY DEFENDANT'S KEENAN, SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, AND DOOKHAN

58. The Plaintiff restates the allegations in paragraph 1 through 57 and incorporates said paragraphs herein as paragraph 58.

59. By the actions described in paragraphs 1 through 58, Defendants Keenan, Suffolk County DA's Office, and Dookhan, while acting under color of state law, did conspire to deprive the Plaintiff of his civil rights, secured by the Constitutions of the United States and the Commonwealth of Massachusetts, through the use of threats, intimidation, and coercion, in violation of M.G.L. c. 12, §111.

60. As a proximate result of these actions, Solomon has suffered damages in an amount to be determined at trial.

WHEREFORE, the Plaintiff requests that this Honorable Court:

1. Award compensatory damages, including prejudgment interest, against all the Defendants jointly and severally;

2. Award punitive damages, including prejudgment interest, against all the Defendants;

3. Award the costs of this action, including reasonable attorney's fees and other associated expenses.

## JURY DEMAND

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a jury trial for all issues so triable.

Jeffrey Solomon,
By his Attorneys,

/s/ Victoria Kelleher                    /s/ Joseph M. Perullo
_____      _____
Victoria Kelleher                        Joseph M. Perullo
BBO# 637908                           BBO# 670542
15 Church Street                       185 Devonshire Street, Suite 200
Salem, MA 01970                     Boston, MA 02110
(978)744-4126– p                    (617)423-0030-p
(978)744-4127 – f                    (617)556-9965-f
vkelleher@verizon.net            jp@josephperullo.com

Dated:  February 1, 2013