UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JEFFREY SOLOMON,                        )
                                        )
          *Plaintiff*,                  )
                                        )
v.                                      )          Civil Action No. 13-10208-GAO
                                        )
ANNIE DOOKHAN, et al.,                  )
                                        )
          *Defendants*.                 )
_____ )

REPORT AND RECOMMENDATIONS
ON DEFENDANTS' RULE 12 MOTIONS

January 7, 2013

SOROKIN, C.M.J.

The Plaintiff, Jeffrey Solomon, has brought suit against ten Defendants (principally police

officers, prosecutors, and employees of the Massachusetts Department of Public Health)[1] alleging

violations of 42 U.S.C. § 1983 and of the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11,

stemming from his December, 2010 arrest on drug-related charges.  Docket # 14.

Pending are seven motions brought pursuant to Fed. R. Civ. P. 12: (1) the Motion to

Dismiss of Defendants Daniel Conley and the Suffolk County District Attorney's Office (Docket

# 16); (2) Defendant Donald Keenan's Motion to Dismiss (Docket # 36); (3) Defendant Kate

Corbett's Motion for Judgment on the Pleadings (Docket # 65); (4) Defendant Julie Nassif's

---

[1]  One defendant, JudyAnn Bigby, was at all relevant times the Secretary of the Executive
Office of Health and Human Services of the Commonwealth of Massachusetts.  Docket # 14 at ¶
5.

Motion to Dismiss (Docket # 105); (5) Defendant Linda Han's Motion to Dismiss (Docket # 82); (6) Defendant John Auerbach's Motion to Dismiss (Docket # 98); and (7) Defendant JudyAnn Bigby's Motion to Dismiss (Docket # 97).

For the following reasons, I RECOMMEND that the Court ALLOW Defendant Conley's, Defendant Auerbach's and Defendant Bigby's motions and that it DENY each of the remaining motions.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Defendant Keenan is employed as a detective by the City of Boston Police Department.[2] Docket # 14 at ¶ 4.  On December 12, 2010, Keenan (who was working undercover) engaged Plaintiff Jeffrey Solomon in an undercover buy of alleged crack cocaine.  Id. at ¶ 12.  Solomon was arrested, and he told the arresting officers that the substance in question was counterfeit, and not crack cocaine.  Id. at ¶ 13.  Keenan conducted a preliminary field test.  Id.  To conduct the testing, Keenan swiped the substance with a "Narc Swipe."  Id.  If the substance had been cocaine, both the swipe and substance would turn blue.  Id.  Keenan noted no color change to either the substance or the swipe.  Id.  Solomon was charged with distribution of a counterfeit substance, a misdemeanor offense with a maximum penalty of one year of incarceration in the house of correction.  Id.

Keenan disposed of both the portion of the substance he had tested and the swipe he had used to do so.  Id. at ¶ 14.  The entirety of the remaining substance was forwarded by Keenan to the Department of Public Health's (DPH's)  Hinton Laboratory in Jamaica Plain for testing and

_____

[2]  In keeping with the standard applicable to motions brought pursuant to Fed. R. Civ. P. 12, the allegations of the Amended Complaint are recited herein as if true.  Additional factual allegations are recited below where particularly relevant to individual motions.

analysis.  Id.  On December 16, 2010, the Hinton Laboratory received the substance and placed it in its evidence safe.  Id. at ¶ 15.

Defendant Annie Dookhan was at all relevant times a chemist employed by DPH.  Id. at ¶ 2.  On February 28, 2011, the substance was released from the evidence locker to Dookhan.  Id. at ¶ 16.  On March 1, 2011, Dookhan recorded that she had conducted three tests on two separate samples of the substance, when in fact she had not conducted any testing.  Id.  Dookhan falsely recorded that the samples of the substance tested positive for cocaine.  Id.

Defendant Kate Corbett was also at all relevant times a chemist employed by DPH.  Id. at ¶ 3. On March 3, 2011, Corbett recorded that she had conducted confirmatory testing on the samples, indicating that both samples were too weak to confirm Dookhan's results.  Id. at ¶¶ 17-18.  Corbett recorded the "weak results" on a control sheet and control card, and returned the samples to Dookhan.  Id.

On March 7, 2011, Dookhan provided a second set of samples to Corbett for testing, and on the same date Corbett recorded on a second control sheet that she had confirmed the presence of cocaine.  Id. at ¶ 19.  In fact, Corbett had not conducted confirmatory testing, but rather had reviewed results of testing conducted by Dookhan.  Id. at ¶ 20.

Corbett was aware that Dookhan had previously forged Corbett's initials on documents provided to others in the course of criminal prosecutions.  Id. at ¶ 21.  Corbett did not report these instances of forgery.  Id.

Two drug certificates were issued, bearing the signatures of Dookhan and Corbett, certifying that the samples of the substance taken from Solomon were cocaine.  Id. at ¶ 22.  On March 10, 2011, the substance was returned to the Hinton Laboratory evidence locker.  Id.

On April 13, 2011, Solomon's counsel from the Committee for Public Counsel Services (CPCS) and the prosecuting attorney met with Keenan at the Boston Municipal Court to inspect the evidence.  Id. at ¶ 23.  Solomon's counsel inspected the substances in two bags produced by Keenan and observed that there was not blue coloring on any of the substances.  Id. at ¶ 24. Keenan stated that his usual practice was to throw the tested pieces on the ground, and that that was probably what happened to the piece he had swiped after arresting Solomon.  Id. at ¶ 25. Speaking privately with Solomon's counsel, Keenan told her that "they had had a lot of problems with CPCS, and that they could make things easy or not" and that "Solomon had been around a long time and in Keenan's opinion, Solomon was not a good guy."  Id. at ¶¶ 25-26.

On July 1, 2011, Keenan was the only witness to appear before a grand jury summoned by a Suffolk County Assistant District Attorney (ADA).  Id.  Keenan falsely testified under questioning by the ADA that because crack cocaine can be homemade, the mixture would not be consistent throughout the whole entire piece of crack cocaine.  Id. at ¶ 29.  Keenan also falsely testified that although the preliminary field testing showed no initial color change consistent with cocaine, he later viewed the substance at an undisclosed date and observed such a color change.  Id.  At the ADA's request, Keenan introduced to the grand jury the two false certifications signed by Dookhan and Corbett.  Id. at ¶ 30.

The grand jury issued indictments against Solomon for Possession with Intent to Distribute a Class B Substance in a School Zone as a Subsequent Offense, and Distribution of a Class B Substance in a School Zone as a Subsequent Offense, which carried two mandatory minimum state prison sentences of seven years.  Id. at ¶ 31.  Dookhan and Corbett were identified to Solomon by the ADA as potential expert witnesses at trial.  Id. at ¶ 33.  On the

curriculum vitae provided to Solomon, Dookhan misrepresented herself as having received a Masters of Science degree in Chemistry from the University of Massachusetts. Id. at ¶ 34.

The ADA did not provide to Solomon either the initial Control Sheet or the back side of the Control Card, which reported that the initial confirmatory testing indicated that the substance was too weak to confirm the presence of cocaine. Id. at ¶ 35. Solomon alleges that the Suffolk County District Attorney's Office had a practice of failing to provide this type of exculpatory evidence in cases where a substance was tested more than once. Id.

On September 27, 2012, the State Police Department's Crime Laboratory retested the substances that had been field tested by Keenan and analyzed by Dookhan and Corbett and detected no controlled substances. Id. at ¶ 36. On the following day, a detective of the State Police filed a Statement of Probable Cause seeking a complaint charging Dookhan, inter alia, with obstructing justice by the filing of a false report of cocaine in Solomon's case. Id. at ¶ 37. On October 5, 2012, citing the criminal case against Dookhan, the Commonwealth filed a nolle prosequi in Solomon's criminal case.[3] Id. at ¶ 38.

Solomon alleges that he was "held on bail in connection with the prosecution of this case such that his liberty was restrained." Id. at ¶ 38. The Defendants contend otherwise. See, e.g., Docket # 37 at 6 n.2. Keenan asserts that Solomon suffered no harm because, according to Keenan, the docket from Solomon's case establishes that once arrested, he was "also held on an outstanding warrant for drug-related charges in Cambridge." Id. While the Court can and does take judicial notice of Solomon's state court docket (appearing at Docket #37-1), the notations

---

[3] The factual background omits additional allegations directed against non-movant defendants.

therein referring to Solomon being "held on other case in Camb." or that he "is being held on a

different case" (id. at 6, 8) do not establish that for the entire time from the indictment to the

dismissal the present case neither resulted in his detention nor in a restraint on his liberty.[4]

II.     DISCUSSION

Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient

factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)).  The Court "must take the allegations in the complaint as true and must make all

reasonable inferences in favor of the plaintiff[]." Watterson v. Page, 987 F.2d 1, 3 (1st Cir.

1993).  This "highly deferential" standard of review "does not mean, however, that a court must

(or should) accept every allegation made by the complainant, no matter how conclusory or

generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992).  Dismissal for

failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations,

either direct or inferential, respecting each material element necessary to sustain recovery under

some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting

Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988) (internal quotation marks omitted).

The tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions. Iqbal, 556 U.S. at 678.  Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice.  Id.  The Court's

---

[4]  The docket Keenan attached names the defendant as "Jeffrey Banks AKA Jeffrey
Solomon."  Docket # 37-1 at 1. For present purposes, the Court assumes that Banks is Solomon
by another name.

assessment of the pleadings is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense." <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 663-64). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief." <u>Id.</u>

A Rule 12(c) motion for judgment on the pleadings[5] "is treated much like a Rule 12(b)(6) motion to dismiss." <u>Perez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008).  Because a Rule 12(c) motion "calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's [benefit]." <u>R.G. Financial Corp. v. Vergara-Nunez</u>, 446 F.3d 178, 182 (1st Cir. 2006).

**<u>Motion of Defendant Conley and Suffolk County District Attorney's Office</u>**

The Suffolk County District Attorney's Office and Defendant Daniel Conley (collectively, 'Conley') move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint on the grounds that all of the actions alleged against it by Solomon are subject to an absolute prosecutorial immunity.  <u>See</u> Docket # 18.  Solomon has sued Conley in both his official and individual capacities.  Docket # 14 at ¶ 11.

The Amended Complaint contains the following additional factual allegations regarding Conley.

1.  that the Suffolk County District Attorney's Office had "a practice of correspondence with the Hinton Lab chemists, both before and after the testing in

---

[5]  Defendant Corbett's motion is brought pursuant to Fed. R. Civ. P. 12(c).

the Suffolk County prosecution involving allegations of illegal drugs." Id. at ¶ 32;

2.     that the District Attorney's Office "failed to enact any internal policy concerning communications between chemists and assistant district attorneys. Rather, the policy, custom and practice provided for direct communication between the chemists and prosecuting assistant district attorneys prior to testing the alleged substances." Id. at ¶ 52;

3.     that the District Attorney's Office had a "practice of failing to provide this type of exculpatory evidence [(the Control Sheet or back of the control card)] in cases where a substance was tested more than once." Id. at ¶ 35;

4.     that the District Attorney's Office failed to train its employees concerning any existing policies for preserving and producing exculpatory evidence. Id. at ¶ 53;

5.     that the District Attorney's Office had a policy, custom and practice that defense counsel was not made aware of the existence of exculpatory evidence from the Hinton Lab. Id. at ¶ 54.

6.     that the District Attorney's Office elicited false testimony in Solomon's case before the grand jury. Id. at ¶ 29.

Solomon brings one claim against Conley, in Count VII, for a violation of Solomon's rights secured by the Due Process Clause of the Fourteenth Amendment arising out of the District Attorney's Office's direct communication with the chemists, failure to provide exculpatory evidence and the Office's failure to train its staff with respect to all of these issues (amounting collectively to a deliberate indifference to Solomon's constitutional rights as described in Counts II - IV). Docket #14 at ¶¶ 75-77.

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) (quoting Burns v. Reed, 500 U.S. 478, 486 (1991)). The applicability of the absolute

8

prosecutorial immunity turns upon the nature of the actions allegedly performed by the District Attorney's Office employees, a point upon which the Parties agree.  See, e.g., Docket # 18 at 4 (citing Buckley, 509 U.S. at 269); Docket # 29 at 5.  The Supreme Court has made clear that absolute prosecutorial immunity reflects "a balance" of "evils."  Van de Kamp v. Goldstein, 555 U.S. 335, 340 (2009) (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2nd Cir. 1949)).

Whether the immunity applies in a given instance turns upon a functional analysis assessing whether absolute immunity attaches to a particular kind of prosecutorial activity. Id. (citing Burns, 500 U.S. at 486 (collecting cases applying "functional approach" to immunity)). The Supreme Court has held that the absolute immunity applies, for example, when a prosecutor: (1) prepares to initiate a judicial proceeding, Burns, 500 U.S. at 492, (2) appears in court to present evidence in support of a warrant application, Kalina v. Fletcher, 522 U.S. 118, 126 (1997), and (3) engages in supervision, training, or information-system management, Van de Kamp, 555 U.S. at 344.  On the other hand, it has found absolute immunity to be inapplicable when a prosecutor (1) gives advice to police during a criminal investigation, Burns, 500 U.S. at 496, (2) makes statements to the press, Buckley, 509 U.S. at 277, or (3) acts as a complaining witness in support of a warrant application, Kalina, 522 U.S. at 132 (Scalia, J. concurring).

Soloman's allegations regarding the suppression of exculpatory evidence and the failure to train ADAs regarding their obligations to disclose exculpatory evidence are strikingly similar to the allegations considered by the Supreme Court in Van de Kamp.  See 555 U.S. at 344-45 (dismissing claim of an alleged failure to train and to supervise prosecutors and to establish an information system about informants as barred by absolute prosecutorial immunity).  The Court determined that although the challenged training and information management actions were

administrative procedures, nevertheless they were "a certain kind of administrative obligation—a kind that itself is directly connected with the conduct of a trial." Id. at 344.  Solomon's allegations concerning the training of prosecutors with respect to their Brady[6] obligations and communication with the Hinton Lab are tied to the conduct of criminal trials in the same way as the allegations in Van de Kamp.

Several other issues remain.  First, Solomon points to the Supreme Court's decision in Connick v. Thompson, 131 S.Ct. 1350 (2011), in which it considered whether similar claims made against the District Attorney in New Orleans were sufficient to establish Brady violations.  While the Court discussed extensively the level of proof necessary to establish a constitutional violation arising out of the failure to train regarding Brady obligations, it never considered the applicability of a prosecutorial immunity.  The Connick decision does not alter the Court's immunity jurisprudence, despite Solomon's implicit suggestion that it does so.  The Court itself noted that "the only issue before us is whether Connick, as the policymaker for the district attorney's office, was deliberately indifferent to the need to train the attorneys under his authority."[7]  Id. at 1366.

Second, Solomon has alleged the subornation of perjury.  Plainly, this falls within the Supreme Court's definition of trial-related activities.  See Imbler v. Pachtman, 424 U.S. 409, 416-17, 421-31 (1976); see also Goldstein v. Galvin, 719 F.3d 16, 24 (1st Cir. 2013) ("The protection afforded by an absolute immunity endures even if the official acted maliciously and

---

[6] See Brady v. Maryland, 373 U.S. 83 (1963).

[7] The claim of immunity had previously been rejected by the trial court, in a pre-Van De Kamp ruling.  See Thompson v. Connick, No. Civ.A.03-2045, 2005 WL 3541035 (E.D. La. Nov. 15, 2005) (Barbier, J.).

corruptly in exercising his judicial or prosecutorial functions." (internal quotation marks
omitted)); <u>Siano v. JJ. of Mass.</u>, 698 F.2d 52, 58 (1st Cir. 1983) (when prosecutor wrongfully
presents false evidence, or otherwise engages in trial misconduct, jury and defense counsel serve
to preserve integrity of truthseeking enterprise).  Finally, Solomon has also alleged direct
communications between Assistant District Attorneys and lab technicians pursuant to a custom
or practice of the District Attorney's Office.  This allegation fails.  Insofar as the ADAs were
communicating with trial witnesses regarding their anticipated testimony and related
documentary exhibits, that activity qualifies as a trial-related activity deserving of absolute
prosecutorial immunity.  Insofar as the activity falls outside of that rubric, the Amended
Complaint lacks sufficient allegations to plausibly state a claim that Conley was deliberately
indifferent to a constitutional violation of Solomon's rights arising from such communication
which, per the Amended Complaint, concerned the timing of the testing of specific substances.
<u>See</u> Docket # 14 at ¶ 48 G ("Dookhan was contacted directly by ADAs and police officers about
specific samples, which she would then "pull" for analysis, even out of order, despite lab policies
forbidding both this contact and action").[8]

     For the foregoing reasons, I RECOMMEND that the Court ALLOW Defendant Conley's
Motion to Dismiss (Docket # 16).

---

[8] Solomon also argues that, "where the violation is endemic to the prosecution of all
Suffolk County drug cases, the rationale behind absolute immunity fails because the prosecutor is
not subject to any ill-effects for her decision-making pertaining to any one particular case."
Docket # 29 at 9.  The Supreme Court, however, addressed that issue in <u>Van de Kamp</u> when it
held that absolute immunity applies to certain prosecutorial activities due to "a balance of evils"
reflected within the doctrine.  <u>See</u> 555 U.S. at 340-41 (quoting <u>Gregoire</u>, 177 F.2d at 581).

**Motion of Defendant Keenan**

Detective Keenan moves to dismiss the claims directed against him (Count I, for Malicious Prosecution; Count IV, for violation of Solomon's due process rights; and, Count VIII, for violation of the Massachusetts Civil Rights Act) on the basis that Counts I and VIII are insufficiently pleaded, and that Keenan in any event enjoys qualified immunity protecting him from suit. Solomon summarizes the allegations against Keenan as being that he "destroyed exculpatory evidence, obstructed justice, engaged in intimidation tactics, and committed perjury before the Grand Jury in order to ensure Solomon's prosecution in Suffolk Superior Court." Docket # 14 at 1.

Sufficiency of Pleading

Count IV

In Count IV, Solomon asserts a violation of his due process rights under the Fourteenth Amendment arising from Keenan's alleged intentional failure to provide exculpatory evidence to the prosecutor and his intentional fabrication of evidence (done with the intent of misleading the jurors and public officials engaged in the proceedings). Docket # 14 at ¶ 66.

Keenan moves to dismiss on three grounds. First, he asserts that a violation of the procedural due process obligation imposed upon law enforcement officers by the Fourteenth Amendment can occur only in the context of a trial. See Docket #37 at 5-6. Because the prosecutor dismissed the charges against Solomon before any trial was conducted, Keenan contends that Solomon suffered no prejudice from Keenan's actions within the meaning of Brady, 373 U.S. 83 (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

12

punishment").

Keenan's discarding of the controlled substance at the time of the arrest was in any event not a <u>Brady</u> violation because the material was not "exculpatory," since Solomon was then charged only with selling a counterfeit controlled substance. Although the material became "exculpatory" no later than when Solomon was indicted some time after July 1, 2011, for the sale of a controlled substance, Keenan had already revealed to Solomon's counsel in April, 2011, that he had previously disposed of the material in keeping with his usual practice. Docket # 14 at ¶¶ 23-25. While the Court agrees that a <u>Brady</u> claim does not lie against Keenan, that is not – in and of itself – dispositive of the question of whether any due process claim lies against him (<u>see infra</u>).

Keenan also argues that Solomon was neither arrested nor held on the drug distribution charges. Both of these defense theories raise factual questions not amenable to resolution on a Rule 12(b)(6) motion. Thus, at least on this record, this case is not akin to <u>Faust v. Coakley</u>, No. 07-11209-RWZ, 2008 WL 190769 (D. Mass. Jan. 8, 2008) (Zobel, J.) in which the defendant was never arrested or detained.

Finally, Keenan contends that he is immune from liability arising from his allegedly perjured testimony before the Grand Jury. Keenan is correct. <u>See</u> <u>Briscoe v. LaHue</u>, 460 U.S. 325 (1983) (holding all trial witnesses, including police officers, are immune from Section 1983 liability arising from their testimony); <u>Rehberg v. Paulk</u>, 132 S.Ct. 1497 (2012) (same, with respect to grand jury testimony).

However, the fact that Keenan is alleged by Solomon to have engaged in unconstitutional misconduct, and then to have engaged in further misconduct in an immunized capacity (<u>i.e.</u>, his

grand jury testimony) does not serve to immunize him retroactively with respect to the earlier acts. See, e.g., Zahrey v. Coffey, 221 F.3d 342, 353 (2nd Cir. 2000) (quoting White v. Frank, 855 F.2d 956, 961 (2nd Cir. 1988)) ("a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity. . . . '[T]he fact that [the officer's] testimony at a judicial proceeding may have been the means by which he initiated the prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution'").  It is also potentially evidence with respect to the allegation plausibly made in the Amended Complaint that Keenan colluded with Dookhan and the ADA, intending to frame Solomon, which would also state a claim for violation of his due process rights.  Even where Brady is not implicated,  state actors nevertheless violate an accused's due process rights when they engage in a "deliberate deception."  Haley v. City of Boston, 657 F.3d 39, 49 (1st Cir. 2011) (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)). "Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights." Id. (citing Newsome v. McCabe, 256 F.3d 747, 753 (7th Cir. 2001)); Pierce v. Gilchrist, 359 F.3d 1279, 1299 (10th Cir. 2004); see also Limone v. Condon, 372 F.3d 39, 44–45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").  As in Limone, Solomon's allegations here are broader than a Brady claim.  The Limone court wrote:

> The plaintiffs have not pleaded a separate claim that their rights were violated merely by the appellants' failure to divulge some discrete piece of Brady evidence. Rather, they have eschewed such a course in favor of a more sweeping accusation that the appellants actively participated in a plot to secure and sustain unjust convictions against innocent

14

men.

<u>Limone</u>, 372 F.3d at 46.  Likewise, Solomon alleges not that Keenan merely disposed of the

tested substance, but then was otherwise an unwitting collateral victim of Dookhan's misconduct.

Rather, he plausibly alleges that Keenan, along with Dookhan, knowingly sought Solomon's

wrongful conviction by: failing to provide the field test materials; attempting to intimidate

Solomon's counsel; seeking an indictment of Solomon on the felony charge; and offering false

(albeit immunized) testimony and evidence to the grand jury.

Accordingly, I RECOMMEND that the Court DENY Keenan's objections to the pleading

of Count IV.[9]

Count VIII

In Count VIII, Solomon brings a claim against Keenan pursuant to M.G.L. c. 12, §11I

(the Massachusetts Civil Rights Act) for violation of his civil rights "through the use of threats,

intimidation, and coercion."  Docket # 14 at ¶¶ 78-79.  Keenan argues that the claim is

insufficiently pleaded in that it lacks allegations that Keenan threatened, intimidated or coerced

Solomon.  Docket # 37 at 8-9.  Drawing reasonable inferences in Solomon's favor (as the Court

must on a Rule 12 motion), the Amended Complaint alleges that Keenan attempted to threaten,

intimidate and coerce Solomon through statements made to his counsel and through the

continuation of the criminal proceedings (which involved the pretrial detention of Solomon or a

restraint on his liberty) premised, in part, on Keenan's (alleged) lie to the grand jury.

_____

[9]  Although Keenan, like many of the defendants, maintains that a fully-developed factual
record will not support the claims, the Court is obliged at this stage to accept all well-pleaded
facts alleged in the Amended Complaint as true and to draw all reasonable inferences in
Solomon's favor.

Qualified Immunity

Keenan also asserts that each claim directed against him should be dismissed on the basis

of his qualified immunity from suit.  The doctrine of qualified immunity protects government

officials "from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982)).  "Qualified immunity balances two important interests—the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably."  Id.

Because qualified immunity is "an immunity from suit rather than a mere defense to

liability . . . it is effectively lost if a case is erroneously permitted to go to trial."  Id. (quoting

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis deleted)).  The "driving force" behind

creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims'

against government officials [will] be resolved prior to discovery."  Id. at 232 (quoting Anderson

v. Creighton, 483 U.S. 635, 640 n.2 (1987)).

The Supreme Court has outlined a two-step sequence for resolving government officials'

qualified immunity claims.  Id.  A court must decide whether the facts that a plaintiff has alleged

(in the case of a Rule 12 motion) make out a violation of a constitutional right.[10]  Id.  The court

must also decide whether the right at issue was "clearly established" at the time of the

---

[10]  In Pearson, the Supreme Court withdrew its previous mandate (announced in Saucier
v. Katz, 533 U.S. 194 (2001)), that district courts inquire first into whether a violation of a
constitutional right was alleged, and next proceed to inquire whether that right was clearly
established only if it found the plaintiff had satisfied that initial step.  See Pearson, 555 U.S. at
236-43.

defendant's alleged misconduct.  Id.  Qualified immunity is applicable unless the official's

conduct violated a clearly established constitutional right.  Id. (citing Anderson, 483 U.S. at 640).

Although Keenan asserts that each of the claims should be dismissed on the basis of

qualified immunity, he develops his argument only with respect to the malicious prosecution

claim in Count I.  He asserts that that claim must be dismissed in that the law was not clearly

established because the First Circuit has not yet definitively ruled as to whether a malicious

prosecution claim may arise from a Fourth Amendment seizure.  Docket # 37 at 10 (citing

Moreno-Medina v. Toledo, 458 Fed. Appx. 4, 6-8, (1st Cir. 2012) (court has previously assumed

without deciding that such a claim lies); Wilson v. Teves, No. 11-11362-GAO, 2012 WL

3800847 (D. Mass. Sept. 4, 2012) (O'Toole, J.)).

Although Judge O'Toole indeed found that the Section 1983 malicious prosecution claim

in Wilson was subject to dismissal on the basis of qualified immunity, he did so on the basis of

the plaintiff's failure to allege a Fourth Amendment seizure (that is, a failure to allege a

constitutional violation in prong one of the qualified immunity analysis), rather than on the basis

suggested by Keenan (that is, that the violation was not clearly established).  Id. at *2.[11]

Solomon, in contrast, has alleged a seizure within the meaning of the Fourth Amendment.  See

Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001) (generally, a Fourth Amendment seizure

would come "either in the form of an arrest warrant (in which case the arrest would constitute the

seizure) or a subsequent charging document (in which case the sum of post-arraignment

deprivations would comprise the seizure)").

---

[11]Indeed, in Wilson, Judge O'Toole stated: "The First Circuit has 'assumed[d] without
deciding' that a violation of the Fourth Amendment may be sufficient to ground an action for
malicious prosecution under § 1983."  Wilson, 2012 WL 3800847, at *1.

More than twenty years ago, the First Circuit recognized a substantive or procedural due process right to be free from malicious prosecution.

> [a]ll federal claims for malicious prosecution are borrowed from the common law tort . . . [which] imposes liability on a private person who institutes criminal proceedings against an innocent person without probable cause for an improper purpose. The federal claim under section 1983 for malicious prosecution differs from the state civil suit in that it requires that state officials acting 'under color of law' institute criminal proceedings against the plaintiff and thereby deprive him of rights secured under the Constitution.

Smith v. Massachusetts Dep't of Correction, 936 F.2d 1390, 1402 (1st Cir.1991) (quoting Torres v. Superintendent of Police, 893 F.2d 404, 409 (1st Cir. 1990)).  Malicious prosecution, it noted, does not per se abridge rights secured by the Constitution.  Id.

> In articulating the elements of a malicious prosecution claim under 42 U.S.C. § 1983, we have held that the complaint must assert that the malicious conduct was so egregious that it violated substantive or procedural due process rights under the Fourteenth Amendment . . . the plaintiff usually must show the alleged conduct deprived him of liberty by a distortion and corruption of the processes of law, i.e., corruption of witnesses, falsification of evidence, or some other egregious conduct resulting in the denial of a fair trial . . .  In addition, the plaintiff must show there was no adequate state post deprivation remedy available to rectify the harm. If state tort law furnishes an adequate remedy, the plaintiff does not have a Section 1983 cause of action merely because the defendant is a government official.

Id. (internal citations omitted).[12]

In Albright v. Oliver, 510 U.S. 266 (1994), the Supreme Court foreclosed the possibility of malicious prosecution claims arising from substantive due process, cast doubt upon the vitality

---

[12] As described here, there is a certain overlap between Solomon's Section 1983 malicious prosecution claim in Count I (which must amount to a due process violation to be actionable) and his Section 1983 due process claim in Count IV (which as noted supra, at 13-14, includes the actions forming the basis of the malicious prosecution claim).  The Defendants have not raised this issue.  One of the claims may be superfluous, and the Court may wish to address this at summary judgment or prior to trial.

of malicious prosecution claims founded in procedural due process, and "strongly suggested in dicta" that there was a Fourth Amendment right to be free from malicious prosecution. Hernandez-Cuevas v. Taylor, 723 F.3d 91, 98-99 (1st Cir. 2013) (citing Albright, 510 U.S. at 274). Recently, the First Circuit noted that "[t]here has long been a sense among the courts that the Constitution provides some protection for individuals who are targeted for unreasonable, baseless prosecutions, and who, as a result, are detained without probable cause during the pretrial period." Hernandez-Cuevas, 723 F.3d at 98. The First Circuit had, in the intervening period, assumed without deciding that a Fourth Amendment malicious prosecution claim was viable. See, e.g., Britton v. Maloney, 196 F.3d 24, 28 (1st Cir. 1999); Nieves, 241 F.3d at 54. The Hernandex-Cuevas court noted that each of the eight Courts of Appeal to consider the question since Albright had recognized a Fourth Amendment malicious prosecution claim. Id. (collecting cases).

Although a "broad consensus" emerged in the years subsequent to Albright that "the Fourth Amendment right to be free from seizure but upon probable cause extends through the pretrial period," circuits were divided as to the elements of such a claim, with four circuits adopting a "purely constitutional approach, requiring the plaintiff to demonstrate only a Fourth Amendment violation" and four others adopting a "blended constitutional/common law approach, requiring the plaintiff to demonstrate a Fourth Amendment violation and all the elements of a common law malicious prosecution claim." Id. The practical difference between the approaches is that the latter approach requires the plaintiff to demonstrate that the defendant acted with subjective malice. Id.

In Hernandez-Cuevas, the First Circuit explicitly joined with those circuits employing the

constitutional approach, and held that a plaintiff may bring a malicious prosecution claim under

§ 1983 if he or she can establish that the defendant (1) caused (2) a seizure of the plaintiff

pursuant to legal process unsupported by probable cause, and (3) criminal proceedings

terminated in the plaintiff's favor.  Id. at 100-101.  Although it did so in 2013, the Court

nevertheless noted that

> [t]his holding makes explicit what has long been implicit in our case law.  In the past
> we have held that 'some truths are self-evident. . . . [I]f any concept is fundamental to
> our American system of justice, it is that those charged with upholding the law are
> prohibited from deliberately fabricating evidence and framing individuals for crimes
> they did not commit.'

Id. at 100 (quoting Limone v. Condon, 372 F.3d 39, 44–45 (1st Cir. 2004)).

Although qualified immunity presents a legal issue, courts analyzing the issue must be

careful "not to permit a defendant to hijack the plaintiff's complaint and recharacterize its

allegations so as to minimize his or her liability."  Limone, 372 F.3d at 46.  A fair reading of the

Amended Complaint is that Solomon alleges that Keenan joined with Dookhan and others in a

scheme to falsify evidence, destroy and withhold exculpatory evidence, obstruct justice and offer

false testimony.  At no point could a reasonable police officer have believed that such conduct

would be permissible.  Qualified immunity does not bar any of the claims asserted against

Keenan.

### Further Factual Allegations Regarding DPH Officials

In June 2011, Defendant Bigby, the Secretary of the Executive Office of Health and

Human Services, was aware that Dookhan was testing and certifying substances at a rate that was

fifty percent higher than any other chemist.  Docket # 14. at ¶¶ 5, 40.  Bigby has characterized

Dookhan's extremely high productivity as, "a red flag that wasn't appropriately investigated."

Id.  Bigby and Defendant Auerbach, the Commissioner of DPH,  "maintained outdated operating procedures for the Hinton Lab, and undertook no action toward independent accreditation."  Id. at ¶ 41.  A December 2011 investigation of Dookhan had failed to uncover misconduct later uncovered by the State Police.  Id. at ¶ 43.  The results of the December 2011 investigation were withheld from supervisors of the Hinton Laboratory (including Han, the Director of the Lab) with their assent, so that they would not be subject to examination in court.  Id. at ¶ 45.  In December, 2012, Defendant Auerbach resigned, writing that, "[i]t is clear that there was insufficient quality monitoring, reporting, and investigating on the part of supervisors and managers surrounding the former Department of Public Health drug lab in Jamaica Plain."  Id. at ¶ 46.

The State Police Report of its investigation of the Hinton Laboratory reported, inter alia, that the Hinton Laboratory had "a culture of lax oversight."  Id. at ¶ 48.  Procedures to restrict access to the evidence room were ignored and circumvented.  Id.  The safe was found open and unattended, was left propped open when it was "busy," and was accessible by codes and keys that had not been changed in over a decade.  Id.  The palm reader access point to the evidence room was not recording those who entered, or that information was not preserved properly, or was destroyed.  Id.  The number and identities of chemists with keys to the safe was unknown.  Id. The laboratory did not have in place safeguards or policies to prevent assistant district attorneys and police officers from contacting a specific chemist about a specific case or cases, and in fact, such communication was the custom and practice of the lab.  Id. at ¶¶ 48, 52.

Solomon alleges that the defendant supervisors and officials (including Bigby, Auerbach and Han) "failed to prohibit direct contact between DPH chemists and prosecuting Assistant District Attorneys prior to testing the substances in the cases being prosecuted" and also "failed

to train their employees concerning any existing policies of communicating between Hinton lab and the District Attorneys' Offices." Id. at ¶ 51.  Solomon alleges that the defendant supervisors and officials (including Han, Bigby and Auerbach) "failed to train their employees concerning any existing policies for preserving and producing exculpatory evidence, including exculpatory evidence contained on GC/MS printouts, control sheets and control cards." Id. at ¶ 53.  Rather, the policy, custom and practice provided that defense counsel was not made aware of the existence of such exculpatory evidence." Id. at ¶ 54.

The State Police reported that Dookhan: (1) forged other chemists' and evidence officers' initials in an unknown number of instances; (2) maintained a level of production that concerned supervisors and co-workers, often analyzing more samples in a week than they did in a month; (3) failed to follow basic lab procedures with respect to documentation, calibration and prevention of cross-contamination; (4) was permitted access to evidence, office computers, the evidence room and the lab even after her suspension; (5) altered test samples "so that they would come out the way she wanted"; (6)  was contacted directly by ADAs and police officers about specific samples, which she would then "pull" for analysis, even out of order, despite lab policies forbidding both this contact and action.  Id. at ¶ 48.

Numerous lab personnel expressed concerns about Dookhan's "workload, documentation errors, blatant forgeries, and questionable test results." Id.  Although Dookhan's work was audited in 2010, no samples were retested.  Id.  In June 2010, Han and Defendant Julie Nassif (head of the Division of Analytical Chemistry, which included the Hinton Laboratory) discovered that Dookhan had removed approximately ninety samples from the evidence room without authorization, but did not properly investigate the specific breach of protocol, Dookhan's

22

workload, her results, and/or her general lack of adherence to protocol.  Id.  They also failed to

make written findings of Dookhan's resubmittals or other Quality Control/Quality Assurance

issues that were recorded.  Id.

### Motion of Defendant Corbett

Defendant Corbett was a fellow lab technician.  Docket # 14 at ¶ 3.  Solomon has brought

two Section 1983 claims against her: (1) Count II, for violation of his rights under the Due

Process Clause arising out of the false certification; and, (2) Count V, for violation of his rights

under the Due Process Clause for intentionally failing to provide the results of the initial

confirmation test.

Corbett moves for judgment on the pleadings on the basis of qualified immunity.  She

describes her role as that of a "confirmatory chemist" who in this case did two things: first, she

found the sample too weak to confirm Dookhan's findings; second, she later examined a GC-MS

comparison sample and confirmed that the sample was cocaine.  Docket # 66 at 8.

The Court need not decide whether such limited factual allegations would suffice to

survive Corbett's motion since Solomon's Amended Complaint alleges much more.  As noted

previously, courts analyzing issues of qualified immunity such as Corbett raises must be careful

"not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so

as to minimize his or her liability."  Limone, 372 F.3d at 46.

Specifically, Solomon makes the following allegations relevant to Corbett's motion:

1.      that Corbett found the first sample of substance seized from Solomon too weak to

        confirm Dookhan's findings (Docket # 14 at ¶ 18);

2.      that Corbett later recorded that she had confirmed Dookhan's finding of the
presence of cocaine despite not having tested it herself, but rather reviewing
Dookhan's findings (id. at ¶¶ 19-20);

3.      that Corbett signed the cocaine certification under oath without any qualification
arising from the results of her first confirmation, and without revealing that first
test (id. at ¶ 22);

4.      that Corbett knew that Dookhan had forged Corbett's name on other occasions
and did not report Dookhan's misconduct (id. at ¶ 19);

5.      that "numerous lab personnel expressed concerns with Dookhan's workload,
documentation errors, blatant forgeries and questionable test results" (id. at ¶
48K);

6.      that Dookhan maintained a workspace filled with vials open to cross-
contamination (id. at ¶ 48D).

In light of these factual allegations and the reasonable inferences to be drawn therefrom,

Solomon has plausibly stated a claim against Corbett for participating in Dookhan's violation of

his constitutional rights, either knowingly or with deliberate indifference.  Qualified immunity

cannot shield Corbett from what Solomon has actually alleged in the Amended Complaint (as

opposed to the limited factual allegations from which Corbett's argument proceeds).  No

reasonable official in Corbett's position could believe that it was permissible for her (as is

alleged) to knowingly abet Dookhan's misconduct, to certify the results of testing she had not

personally conducted, to provide false certifications to be introduced to the grand jury, and to

certify without qualification that a substance was cocaine (omitting any reference to her own

initial testing to the contrary).  Although Corbett "disputes the factual account contained in

Plaintiff's Amended Complaint," this Rule 12(c) motion, at this stage of the case, is not a proper

vehicle for resolving such factual disputes.

Accordingly,  I RECOMMEND that the Court DENY Corbett's motion.

**Motion of Defendant Nassif**

Defendant Julie Nassif was in charge of the Division of Analytic Chemistry within the
Department of Public Health.  Docket # 14 at ¶ 8.  Nassif was in the direct chain of command
above Dookhan (although whether or not she was Dookhan's direct supervisor has not been
alleged).

The Parties agree that Nassif is liable, if at all, on a theory of supervisory liability.

Solomon alleges that Nassif:

1.  in June 2011, discovered that Dookhan had breached protocol and removed ninety
    samples from the evidence room without authorization, but that Nassif did not
    properly investigate the specific breach, or Dookhan's general lack of adherence
    to protocol, or make written findings of the quality control issues that were
    uncovered (Docket # 14 at ¶48 R-S);

2.  failed to adequately monitor Dookhan, and continued to permit her access to
    substances, to conduct testing, and to testify in court, even following the discovery
    of Dookhan's June 2011 breach of protocol with respect to the unauthorized
    removal of ninety samples from the evidence room (id. at ¶¶ 47);

3.  failed to take an inventory of who had keys to the evidence room after it became
    clear that an unknown number of keys opened the safe (id. at ¶ 48V-X);

4.  failed to prohibit contact between ADAs and chemists prior to testing (id. at ¶ 51);

5.  failed to train lab employees concerning policies for producing exculpatory
    evidence, including control sheets and control cards such as the one on which
    Corbett recorded her "weak" test result (id. at ¶ 53); and,

6.  acquiesced in Auerbach's concealment of the results of his investigation of
    Dookhan from her, so that she would not have to testify about same (id. at ¶ 45).

25

There is no dispute as to the governing law with respect to Nassif's motion (law which also largely governs the motions of Han, Auerbach and Bigby, infra).  Pursuant to § 1983, a supervisor can only be liable for a subordinate's behavior if "(1) the behavior of [his] subordinates results in a constitutional violation, and (2) the [supervisor's] action or inaction was affirmative[ly] link[ed] to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d. 50, 54 (1st Cir. 2008) (citations omitted).   In addition, to establish supervisory liability, Solomon must allege facts sufficient to support a finding that Nassif either had actual notice of the offending conduct of Dookhan, or that she would have known of Dookhan's conduct "but for [her] deliberate indifference." Rochleau, 115 F. Supp. 2d at 181; Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 535 (1st Cir. 2011) ("actual or constructive notice of a rights violation is a prerequisite for stating any claim").

A number of factual allegations (many allegedly drawn from the state police investigation) bear mention: (1) Dookhan tested drugs at a rate at least fifty percent higher than other lab technicians (Docket # 14 at ¶ 40); (2) Dookhan's level of production of test results concerned supervisors; (id. at ¶ 48C); (3) Dookhan left many samples out on her benchtop and maintained a work space "filled with numerous vials open to cross contamination," (id. at ¶ 48C, 48D); (4) Dookhan "ignored lab procedures" (id. at ¶ 48A); (5) the "Laboratory had a culture of lax oversight" (id. at ¶ 48J); (6) Dookhan bore "responsibil[ity] for training and for some QA/QC procedures"(id.); (7) "Numerous lab personnel expressed concerns with Dookhan's workload, documentation errors, blatant forgeries, and questionable test results" (id. at ¶ 48K); (8) the procedures "to restrict access to the evidence room were ignored and circumvented" (id. at ¶

26

48O); and (9) the "safe was found open and unattended, was left propped open when [the Lab] was 'busy,' and was accessible by codes and keys that had not been changed in over a decade" (id. at ¶ 48R).

The foregoing allegations, combined with the reasonable inferences to be drawn therefrom (and particularly when viewed in light of Nassif's role at the lab both as Director of Analytic Chemistry and within Dookhan's direct chain of supervision), suffice to state a claim of Nassif's supervisory encouragement of, condonation of, or acquiescence in Dookhan's misconduct, or of gross negligence amounting to deliberate indifference toward Solomon's constitutional rights.  See Pineda, 533 F.3d at 54.  Particularly salient is Dookhan's disturbingly high rate of production, coupled with the other warning signs both specific to Dookhan and visible to those running the lab.  Although a fully-developed factual record indeed may not ultimately support the claim, the Court is obliged at this stage to accept all well-pleaded facts alleged in the Amended Complaint as true and to draw all reasonable inferences in Solomon's favor.  See supra at 6-7.

Accordingly, I RECOMMEND that the Court DENY Nassif's motion.

**Motion of Defendant Han**

Defendant Linda Han moves to dismiss the sole claim directed against her in Count VI, arguing that the Amended Complaint fails to sufficiently plead facts supporting supervisory liability.  Han was Nassif's supervisor and the Director of the Hinton Lab.  Docket # 14 at ¶ 7.  Solomon's factual allegations with respect to Han closely mirror those concerning Nassif.  Solomon alleges that Han:

1.     in June 2011, discovered that Dookhan had breached protocol and removed ninety

27

samples from the evidence room without authorization, but that Han did not properly investigate the specific breach, or Dookhan's general lack of adherence to protocol, or to make written findings of the quality control issues that were uncovered (Docket # 14 at ¶ 48 R-S);

2.  failed to adequately monitor Dookhan, and continued to permit her access to substances, to conduct testing, and to testify in court, even following the discovery of Dookhan's June 2011 breach of protocol with respect to the unauthorized removal of ninety samples from the evidence room (id. at ¶¶ 47);

3.  failed to prohibit contact between ADAs and chemists prior to testing (id. at ¶ 51);

4.  failed to train lab employees concerning policies for producing exculpatory evidence, including control sheets and control cards such as the one on which Corbett recorded her "weak" test result (id. at ¶ 53); and,

5.  acquiesced in Auerbach's concealment of the results of his investigation of Dookhan from her, so that she would not have to testify about same (id. at ¶ 45).

Both the governing law and the factual allegations relevant to Han's motion are the same as those analyzed with respect to Nassif's motion.  Although Han held a higher position within the lab's hierarchy and thus was arguably more removed from events than was Nassif, she nevertheless was the Director of the Hinton Lab.  The allegations noted above, combined with the supplemental allegation which supported the claim against Nassif, support the reasonable inference that Han – like Nassif – was aware of the problems with Dookhan as well the problems at the lab noted, supra.

Accordingly, I RECOMMEND that the Court DENY Han's motion for the same reasons for which I have previously recommended that the Court deny Nassif's Motion (and repeating the same caveat that a fuller factual record may produce a different result at a later stage of the case).

### Motion of Defendant Auerbach

Defendant John Auerbach moves to dismiss the Amended Complaint to the extent directed against him, asserting: (1) that the Amended Complaint insufficiently pleads supervisory liability against him; (2) that there is no Brady obligation running to Auerbach in his role as Commissioner of the Department of Public Health; and (3) that he is entitled to qualified immunity.  See Docket # 99.

In the Amended Complaint, Solomon alleges that Auerbach, at all relevant times the Commissioner of the Department of Public Health, "failed to adequately supervise, train, and monitor its Hinton Laboratory, and then engaged in a cover-up of their offenses."  Docket # 14 at 2.  He alleges that Auerbach maintained outdated operating procedures for the Hinton Lab, and undertook no action toward independent accreditation."  Id. at ¶ 41.  As early as 2008, Auerbach met with one of Dookhan's supervisors to discuss the lab's problems.  Id. at ¶ 42.  Auerbach initiated an investigation of Dookhan's conduct in December 2011, which failed to produce evidence of gross misconduct discovered by the State Police during their investigation months later.  Id. at ¶ 43.  He further alleges that, at the time of Auerbach's investigation, the Hinton Lab was working off a grant with the State Police that required quarterly reports, including reports of gross misconduct and that Auerbach failed to notify the State Police until several months later, while working out the wording of the gross negligence report.  Id. at ¶ 44.  Solomon alleges that Auerbach intentionally withheld the specific findings of the investigation from certain supervisors of the Hinton Laboratory, including Han and Nassif, so that they would not be subject to examination in court.  Id. at ¶ 45.  When Auerbach resigned from his post in December 2012, he issued a statement reading, in part, that "[i]t is clear that there was

insufficient quality monitoring, reporting, and investigating on the part of supervisors and managers surrounding the former Department of Public Health drug lab in Jamaica Plain." Id. at ¶ 46.   The argument with respect to Auerbach's Brady obligations is a non-issue for two reasons: (1) Solomon disclaims any intent to impose such an obligation upon Auerbach; and, (2) Solomon fails, in any event, to sufficiently plead supervisory liability.   For that reason, I also have not addressed the qualified immunity argument.

Auerbach stands in a materially different position from Han and Nassif.   Auerbach had substantially larger responsibilities and did not personally work at or directly supervise the lab itself.   Accordingly, absent specific factual allegations, it is not a reasonable inference that Auerbach would have known of Dookhan's misconduct or of the problems at the lab absent his deliberate indifference to Dookhan's violation of Solomon's constitutional rights.

Solomon does advance a few allegations specific to Auerbach, noted above.   These allegations, and the reasonable inferences to be drawn therefrom, fail to plausibly state a claim that Auerbach knew of, or condoned, Dookhan's violation of Solomon's constitutional rights, or, that he would have known of it but for his deliberate indifference.   Simply put, even taking Solomon's allegations as true, Auerbach is too far removed and lacking in knowledge of, or participation in, Dookhan's misconduct to state a claim of supervisory liability under the governing Section 1983 caselaw discussed supra.   Moreover, the allegations of a "cover-up" regarding his instructions to Han and Nassif are too generalized and vague to plausibly state a claim of violation of Solomon's constitutional rights.

Accordingly, I RECOMMEND that the Court ALLOW Defendant Auerbach's motion.

**Defendant Bigby's Motion**

Defendant Bigby moves to dismiss the Amended Complaint as directed against her, as failing to state a claim for supervisory liability.  Docket # 96.  Solomon alleges in the Amended Complaint that Bigby was at all relevant times the duly appointed Secretary of the Executive Office of Health and Human Services of the Commonwealth of Massachusetts, responsible for oversight of the Department of Public Health. Docket # 14 at ¶ 5. He alleges that Bigby was aware in June 2011, that Dookhan was testing and certifying substances at a rate that was fifty percent higher than any other chemist, and that Bigby described Dookhan's productivity as, "a red flag that wasn't appropriately investigated." Id. at ¶ 40. The remainder of the factual allegations concerning Bigby assert generally that she "failed to properly supervise, train, investigate, and monitor the Department of Public Health and the Hinton Laboratory which employed Dookhan" and that she (along with other lab supervisors) maintained outdated operating procedures for the Hinton lab, failed to seek accreditation, and failed to train lab employees concerning Brady obligations and contact with prosecutors. Id. at 2; ¶¶ 41, 51, 53, 72-73.

Solomon advances one claim against Bigby in Count VI, for a due process violation under the Fourteenth Amendment.  Id. at ¶¶ 71-74.  The claim against Bigby fails for two reasons.  First, even taking the factual allegations as true, Bigby is even more removed and uninvolved than Auerbach, and thus the allegations regarding Dookhan's misconduct and the operation of the lab do not state a deliberate indifference claim as to Bigby.

Second, the only specific factual allegation regarding Bigby is that Bigby was aware in June 2011 that Dookhan was testing and certifying substances at a rate that was fifty percent

higher than any other chemist.  Much later, Bigby described Dookhan's productivity as, "a red flag that wasn't appropriately investigated."  Id. at ¶ 40.  The fifty percent number is, in and of itself, insufficient to plausibly allege that a person in Bigby's remote position would be on notice of its significance, amounting to deliberate indifference to Dookhan's violation of Solomon's constitutional rights.

The remainder of the factual allegations concerning Bigby assert generally that she "failed to properly supervise, train, investigate, and monitor the Department of Public Health and the Hinton Laboratory which employed Dookhan" and that she (along with other lab supervisors) maintained outdated operating procedures for the Hinton lab, failed to seek accreditation, and failed to train lab employees concerning Brady obligations and contact with prosecutors.  Id. at 2; ¶¶ 41, 51, 53, 72-73.  These allegations all sound in negligence only.

Accordingly, I RECOMMEND that the Court ALLOW Bigby's motion to dismiss.

III.     CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court (1) ALLOW the Motion to Dismiss of Defendants Daniel Conley and the Suffolk County District Attorney's Office (Docket # 16); (2) DENY Defendant Donald Keenan's Motion to Dismiss (Docket # 36); (3) DENY Defendant Kate Corbett's Motion for Judgment on the Pleadings (Docket # 65); (4) DENY Defendant Julie Nassif's Motion to Dismiss (Docket #105); (5) DENY Defendant Linda Han's Motion to Dismiss (Docket # 82); (6) ALLOW Defendant John Auerbach's Motion to Dismiss (Docket # 98); and, (7) ALLOW Defendant JudyAnn Bigby's Motion to Dismiss (Docket # 96).[13]

_/s / Leo T. Sorokin_____
Leo T. Sorokin
Chief United States Magistrate Judge

---

[13]  The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72; 28 U.S.C. § 636(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).