

**Edward F Davis, Police Commissioner**

### INCIDENT REPORT

STATUS: UNAPPROVED

| ORIGINAL | | COMPLAINT NO. | RPT DIST. | CAD RA | | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|---|---|
| KEY SITUATIONS | | 100863844 | A1 | 123 | | 123 | |
| Drugs | | STATUS | | | DATE OCCURRED FROM | DATE OCCURRED TO | |
| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION | | | | 12/12/2010 | | |
| | | APT | DISPATCH TIME | | TIME OCCURRED FROM | TIME OCCURRED TO | |
| LOCATION OF INCIDENT | | | 08:48 AM | | 08:45 AM | | |
| 888 WASHINGTON ST | | PLACE OF ENTRY | | WEATHER | | LIGHTING | |
| NEIGHBORHOOD | TYPE OF BUILDING | | | | | | |
| FINANCIAL DIST./CHINATOWN / BAY VILLAGE / X-ING | | | | CLOUDY | | OUTSIDE - DAY | |
| TYPE OF WEAPON-TOOL | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | | | SUSPECT RELATIONSHIP TO VICTIM | | |
| DRUGS | FOOT | | | | | | |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR

SEE NARRATIVE

| P E R S O N S | 1 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | VICTIM | COMM OF MA | | | | 0 | | |
| | | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
| | | | , | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | CONTACT #1 | CONTACT #2 | |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | |

| P E R S O N S | 2 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | WITNESS | DET. WASLH, P.O.'S STODDARD, CASALLAS, MCELMOYLE | | | | 0 | | |
| | | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
| | | | AREA D-4 DCU , MA | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | CONTACT #1 | CONTACT #2 | |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | |

| P E R S O N S | 3 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | WITNESS | P.O.'S GREEN, RODRIGUES, | | | | 0 | | |
| | | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
| | | | AREA D-4 DCU , MA | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | CONTACT #1 | CONTACT #2 | |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | |

| P E R S O N S | 4 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | WITNESS | P.O.'S MCCARTHY & NOGUEIRA | | | | 0 | | |
| | | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
| | | | A-1 TRANSPORT P.O.'S , MA | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | CONTACT #1 | CONTACT #2 | |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | |

| PERSONS | 5 TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|---|---|
| | OFFENDER | BANKS,JEFFREY | | | 100216910 | |
| | ALIAS | ADDRESS | | GENDER | RACE | DOB | AGE |
| | | | | MALE | BLACK NON-HISPANIC | | 39 |

| HEIGHT | WEIGHT | BUILD | | HAIR | | EYES | | |
|---|---|---|---|---|---|---|---|---|
| 5-08 | 200 | MEDIUM | | BLACK | | BROWN | | |
| OCCUPATION | | MARITAL STATUS | EMAIL ADDRESS | | | CONTACT #1 | CONTACT #2 | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)
BLK, SWEATSHIRT, BLUE JEANS, GREY DOO-RAG, BLK. BB CAP

| PROPERTY | STATUS | TYPE OF PROPERTY | SERIAL | BRAND NAME - DESCRIPTION | MODEL | VALUE |
|---|---|---|---|---|---|---|
| | TURNED IN AS EVIDENCE | DRUG / NARCOTICS | | UNKNOWN SUBSTANCE - TWO P/B'S BIEGE ROCKS | | $0.00 |
| | TURNED IN AS EVIDENCE | DRUG / NARCOTICS | | UNKNOWN SUBSTANCE - SIX P/B'S BIEGE ROCKS | | $0.00 |
| | TURNED IN AS EVIDENCE | DANGEROUS WEAPON | | SHURIKEN (THROWING STAR) - METAL THROWING STAR | | $0.00 |

NARRATIVE AND ADDITIONAL INFORMATION:

On Sunday December 12, 2010 Officers from the Area D-4 Drug Control Unit under the supervision of Sgt. Det. Keenan conducted a buy/bust drug investigation in the area of Pine Street & Washington Street.

Sgt. Det. Keenan (The UC) was acting in an undercover capacity and provided with $30.00 BPD buy money by Det. Walsh prior to being deployed near the New England Medical Center. The UC met the suspect later identified as Jeffrey Banks in front of 888 Washington Street near Pine Street as the UC was walking out-bound and Banks was walking inbound toward the New England Medical Center. The UC asked Banks "what's good?". Banks responded "what do you want?". The UC stated "I have thirty". Banks told the UC to walk with him. Banks started to ... plastic bag with several p/b's of beige rock like items believed to be crack cocaine con... ... ... the UC if he was a police officer to ... the UC denied before Banks told the UC ... ... in front of him. The UC walked in front of Banks as Banks opened the ... ... ... asked the UC for the money. The UC then exchanged the $30 of BPD buy money for two p/b's of beige rocks believed to be crack cocaine in front of 888 Washington Street. The UC thanked Banks and walked out-bound on Washington Street as Banks continued to walk in-bound. Officer Stoddard observed the UC and Banks walking together and then separate after the drug transaction. The UC signaled to the surveillance officers of the completed drug transaction and notified Officer Stoddard by phone of the incident.

Officer Stoddard and Detective Walsh observed Banks walk from the UC to the MBTA bus stop located across from 800 Washington Street where they identified themselves as police officers and placed Banks under arrest. During a search of Banks Detective Walsh recovered the $30.00 of BPD buy money from Banks front left pants pocket. Officer Stoddard confirmed the BPD buy money on-scene with Sgt. Det. Keenan. A plastic bag with six additional p/b's of beige rock were recovered in the right sleeve of Banks by Det. Walsh and a Shuriken aka throwing star in Banks right rear pants pocket.

Banks was transported to Area A-1 for booking by the A202D Officers McCarthy & Noguera.

Once back at Area A-1 Banks complained of falling in the rear of the transport wagon and hurting himself. Banks claimed he was hurt but made a recovery and refused medical attention after the ambulance arrived, stating he is feeling better and signed a waiver declining medical attention.

Banks was booked for Distribution of Class "B", crack cocaine and Distribution of Class "B" within 1000 feet of a school zone (Josiah Quincy School) & Possession with Intent to Distribute Class "B"

The drugs sold to the UC were later field tested by Sgt. Det. Keenan where he could not get a positive result for cocaine.

The unknown substance was logged into drug control log book # 66 page # 140.

Banks to be charged with:
1) Distribution of a counterfeit substance.
2) Possession with intent to distribute counterfeit substance.
3) Possession of a dangerous weapon, Shuriken throwing star.

Banks was also found to have a straight warrant out of Cambridge District Court for:
a)Drug violation near school/park
b)Conspiracy to violate drug law
c)Distribute Cocaine subsequent offense
docket # 1052CR0003107 issued on 11/17/2010 reference # W7913406

| UNIT ASSIGNED | SHIFT | REPORTING OFFICERS NAME | REPORTING OFFICERS ID | PARTNER'S ID |
|---|---|---|---|---|
| V938 | 3 | DONALD F. KEENAN | 10652 | 53987 |
| SPECIAL UNITS NOTIFIED(REPORTING) | | | | |
| Drug Control Unit | | | | |

COB00002

| DATE OF REPORT | TIME COMPLETED | APPROVING SUPERVISOR NAME | APPROVING SUPERVISOR ID |
|---|---|---|---|
| 12/12/2010 | 11:08 AM | N/A | 0 |

COB00003



*Edward F Davis, Police Commissioner*

## INCIDENT REPORT

SUPPLEMENT NO. 1 OF 1                  STATUS: UNAPPROVED

| KEY SITUATIONS | | | COMPLAINT NO. | RPT DIST. | | CAD RA | | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|---|---|---|---|
| Drugs | | | 100863844 | A1 | | 123 | | 0 | A1 |

| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION | STATUS | DATE OCCURRED FROM | DATE OCCURRED TO |
|---|---|---|---|---|
| | FIREARM/WEAPON - POSSESSION OF DANGEROUS | Cleared By Arrest | 12/12/2010 | 04/25/2011 |

| LOCATION OF INCIDENT | | | APT | DISPATCH TIME | TIME OCCURRED FROM | TIME OCCURRED TO |
|---|---|---|---|---|---|---|
| 888 WASHINGTON ST | | | | 08:48 AM | 08:45 AM | 07:40 AM |

| NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | WEATHER | LIGHTING |
|---|---|---|---|---|
| FINANCIAL DIST./CHINATOWN / BAY VILLAGE / X-ING | | | CLOUDY | OUTSIDE - DAY |

| TYPE OF WEAPON-TOOL | | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | SUSPECT RELATIONSHIP TO VICTIM |
|---|---|---|---|---|
| DRUGS | FOOT | | | |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR

PLEASE REFER TO ORIGINAL NARRATIVE

| P E R S O N S | 1 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | VICTIM | COMM. OF MASS. | | | | 0 | | | |
| | | ALIAS | ADDRESS | | | GENDER | RACE | | DOB | AGE |
| | | | | | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | | CONTACT #1 | | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | | |

| P E R S O N S | 2 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | REPORTER | DET. WALSH, GREG (D-4 DCU) | | | | 0 | | | |
| | | ALIAS | ADDRESS | | | GENDER | RACE | | DOB | AGE |
| | | | | | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | | CONTACT #1 | | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | | |

| P E R S O N S | 3 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | WITNESS | SGT. DET. KEENAN, DONALD (D-4 DCU) | | | | 0 | | | |
| | | ALIAS | ADDRESS | | | GENDER | RACE | | DOB | AGE |
| | | | | | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | | CONTACT #1 | | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | | |

| P E R S O N S | 4 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | WITNESS | P.O. STODDARD, JAMES/P.O. CASALLAS, RICHARD (D-4 D | | | | 0 | | | |
| | | ALIAS | ADDRESS | | | GENDER | RACE | | DOB | AGE |
| | | | | | | | | | | 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | | | EYES | |
| | | OCCUPATION | MARITAL STATUS | EMAIL ADDRESS | | | | CONTACT #1 | | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | | |

| P E R S O N S | 5 | TYPE WITNESS | NAME (LAST, FIRST, MI) P.O. MCELMOYLE, KEVIN/P.O. GREEN, STEPHEN (D-4 DCU | | S.S. NO. | BOOKING NO. 0 | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|
| | | ALIAS | ADDRESS | | GENDER | RACE | DOB | AGE 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | EYES | |
| | | OCCUPATION | | MARITAL STATUS | EMAIL ADDRESS | | CONTACT #1 | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | |

| P E R S O N S | 6 | TYPE WITNESS | NAME (LAST, FIRST, MI) P.O. RODRIGUES, GINO (D-4 DCU) | | S.S. NO. | BOOKING NO. 0 | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|
| | | ALIAS | ADDRESS | | GENDER | RACE | DOB | AGE 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | EYES | |
| | | OCCUPATION | | MARITAL STATUS | EMAIL ADDRESS | | CONTACT #1 | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | |

| P E R S O N S | 7 | TYPE WITNESS | NAME (LAST, FIRST, MI) P.O. MCCARTHY AND P.O. NOGUEIRA (A-1 PRISONER TRAN | | S.S. NO. | BOOKING NO. 0 | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|
| | | ALIAS | ADDRESS | | GENDER | RACE | DOB | AGE 0 |
| | | HEIGHT | WEIGHT | BUILD | | HAIR | EYES | |
| | | OCCUPATION | | MARITAL STATUS | EMAIL ADDRESS | | CONTACT #1 | CONTACT #2 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | |

| P E R S O N S | 8 | TYPE OFFENDER | NAME (LAST, FIRST, MI) BANKS, JEFFREY | | S.S. NO. ████ | BOOKING NO. 0 | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|
| | | ALIAS | ADDRESS ████████████ | | GENDER MALE | RACE BLACK NON-HISPANIC | DOB ████ | AGE 46 |
| | | HEIGHT 5-08 | WEIGHT 200 | BUILD MEDIUM | | HAIR BLACK | EYES BROWN | |
| | | OCCUPATION | | MARITAL STATUS | EMAIL ADDRESS | | CONTACT #1 (000)-000-0000 | CONTACT #2 (000)-000-0000 |
| | | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) BLACK SWEATSHIRT, BLUE JEANS, GREY D00-RAG, BB CAP | | | | | | |

| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL | BRAND NAME - DESCRIPTION | MODEL | VALUE |
|---|---|---|---|---|---|---|
| | STOLEN/RECOVERED | DRUG / NARCOTICS | | - (2) PLASTIC BAGS OF CRACK COCAINE | | $0.00 |
| | TURNED IN AS EVIDENCE | DRUG / NARCOTICS | | - (6) PLASTIC BAGS OF CRACK COCAINE | | $0.00 |
| | TURNED IN AS EVIDENCE | DANGEROUS WEAPON | | - SHURIKEN (THROWING STAR) METAL THROWING STAR | | $0.00 |

NARRATIVE AND ADDITIONAL INFORMATION:

ON THE MORNING OF SUNDAY, DECEMBER 12, 2010, MEMBERS OF THE AREA D-4 DRUG CONTROL WERE CONDUCTING A BUY/BUST OPERATION IN THE AREA OF PINE STREET AND WASHINGTON STREET.

AS A RESULT OF THIS INVESTIGATION SUSPECT JEFFREY BANKS WAS ARRESTED AFTER HE SOLD (2) PLASTIC BAGS OF CRACK COCAINE TO SGT. DET. KEENAN WHILE HE WAS WORKING IN AN UNDERCOVER CAPACITY. BANKS WAS ALSO FOUND TO BE IN POSSESSION OF (6) ADDITIONAL PLASTIC BAGS OF CRACK COCAINE WHICH APPEARED TO BE PACKAGED FOR SALE.

IT SHOULD BE NOTED, THE DRUG CHARGES ORIGINALLY SOUGHT AGAINST SUSPECT BANKS WERE FOR DISTRIBUTION OF A COUNTERFEIT SUBSTANCE ALONG WITH POSSESSION WITH INTENT TO DISTRIBUTE A COUNTERFEIT SUBSTANCE. AT A LATER DATE, A CHEMICAL ANALYSIS WAS CONDUCTED AT THE STATE DRUG LAB OF THE AFOREMENTIONED SUBSTANCES WHICH TESTED POSITIVE FOR COCAINE.

NEW DRUG CHARGES WILL BE SOUGHT AGAINST SUSPECT BANKS FOR THE FOLLOWING OFFENSES.
1) DISTRIBUTION OF CLASS B
2) DISTRIBUTION OF CLASS B SUBSEQUENT OFFENSE (PREVIOUS CONVICTION 04/28/04, PLYMOUTH SUPERIOR COURT DOCKET #0200486001 FOR DISTRIBUTION OF CLASS B.)
3) DISTRIBUTION OF CLASS B WITHIN 1000' OF A SCHOOL ZONE
4) POSSESSION WITH INTENT TO DISTRIBUTE CLASS B

THE LOCATION OF THE DRUG SALE IS 160 FEET TO THE JOSIAH QUINCY UPPER SCHOOL LOCATED AT 900 WASHINGTON STREET. SAID MEASUREMENT WAS CONDUCTED BY DETECTIVE WALSH UTILIZING A MEASURE MASTER MODEL MM30 MEASURING WHEEL.

PLEASE REFER TO THE ORIGINAL REPORT FOR SPECIFICS OF THE INCIDENT.

| UNIT ASSIGNED | SHIFT | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID |
|---|---|---|---|---|
| V858 | 3 | GREG T WALSH | 11846 | 10652 |

| SPECIAL UNITS NOTIFIED(REPORTING) | | | | |
|---|---|---|---|---|
| Area D-4 | | | | |

| DATE OF REPORT | TIME COMPLETED | APPROVING SUPERVISOR NAME | APPROVING SUPERVISOR ID |
|---|---|---|---|
| 04/16/2011 | 08:59 PM | N/A | 0 |



# Boston Police Department
# Arrest Booking Form

**District:** 01    **UCR Code:** 1848
**OBTN:**
**Court of Appearance:** Boston Municipal Court
**Master Name:**                                    **Age:** 39
**Location of Arrest:** 800 Washington St, Boston



**Booking Name:** BANKS, Jeffrey
**Alias:**
**Address:** 534 Revere St, REVERE MA US

**Charges:**
Possession W/I to Distribute, Class B, Drugs Within 1000' School Zone (94C-32J)
Distribution of Class B, Drugs (94C-32A)
Possession W/I to Distribute, Class B, Drugs (94C-32A)

**Booking #:** 10-02169-10              **Incident #:** 100663844       **CR Number:**
**Booking Date:** 12/12/2010 08:56      **Arrest Date:** 12/12/2010 08:50    **RA Number:**

| | |
|---|---|
| **Sex:** Male | **Height:** 5'08 | **Occupation:** Unemployed |
| **Race:** Black Non-Hispanic | **Weight:** 200    lbs | **Employer/School:** |
| **Date of Birth:** | **Build:** Medium | **Emp/School Addr:** MA US |
| **Place of Birth:** BOSTON MA US | **Eyes Color:** Brown | **Social Sec. Number:** |
| **Marital Status:** Single | **Hair Color:** Black | **Operators License:** |
| **Mother's Name:** MITCHELL, Mary | **Complexion:** Dark | **State:** MA |
| **Father's Name:** SOLOMAN, Henry | | |

**Phone Used:** Yes         **Scars/Marks/Tattoos:** Tattoos / Names or Nicknames /Left Forearm
**Examined at Hospital:** No        **Clothing Desc:** blk. sweatshirt, gry. 2 sweatshirts, gry. doo-rag, blu. jeans, red / wht
**Breathalyzer Used:** No                     snkrs
**Examined by EMS:** Yes

| | | | | |
|---|---|---|---|---|
| **Arresting Officer:** BPD | 53987 | STODDARD, James M | **Cell Number:** 11 | |
| **Booking Officer:** BPD | 51340 | BROOKS, Mark | **Partner's #:** 11646 | |
| **Informed of Rights:** BPD | 51340 | BROOKS, Mark | **Unit #:** VD103 | |
| **Placed in Cell By:** BPD | 53987 | STODDARD, James M | **Trans Unit #:** A202D | |
| **Searched By:** BPD | 53987 | STODDARD, James M | | |

**Cautions:**                **Booking Comments:**           **Visible Injuries:**
Suicidal                     bop and q5 completed, not on q5    complaining of neck and leg pain

JUVENILE INFORMATION

**Person Notified:**              **Relationship:**              **Phone:**
**Address:**                   **Juv. Prob. Officer:**
**Notified By:**                               **Notified Date/Time:**

**Bail Set By:**                             I Selected the Bail Comm.
**Bailed By:**
**Amount:**                                  _Signature of Prisoner_

| | | | |
|---|---|---|---|
| **BOP Check:** | BPD | 51340 | BROOKS, Mark |
| **Suicide Check:** | | | |
| **BOP Warrant:** | | | |
| **BOP Court:** | | | |

_Signature of Duty Supervisor_



# Boston Police Department
## Prisoner Booking Form

**Booking Name:** BANKS
**First:** Jeffrey
**Middle:**          **Suffix:**
**Home Address:** 534 Revere St, REVERE MA US

**Report Date:** 12/12/2010 09:35
**Booking Status:** Unverified
**Printed By:** BROOKS, Mark

**Sex:** Male
**Race:** Black Non-Hispanic
**Date of Birth:**
**District:** 01
**Booking Number:** 10-02169-10
**Incident Number:** 100663844

**Arrest Date:** 12/12/2010 08:50
**Booking Date:** 12/12/2010 08:56

**Charges:**  Possession W/I to Distribute, Class B, Drugs Within 1000' School Zone (94C-32J)
Distribution of Class B, Drugs (94C-32A)
Possession W/I to Distribute, Class B, Drugs (94C-32A)

## Miranda Warning

Before asking you any questions, it is my duty to advise you of your rights:

1) You have the right to remain silent;

2) If you choose to speak, anything you say may be used against you in a court of law or other proceeding;

3) You have the right to consult with a lawyer before answering any questions and you may have him present with you during questioning;

4) If you cannot afford a lawyer and you want one, a lawyer will be provided for you by the State without cost to you;

5) You may also waive the right to counsel and your right to remain silent and you may answer any question or make any statement you wish. If you decide to answer any questions you may stop any time to consult with a lawyer.

Do you understand what I have told you?          **Informed Rights By Officer:**
Yes, I understand.          BPD     51340   BROOKS, Mark

_____          _____
**Signature of Prisoner**          **Signature of Officer**

## Prisoner Property

**Telephone Used:** Yes
**Breathalyzer Used:** No
**Examined at Hospital:** No
**Examined by EMS:** Yes

**Money:** 0.00     **Property Storage No:**
**Property:** belt, gloves, mini light, laces, wallet w/ i.d. and cards, cellphone, doorag, hat

**Visible Injuries:**
complaining of neck and leg pain

Acknowledgement of property items being held

_____
**Signature of Prisoner**

COB00008



09-02048-04
SOLOMON, Jeffrey M



09-02048-04
SOLOMON, Jeffrey M

COB00009

**Boston Police** — **Drug Control Log** — **District Unit:** D-4/DCU

0028-BIS-1106

| Date | CC Number | Name of Officer | Name & Address of Defendant | Location of Arrest | Drug Depository # |
|---|---|---|---|---|---|
| | 10CW3844 | P.O. Stoddard | Jeffrey Banks 534 Revere Street Revere, MA | opposite 600 Washington St | |
| | | | | | |
| | | | | | |

| Type of Arrest | Type of Drugs | Amount | Analysis # | Date of Court Disposition | Certification of Destruction Date |
|---|---|---|---|---|---|
| | Unknown Beige Substance | 3 P/BS | | | |
| | Unknown Beige Substance | 6 P/BS | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | 140 | |

#53967

Secured by: _____ P.O. _____ Signed out by: _____ Date
Super ID# 1065  P.O. ID#   Super ID#   P.O. ID#

COB00010

12-12-10
CC# 100663844

$30 BPD Buy
money recoverd
From Banks by
Det. Walsh
& Confirmed by
P.O. Stoddard
w/ Sgt. Det. Keenan





COB00011





COB00012











COB00013







COB00014

Incident History for: #PD100663844  Xref:   #ED103460113

| | | | |
|---|---|---|---|
| Entered | 12/12/10 | 08:48:49 | BY PDT02  90619 |
| Dispatched | 12/12/10 | 08:48:49 | BY PDT02  90619 |
| Enroute | 12/12/10 | 08:48:49 | |
| Onscene | 12/12/10 | 08:48:49 | |

Initial Type: IVPER      Final Type: ARREST (ARREST O/S NO ASSISTANCE)
Initial Priority: 2      Final Priority: 7
Disposition:          Source: R     Primary Unit: VD103
Police BLK: 0112301  Fire BLK: 23-1481  EMS BLK: 0702112
Group: 40  (01 ) Beat: 3     Map Page: 1223
Loc: 800 WASHINGTON ST ,BO -- HOSP TMC ATRIUM btwn KNEELAND ST & OAK ST (V)
Name:                 Addr:                    Phone:

| | | | |
|---|---|---|---|
| /084849 | (90619 ) | $OUTSRV | ,BY DOUBLETREE HOTEL...B/M..BLK BB ..GRY HOODY ..BLU JEANS |
| /084849 | | DISPOS  VD103 | #53987  STODDARD, JAMES ,BY DOUBLETREE HOTEL...B/M..BLK BB ..GRY HOODY ..BLU JEANS |
| /084917 | | CHANGE | LOC: WASH/NASSAU -->  800 WASHINGTON ST ,BO-- HOSP TMC ATRIUM, DGP: 40 -->  01, BLK:  -->  0112301 |
| /084939 | | ASSTER  A103D | [800 WASHINGTON ST ,BO] #103524 WONG, FRANK #103760 GREY, ETHAN |
| /085014 | | CHANGE | TYP: IVPER  --> ARREST RSP: RPW --> PW PRI: 2  --> 7 HAZ: N --> N |
| /085806 | | ASSTOS  A202D | [800 WASHINGTON ST ,BO] #103766 MCCARTHY, PATRICK J. #93315  NOGUEIRA, FRANK |
| /085812 | | CLEAR   A103D | |
| /090449 | | $CROSS | #ED103460113 |

COB00015

AKA Jeffrey Solomon
**JEFFREY BANKS**

# BOSTON MUNICIPAL COURT-CENTRAL DIVISION

| DOCKET ENTRIES | ATTORNEY |
|---|---|
| Legal Counsel Fee Assessment | CPCS |
| Legal Counsel Fee Contribution | Rule 3.03 |
| Victim/Witness Fund Assessment | Sherman |
| Drug Analysis Fund Assessment | Drechsler |
| Supervised Probation Fee | Sanders |

DEC 13 2010  *Defendant in custody*    BAIL ONLY

17      Sherman

2:35    Giviskud        Lawton

SEE NO.
11-2531

1000 to February 22 2011 a.s.m. n.c. g

Rm 11 PTH

Held W/O                1053 C12 3107  (N)

TK Cambridge          Drug Violation Near School/Park
Defendant needs       Conspiracy To Violate Drug Law
Medication            Distribute Cocaine Subsequent OSS
Prescription Attached

Dec 29 2010 Called Ahead by Atty Sherman for A + C    Rm 11 746
                                                      /CPCS
9:30 ADA Walker      Appear PO              12/10

Cambridge Jail      CORTS TO Jan 5
                    Rm 11 PTH

JRE OVER  DREASON TONE



# BOSTON MUNICIPAL COURT-CENTRAL DIVISION

## DOCKET ENTRIES

JAN 19 2011

10      Mr. Sherman so-

9:30    Melville     Pamphile

Not Transported In Cambridge

Cambridge   HABEAS CORPUS TO ISSUE FOR

Jail     THE CD FOR IMPRISONED

       IN CELL TO APPEAR TO TESTIFY

       NO C.R. 2/8    JCM 1 JJ UG

1000 to February 8 m y

Rm 11 PTH

Redd

---

FEB 08 2011

Export 11    Defendant Not In / In Court    Atty Creche Present

Sentence 9:08 ADA   Solomon   APO Pamphile

Not Transported

Cambridge   HABEAS CORPUS TO ISSUE FOR

Jail     THE CD FOR IMPRISONED

       TO TESTIFY TO APPEAR TO TESTIFY    100 to March 7

       NO C.R. 3/7    JCM    CMSH

              Rm 10 Motion

    PTC Report filed

Defendant's discovery motions received & filed allowed

Commonwealth's motion received & filed

Duggan J.

COB00017

**BOSTON MUNICIPAL COURT DEPARTMENT**
**CRIMINAL BUSINESS DIVISION**

NAME: _Jeffrey Banks_          DOCKET # _1001 CR 9024_

OFFENSE: _____

| Room # _10_ | Defendant Not In / In Court | Attorney _Sanders_ | Appears |
|---|---|---|---|
| Time | ADA _Melville_ | _Clifford_ | _s_ |

100 Cash to March 21 _Missized_
Rm 10 - motion
Discovery to be completed by next date

Cont

HABEAS CORPUS TO ISSUE FOR
H.C.C.J. FOR APPEARANCE
OF DEFT TO ANSWER TO TESTIFY
AT M.C. _3-21_  9AM          _Issued_
_Cambridge Jail_                          _Sinnott V Mc_

---

**MAR 21 2011** _10_  Custody  _Sanders_ Present
Tape #_____  Defendant Not In / In Court  Atty
Footage _10:28_  ADA _Mingo_  APO _Pamphile_   (N)

100 Cash to (March 30) April 13   (N)
Rm 10 - Motion to ~~Sup~~ Dismiss
Defendants' motion to suppress is withdrawn.
Defendants' motion for discovery received & filed
in open Court ;  Motion to Dismiss rec'd & filed

HABEAS CORPUS TO ISSUE FOR
H.C.C.J. FOR APPEARANCE   Cambridge
OF DEFT TO ANSWER TO TESTIFY   Jail  N
AT M.C. _____  9AM
_April 13_                          _Sinnott J (RMS)_

COB00018

## BOSTON MUNICIPAL COURT DEPARTMENT
### CRIMINAL BUSINESS DIVISION

NAME: _JEFFREY BANKS_    DOCKET # _1001CR9024_

OFFENSE: _____

APR 13 2011

Room # _10_   Defendant Not In / In Court    Attorney _Sanders_    Appears

Time: _9:30_ ADA _Mingo_    Appears   P.O. _Ko Lowsky_   Appears

_10:18_
_11:31_

Upon defendant motion Commonwealth
not ready Counts 1 & 2 **DISMISSED**
3 + 4 motion denied

100 to May 16
Cash as to Count 3

HABEAS CORPUS TO ISSUE FOR
H.C.C.J. FOR APPEARANCE   _Cambridge_
OF DEFT TO ANSWER TO TESTIFY   _Jail_
AT M.C. _5-16-11_ 9AM

Rm 10 / Motion          Dougan J. (RSA)

MAY 16 2011
Tape# _10_   Defendant Not In / In Court   Atty _Sanders_   Present

Footage _12:30_ ADA _Mingo_   APO _Pamphile_

_Cambridge Jail_ HABEAS CORPUS TO ISSUE FOR   100 to June 7
H.C.C.J. FOR APPEARANCE   _CASH_
OF DEFT TO ANSWER TO TESTIFY
AT M.C. _6-7_ 9AM    Rm 17 Status

Forde J.    DFM

COB00019

BOSTON MUNICIPAL COURT DEPARTMENT
CRIMINAL BUSINESS DIVISION

NAME: Jeffrey Banks          DOCKET # 1001 CR 9024

OFFENSE: _____

JUN 07 2011.

| Room # 17 Defendant Not In /In Court | Attorney Sanders | Appears |
| Time: 930 ADA Honey | Appears P.O. M. Grissin | Appears |

CASH
100  to   July 5

Rm 10 Trial

~~HABEAS CORPUS TO ISSUE FOR
H.C.C.J. FOR APPEARANCE~~ Comply =
~~OF DEFT TO ANSWER TO TESTIFY~~ Jail
~~AT M.C. 2 5 11   9AM~~

late   Revised by Court

At request of Commonwealth

Counts 1, 2 + 3   ~~Dismissed~~   Deft. assents

Summerville J  pm

COB00020



# REASONS FOR ORDERING BAIL

Suffolk, ss.

Defendant: _Jeffrey Banks_          Docket Number: _1001 — 9024_

Amount of Bail: _$100 cash_

## TO THE SUPERIOR COURT DEPARTMENT :

On ...... ...... the court denied the relea~~ ~~ .....s above named defendant on personal recognizance without surety. A summary of the court's rea...... ...... is evidenced by my marking one or more of the items listed below in Section I. A further explanation may appear in Section II. In the case of revision of bails upwards, findings of fact do appear Section II.

## SECTION I

| | |
|---|---|
| X | The nature and circumstances of the offense charged. |
| ___ | The potential penalty the defendant faces. |
| ___ | The defendant's family ties. |
| ___ | The defendant's financial resources and employment record. |
| ___ | The defendant's history of mental illness. |
| ___ | The defendant's reputation and length of residence in the community. |
| ___ | The defendant's record of conviction's. |
| ___ | The defendant's present drug dependency or his record for illegal drug distribution. |
| ___ | The defendant's record of flight to avoid prosecution. |
| ___ | The defendant's fraudulent use of an alias or false identification. |
| ___ | The defendant's failure to appear at a court proceeding to answer to an offense. |
| ___ | The defendant's status of being on bail pending adjudication of a prior charge. |
| ___ | The defendant's status of being on probation, parole or other release pending completion of sentence for any conviction. |
| ___ | The defendant's status of being on release pending sentence on appeal for any conviction. |

## SECTION II

Further explanation ( and, in the case of a revision of bail upwards, finding of fact ):

_Δ held on other case in Court._

_Rayol Darga_                    _2, 8, 11_
_____                 _____
Justice                              Date

COB00021

| | | |
|---|---|---|
| **TRIAL COURT OF MASSACHUSETTS**<br>**BOSTON MUNICIPAL COURT DEPARTMENT** | **DIVISION**<br>BMC Central | |
| **COMMONWEALTH vs.** _Jeffrey Banks_<br>NAME OF DEFENDANT | **DOCKET NUMBER**<br>1001 CR 9024 | |

## PRETRIAL CONFERENCE REPORT

A pretrial conference between the parties was conducted on _January 19_, 20_11_ with the following results:

**1. AUTOMATIC MANDATORY DISCOVERY FOR THE DEFENDANT.** *See Rule 14(a)(1)(A).* The Commonwealth has disclosed to the defense and permitted the defense to discover, inspect and copy the following, provided it is relevant to the case and is in the possession, custody or control of the prosecutor, persons under the prosecutor's direction and control, or persons who have participated in investigating or evaluating the case and either regularly report to the prosecutor's office or have done so in the case:

*4 weeks prior to trial*

| Y | N | C/D | N/A | *(Not applicable because not relevant to case or not in the possession, custody or control of the prosecutor.)* |
|---|---|---|---|---|
| | | | | Any written or recorded statements, and the substance of any oral statements, made by the defendant or a co-defendant. |
| | | | | Grand jury minutes, and the written or recorded statements of a person who has testified before a grand jury. |
| | | | | Any facts of an exculpatory nature. |
| | | | | The names, addresses, and dates of birth of the Commonwealth's prospective witnesses other than law enforcement witnesses. The Commonwealth shall also provide this information to the Probation Dept. |
| | | | | The names and business addresses of prospective law enforcement witnesses. |
| | | | | Intended expert opinion evidence, other than evidence that pertains to the defendant's criminal responsibility and is subject to subdivision (b)(2). Such discovery shall include the identity, current curriculum vitae, and list of publications of each intended expert witness, and all reports prepared by the expert that pertain to the case. |
| | | | | Material and relevant police reports, photographs, tangible objects, all intended exhibits, reports of physical examinations of any person. *if in CCc of cw* |
| | | | | Reports of scientific tests or experiments, e.g., substance analysis, ballistics, and fingerprints. |
| | | | | Statements of persons the party intends to call as witnesses. *See definition of statement in Rule 14(d).* |
| | | | | Summary of identification procedures, and all statements ~~...~~ ~~...~~ ~~...~~ ~~...~~ accuracy of the identification procedure. |
| | | | | Disclosure ~~...~~ ~~...~~ ~~...~~ rewards or inducements made to witnesses the party intends to present at trial. |

**2. DISCRETIONARY DISCOVERY.** The court has ordered or the parties have agreed to provide the following:

| Y | N | C/D | *(Please list and indicate whether provided.)* |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**3. CONTINUING DUTY.** *See Rule 14(a)(4).* The undersigned acknowledge that each party shall promptly notify the other party if it subsequently learns of additional material which it would have been required to disclose or produce pursuant to rule or court order, and shall disclose said material in the same manner as required by this rule.

COB00022

**COMMONWEALTH OF MASSACHUSETTS**

**BOSTON MUNICIPAL COURT DEPARTMENT**

Suffolk, ss.

## MOTION FOR CONTINUANCE

COMMONWEALTH   Vs.   ~~Jeffrey Banks~~

DOCKET NO.   100CR9024

The above - entitled case is scheduled for trial in the Boston Municipal

Court on   2/22/11

Now comes the   Jeffrey Banks   and respectfully moves that the

trial in this matter be continued to   4/9/11

The reason this continuance is being sought is as follows :

- Mr. Banks is being held on a different case

The other party in this matter has / has not agreed to this continuance.

The information contained herein is true to the best of my knowledge

and belief.

_____ Attorney for Moving Party.

06.24.10   Date

Motion is (allowed) / denied.   _____

**JUSTICE**

Request habe from cambridge Jail
for new date

COB00023

# APPLICATION FOR COMPLAINT

NUMBER 10CR9024

**Trial Court of Massachusetts**
Boston Municipal Court Department

☑ ARREST ☐ HEARING ☐ SUMMONS ☐ WARRA...

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below.

Boston Municipal Court
Criminal Division, 6th Floor
24 New Chardon Street
Boston, MA, 02114

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 12/12/2010 | 12/12/2010 | 888 WASHINGTON STRE... |

**NAME, ADDRESS AND ZIP CODE OF COMPLAINANT**

SGT. DET. KEENAN, DONALD / 10652

D-4 DRUG CONTROL UNIT/1 SCHROEDER PLAZA

BOSTON, MA, 02120

| NO. | OFFENSE | G.L.Ch.and Sec |
|---|---|---|
| 1 | COUNTERFEIT DRUG, DISTRIBUTE c94C s32G | 094C:032G:A |
| 2 | COUNTERFEIT DRUG, POSSESS TO DISTRIBUTE c94C 2G | 094C:032G:B |
| 3 | DANGEROUS WEAPON, CARRY c269 s10 | 269:010:B |

**NAME, ADDRESS AND ZIP CODE OF DEFENDANT**

BANKS, JEFFREY

534 REVERE STREET

REVERE, MA, US

IF ADDITIONAL OFFENSES CHECK HERE ... AND ATTAC...

## DEFENDANT IDENTIFICATION INFORMATION - Complete data below if known.

| C.C. # 100663844 | DATE OF BIRTH | SEX M | RACE B | HEIGHT 5'8" | WEIGHT 200 lbs | EYES BRO | HAIR BLK | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|---|---|

| COURT USE ONLY | A hearing upon this complaint application will be held at the Boston Municipal Court, Rm. 1105 on | DATE OF HEARING | TIME OF HEARING AT | COURT USE ONLY |
|---|---|---|---|---|

## CASE PARTICULARS - BE SPECIFIC

| No. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OF PROPERTY Over or under $250. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc.. |
|---|---|---|---|---|
| 1 | COMM. OF MASS., | (2) PLASTIC BAGS OF UNKNOWN BEIGE SUBSTANCE | | UNKNOWN |
| 2 | COMM. OF MASS., | (6) PLASTIC BAGS OF UNKNOWN BEIGE SUBSTANCE | | UNKNOWN |
| 3 | COMM. OF MASS., | EDGED THROWING WEAPON | | SHURIKEN (THROWING STAR) |
| 4 | | | | |

**OTHER REMARKS:**

On Sunday December 12, 2010 Officers from the Area D-4 Drug Control Unit under the supervision of Sgt. Det. Keenan conducted a buy/bust drug investigation in the area of Pine Street & Washington Street. Sgt. Det. Keenan (The UC) was acting in an undercover capacity and provided with $30.00 BPD buy money by Det. Walsh prior to being deployed near the New England Medical Center. The UC met the suspect later identified as Jeffrey Banks in front of 888 Washington Street near Pine Street as the UC was walking out-bound and Banks was walking inbound toward the New England Medical Center. The UC asked Banks "what's good?", Banks responded "what do you want?". The UC stated "I have thirty". Banks told the UC to walk with him as Banks started to open a plastic bag with several p/b's of beige rock like items believed to be crack cocaine contained in it. Banks asked the UC if he was a police officer to which the UC denied before Banks told the UC to walk in front of him. The UC walked in front of Banks as Banks opened the lager plastic bag and then asked the UC for the money. The UC then exchanged the $30 of BPD buy money for two p/b's of beige rocks believed to be crack cocaine in front of 888 Washington Street. The UC thanked Banks

IF PROCESS IS ORDERED, THIS APPLICATION MUST BE PRESENTED AT ONCE TO PLEADING CLERK AT ROOM 1105.

| NAMES OF WITNESSES | Recog. to S.C. | Give place of business or employment, if in Boston, otherwise, residence | ST. NO. |
|---|---|---|---|
| DET. WALSH, GREG | | D-4 DRUG CONTROL UNIT, MA 12/13/10 | |
| P.O. STODDARD, JAMES | | D-4 DCU, MA Various $300 Asst (1st award (1.2.8) | |

State if defendant is arrested: No

Date of Arrest:

FOR ADDITIONAL REMARKS OR WITNESSES-USE REVERSE OF ORIGINAL AND CHECK HERE ☐

Page 1/2

COB00024

| APPLICATION FOR COMPLAINT | | NUMBER | | Trial Court of Massachusetts Boston Municipal Court Department |
|---|---|---|---|---|

☑ ARREST  ☐ HEARING  ☐ SUMMONS  ☐ WARRA...

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below.

Boston Municipal Court
Criminal Division, 6th Floor

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE | 24 New Chardon Street |
|---|---|---|---|
| 12/12/2010 | 12/12/2010 | 888 WASHINGTON STRE... | Boston,MA,02114 |

NAME, ADDRESS AND ZIP CODE OF COMPLAINANT

SGT. DET. KEENAN, DONALD / 10652

D-4 DRUG CONTROL UNIT/1 SCHROEDER PLAZA

BOSTON,MA,02120

NAME,ADDRESS AND ZIP CODE OF DEFENDANT

BANKS, JEFFREY

534 REVERE STREET

REVERE,MA,US

**OTHER REMARKS:**

and walked out-bound on Washington St ⌐ ·⌐· ' to walk in-bound. Officer Stoddard observed the UC and Banks walking together and then separate after the drug transaction. The ⌐ 'gnaled to the surveillance officers of the completed drug transaction and notified Officer Stoddard by phone of the incident. Officer ⌐. .' and Detective Walsh observed Banks walk from the UC to the MBTA bus stop located across from 800 Washington Street where they .. ' 'hemselves as police officers and placed Banks under arrest. During a search of Banks Detective Walsh recu ⌐' the $30.00 ⌐ '⌐ buy money from Banks front left pants pocket. Officer Stoddard confirmed the BPD buy money on-scene with Sgt. Det. Keena. bag with six additional p/b's of beige rock were recovered in the right sleeve of Banks by Det. Walsh and a Shurike. star in Banks right rear pants pocket. Banks was transported to Area A-1 for booking by the A202D Officers McCarthy & Nogueira. Once back at Area A-1 Banks complained of falling in the rear of the transport wagon and hurting himself. Banks claimed he was hurt but made a recovery and refused medical attention after the ambulance arrived, stating he is feeling better and signed a waiver declining medical attention. Banks was booked for Distribution of Class "B", crack cocaine and Distribution of Class "B" within 1000 feet of a school zone (Josiah Quincy School) & Possession with intent to Distribute Class "B" The drugs sold to the UC were later field tested by Sgt. Det. Keenan where he could not get a positive result for cocaine. The unknown substance was logged into drug control log book # 66 page # 140. Banks to be charged with: 1) Distribution of a counterfeit substance. 2) Possession with intent to distribute counterfeit substance. 3) Possession of a dangerous weapon, Shuriken throwing star. Banks was also found to have a straight warrant out of Cambridge District Court for: a)Drug violation near school/park b)Conspiracy to violate drug law c)Distribute Cocaine subsequent offense docket # 1052CR0003107 issued on 11/17/2010 reference # W7913406

X ~~Donald Kean~~
SIGNATURE OF COMPLAINANT

COB00025

Volume: I
Pages: 1-22
Exhibits: 6
Word Index: 23-26

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                      SUPERIOR COURT DEPARTMENT
                                 OF THE TRIAL COURT

* * * * * * * * * * * * * * * *
                              *
                              *
                              *
JEFFREY BANKS                 *        SUFFOLK COUNTY
                              *     SPECIAL GRAND JURY
                              *
                              *
* * * * * * * * * * * * * * * *

APPEARANCES:

For the Commonwealth:
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, Massachusetts 02114
By: Tonya Platt, ADA
Also Present:
Linda Poulos, ADA

Grand Jury
Boston, Massachusetts
July 1, 2011

J&K COURT REPORTING SERVICES
P.O. BOX 321 SWAMPSCOTT, MA 01907 (781)593-3950

I  N  D  E  X

WITNESSES:                                    PAGE:

Donald Keenan                                    3



EXHIBITS PUBLISHED TO GRAND JURY:        PAGE:

1     Lab Analysis Report                    16
2     Lab Analysis Report                    16
1     Photocopy                              17
2     Photocopy                              17
3     Photocopy                              17
4     Photocopy                              17

1  **(Grand Jury called to order.)**

2  **(10:12 A.M.)**

3  MS. PLATT:  Good morning, ladies and gentlemen.  My

4  name is Tonya Platt.  And, I'd like to begin an

5  investigation into the facts and circumstances

6  surrounding an alleged distribution of cocaine as well as

7  possession with intent to distribute cocaine, that

8  occurred on December 12th of 2010, in the financial

9  district area of Boston.

10  I'll be calling one witness today.  You'll hear from

11  Sergeant Detective Donald Keenan.

12  WITNESS: Good morning.

13  MS. PLATT: Good morning.

14  Can you raise your right hand;

15

16  DONALD KEENAN, SWORN

17

18  BY MS. PLATT:

19  Q  Please have a seat and make yourself comfortable.

20  And, if you wouldn't mind, could you please state your

21  name and introduce yourself to the grand jury and spell

22  your last name.

23  A  My name is Donald Keenan.  It's K-E-E-N-A-N.  I am a

24  Sergeant Detective in the Boston Police Department.  I am

25  assigned to Area D-4.  I supervise a drug squad in D-4,

1   which covers the, the South End, lower Roxbury, Back Bay,

2   Fenway areas of the city.

3   Q   And Sergeant Detective Keenan, how long have you

4   been with the Boston Police Department?

5   A   Since 1997.

6   Q   How long have you been in a Drug Control Unit?

7   A   Since 2005, I, I entered the drug unit in 2005, and

8   I've been a supervisor since 2007 in the drug unit.

9   Q   Thank you.  I'd like to draw your attention to

10  December 12th of 2010, were you working that day?

11  A   Yes.

12  Q   And how -- where were you working?

13  A   We were working in the, the South End, downtown

14  area, near new, near New England Medical Center.

15  Q   And was there any particular reason why you were in

16  that area?

17  A   Yeah, on, in the, specifically in the mornings

18  there's a lot of drug activity between the Pine Street

19  and New England Medical Center.

20  Q   Alright and at approximately 8:45 in the morning,

21  which is a Sunday morning, were, you were specifically in

22  that area?

23  A   Yes.

24  Q   And was there anybody with you?

25  A   Yes.

1  Q   Who was with you?

2  A   Officers from my unit, it was Detective Walsh,

3  Officer Stoddard, Officer McElmoyle, Officer Greene,

4  Officer Robert Walsh another Walsh.

5  Q   So, it's fair to say that the entire squad was

6  there?

7  A   Yes.

8  Q   And what was your assignment that day?

9  A   I've been -- prior to becoming a supervisor, I was

10  a, I was one of the main undercovers in the downtown

11  area, so I went back to being an undercover at that, that

12  morning.  I was, that was going to be my assignment.

13  Usually I don't do it as a supervisor, but that day I, I

14  went out there as the undercover officer.

15  Q   And when you went out there as the undercover

16  officer, did you have anything on you?

17  A   Yes, I was provided with a kell, which is a, a

18  transmitter, to transmit your voice, and one of the

19  officers had the receiver in their vehicle.  I was also

20  supplied with $30 of currency which was photocopied prior

21  to going out there.

22  Q   And once you went out there, did you see anybody?

23  A   I did -- as I was deployed in the area of the New

24  England Medical Center and I was walking towards, walking

25  outbound towards like the South End on Washington Street.

1   I met an individual right at, right before you get to
2   Marginal, right before you get to Mass Pike.  It's called
3   Pine Street, but it's not the Pine Street Inn, it's a
4   small, small street.  Right at that corner of Pine Street
5   and Washington Street, I met an individual we later
6   identified as Jeffrey Banks.

7   Q    And could you just spell the last name?
8   A    Yeah, it's B-A-N-K-S.  I, I just, well as I was
9   walking by him I asked Jeffrey Banks what's good, he
10  said, "What do you need?"  I said I had $30.  He told me
11  to walk with him.  I turned and walked back towards the
12  downtown area, towards New England Medical Center with
13  him.  He asked me if I was a police officer.  I to -- I
14  told him I was not, and as he opened up a plastic bag I
15  could see white rocklike substance, which I believed to
16  be crack in it.  He, he told me to walk in front of him,
17  so I -- he was walking right, right to my rear as he was
18  going through the bag, and I could see him over
19  myshoulder, and then he asked me for the money.  I
20  turned, gave him the $30 that I was supplied with, in, in
21  exchange for two plastic bags of crack cocaine.  Usually
22  the crack's sold in $20 bags, but you get a deal.  If I -
23  - I would ask him for two for $30, instead of paying him
24  the full price for $40.  So, I gave him the $30.  He then
25  gave me the two plastic bags, and out of that larger

1    plastic bag that had several more rocks of crack cocaine
2    in it. I thanked him and I -- again, I, I turned around
3    and started walking my original, original way back
4    towards the South End. He continued, Mr. Banks continued
5    on Washington Street towards the downtown area. I then
6    notified ----

7    Q    I'm just going to stop you right there. So how long
8    would you say your transaction with Mr. Banks was?
9    A    From the time I met him to the time I left him was
10   probably less, probably like twenty seconds or so.

11   Q    Okay. And how close were you to Mr. Banks?
12   A    We were within arms distance of each other as we
13   walked.

14   Q    And, and how did you exchange the money and the
15   currency?

16   A    When he asked me for the money after he went through
17   his bag, I turned and we exchanged it hand to hand, right
18   in front of each other.

19   Q    So, your hand to his hand?

20   A    Correct.

21   Q    Okay. Now at -- once you walked away from Mr.
22   Banks, you said, you began to say that you notified
23   somebody, who did you notify?

24   A    Yeah, I notified Officer Stoddard that I had
25   completed the drug transaction with Mr. Banks. Actually,

1   Officer Stoddard observed me with Mr. Banks walking with

2   him, and then separate from him, from Mr. Banks. Once I

3   notified Officer Stoddard of the completed drug

4   transaction the, they, they watched and followed him to

5   the bus stop, which is underneath the New England Medical

6   Center. You know, you know, the bridge goes between both

7   buildings. There's a bus stop there. He was approached

8   by, Mr. Banks was approached by Officer Stoddard and

9   Detective Walsh, and placed under arrest.

10  Q   And once he was placed under arrest, do you know if

11  they were able to recover anything from Mr. Banks'

12  person?

13  A   Yes, Detective Walsh recovered the $30 of buy money

14  that I used to purchase the two rocks of crack cocaine.

15  Q   And how do you know it was the same $30?

16  A   I responded to the scene and with Officer, with

17  Officer Stoddard we matched up the photocopy with the buy

18  money that was recovered from Mr. Banks.

19  Q   And so the photocopy showed the serial numbers?

20  A   Exactly.

21  Q   Okay. And was anything else recovered from Mr.

22  Banks' person?

23  A   Yes, there's also recovered a plastic bag with six

24  additional rocks of crack cocaine in it. And, and one of

25  those throwing stars, like, you know, the Chinese

1   throwing stars, I think they call them.

2   Q   Now the plastic bag that had the six additional

3   plastic bags of crack cocaine in it, did you recognize

4   that bag?

5   A   . It appeared to be the same plastic bag, it was like

6   a sandwich type bag that he was using, that he was

7   recovering the two plastic bags out.

8   Q   That he gave to you?

9   A   Yes.

10  Q   Okay. And then once Mr. Banks was placed under

11  arrest, where was he brought?

12  A   He -- I, I responded to the scene, I saw him being

13  placed in, in the wagon and he was brought to Area A-1 to

14  be booked.

15  Q   And when he was being booked, what were you charging

16  him with at that point?

17  A   At, at booking he was charged with distribution of

18  Class B crack cocaine, and within a school zone.

19  Q   And did Mr. Banks make any comments to you?

20  A   He did. At first he said he fell in the wagon, he

21  was, he injured himself and we called an ambulance for

22  him. When the ambulance got there he said he was fine,

23  there was nothing wrong with him. He then said that the

24  crack that he sold me was, was fake and it was a

25  counterfeit type substance.

1    Q    Now, in your experience, you said that you, you had
2    ample experience as an undercover and now you're a
3    supervisor, did the crack look -- did the substance look
4    like crack to you?

5    A    It did.

6    Q    But given the fact that he said it was fake, did you
7    do anything further at that point?

8    A    I did.  What, what we'll do is a preliminary test on
9    the drugs.  In this case he said it was fake.  I, I was
10   going to conduct a test on it to see if, if he was
11   telling the truth or not.  So, I, I did that.

12   Q    And the preliminary test, is that also called a
13   field test?

14   A    Yes.

15   Q    And just briefly, what is a field test?

16   A    It's, it's a presumptive test of, of, of drugs.  In
17   this case cocaine.  And the way we do it, the way I do
18   it, is we have these things called narco swipes.  And,
19   they're just like -- they're -- what they look like is,
20   you know, you go to like KFC or something and you, you
21   got the, the wipes you clean your hands with, same exact
22   thing, except on the, on the outside of it it says narco
23   swipe.  So you open it up and it's, it's like, it's
24   white, maybe a tone of pink on it, and then you just
25   swipe whatever, whatever substance you're trying to get a

1   cocaine, the cocaine positive for, or, or negative. You

2   swipe that and that, that, that swipe will turn a blue

3   color, same color as that, like an aqua blue color pretty

4   much right away. And that's what I, I tested it with.

5   Q   And when you say that something turns blue, is it

6   the actual wipe, or is it the rock?

7   A   Both the rock and the, both the rock and the, the

8   swipe turns blue.

9   Q   Will turn blue?

10   A   Well, whatever you're -- if the cocaine's there, it

11   goes onto the, onto the, onto the swipe. But usually

12   with the -- that's with the cocaine. Usually you, you

13   wipe it right up and it's on, on the, on there. But on a

14   rock, the rock doesn't -- it's not powder, so it stays,

15   you know, it's getting the substance both from, from the

16   wipe on the rock so you're getting the color on both

17   usually.

18   Q   Okay. Now -- and that's the procedure you did in

19   this particular case?

20   A   Yes.

21   Q   And what were the results of the field test in this

22   case?

23   A   When I wiped it I didn't get a -- immediately I

24   didn't get a, a color change, so I couldn't get a

25   positive result for cocaine at that time.

1  Q    So in light of that did, did you change the charges

2  for Mr. Banks?

3  A  : I did.

4  Q    And what was he originally charged with?

5  A    At booking he was charged with the distribution of,

6  of the Class B, crack cocaine. And once I did that test

7  and couldn't get a positive result we, I just, I charged

8  him with distribution of a counterfeit substance.

9  Q    Okay. And what did you do with the actual rocks of

10  cocaine that he both gave you and that you recovered from

11  his person?

12  A    Cause, because I, I the appearance, and I've seen

13  crack so many times, I packaged it up and sent it to the

14  lab for, for a real analysis.

15  Q    So you followed the same drug protocols you would

16  for what you believed to be crack cocaine?

17  A    Yes.

18  Q    And do you know if the lab did an -- analyzed the

19  drugs, or the substance?

20  A    Yes, they did.

21  Q    Do you know what the results were of that analysis?

22  A    Yeah, they came back positive for, for cocaine.

23  Q    Now Sergeant Detective Keenan, with regard to the

24  crack cocaine, if -- I just want to ask you a few

25  questions about crack cocaine --

1    A    Uh-huh.

2    Q    -- in terms of how it's made. Do you -- like -- is

3    crack co -- do you know if crack cocaine comes ready made

4    or if someone has to make it, or if there's a mixture?

5    A    Yeah.  I mean crack cocaine's not bought in the

6    store.  It's not produced by anybody like a company.

7    It's made in somebody's kitchen. So, it's like a

8    homemade type substance. So, you're, you're going to get

9    different grades and dif -- and whoever does it at their

10   home is going to have it done differently. You know,

11   you're going to have different -- different, what do you

12   call it, I'm losing me here -- amounts I guess --

13   Q    There's going to be different purities?

14   A    -- yeah, different purities, different amounts in

15   there so you may get a higher grade or a lower grade of,

16   of cocaine in that. So it's what we usually call it is,

17   someone will say, "that's fire" that means there's a lot

18   of coke in there, and if, or someone will say "you got

19   garbage" there's no coke in there.

20   Q    Now, in term -- because it's homemade, in terms of

21   the consistency of any particular crack rack (sic) crack

22   rock, is it possible that the consistency of cocaine

23   might be different throughout the rock?

24   A    Yeah, the way I understand it is sometimes you'll

25   get some, some cocaine, you know, the mixture will not be

1   consistent throughout the whole cocaine.  It's made on a,

2   on a bottom of a a cooking pan and it's flat and, when

3   it's cooked, and then they slice it up, so I mean it's

4   pretty obvious, some of it would be more consistent, on,

5   on, on other parts of the -- during the cooking process.

6   Q   So, with regard to the preliminary field test, is

7   it, can you think of any reason why it may not have been

8   positive at the time that you did it?

9   A   Both, like I just said, it might not have been

10  consistent throughout and I may have grabbed a part where

11  it wasn't cocaine.  Cause I just do a really small swab

12  on the side of a, a cut piece.  But, I think more so is

13  these swipes are made for, for po -- like for cocaine,

14  and when you wipe cocaine, you see it right away.  On, on

15  crack cocaine it's a solid substance, so I believe what

16  happened here was the, the substance just didn't, it, it

17  didn't take it right away until, you know, after, after

18  awhile where it set in, and the crack, and then it

19  eventually it showed up.

20  Q   Okay.  Now on the date that you tested it there was

21  no blue on the crack cocaine?

22  A   Yes.

23  Q   Have you seen those same drugs that you tested on

24  that day since then?

25  A   Yes.

1  Q   And did you notice anything about the drugs at that
2  point?

3  A   I did.  If you look a the drugs there's, there is a
4  little, a small piece in there that's blue, the same
5  color that I described, and if I would expect to see when
6  I, if I swiped it in the, the color would come up for a
7  positive result of cocaine.  It's there now.

8  Q   Okay.  Now Sergeant Detective Keenan, you said that
9  this occurred on Pine Street, in the Pine Street area, or
10 the area of Pine Street?

11 A   On Washington Street in front of 888 Washington
12 Street, it's right before, it's right before the New
13 England Medical Center.

14 Q   Is that close to any type of school?

15 A   Yeah, it's, it's right next to the, the Josiah
16 Quincy Upper Middle School, which is located at 889, is
17 that, 889 Washington Street.

18 Q   It's, it's located on Washington Street?

19 A   It's -- I'm sorry, located at 900 Washington Street
20 and a measurement was taken by Detective Walsh, from the
21 location where I purchased the drugs to the school, which
22 is a Boston Public School, and the measurement was 160
23 feet.

24 Q   It was 160 feet between the school and where you,
25 you did the transaction with Mr. Banks?

1    A    Exactly.

2    Q    And the Josiah -- and just to be clear, the Josiah

3    Quincy Upper school, that is a Boston Public School?

4    A    It is.

5    Q    And was that school active, not necessarily on that

6    day because it was a Sunday, but is this an active

7    school?

8    A    It is, it's an open and running Boston Public School

9    presently.

10   Q    Okay.

11   A    And at that time it was.

12   Q    Now Sergeant Detective Keenan, I am showing you what

13   has been pre-marked as Grand Jury Exhibits 1 and 2.  Have

14   you seen these before?

15   A    I have.

16   Q    And what are those?

17   A    These are the, the analysis from the, from the drugs

18   that I sent to the lab, this is the State Lab Analysis.

19   Exhibit Number 1 is the two plastic bags that I had

20   purchased, and it states that the substance was found to

21   contain cocaine.  Two items were received and one was

22   selected and analyzed.  The defendant is Jeffrey Banks.

23       And the second  -- both of them Exhibit -- I'm

24   sorry, that was Exhibit 2, I just called off the, the two

25   plastic bags.  And Exhibit Number 1 is the six plastic

1   bags that were recovered from him on scene after he's

2   arrested.  And it states that six items were received and

3   one was selected and analyzed and it contained cocaine.

4   The defendant is Jeffrey Banks.

5   Q    Thank you.

6        MS. PLATT: Thank you.  At this time I publish these,

7   these Exhibits to the grand jury.

8   Q    And then finally I'm showing you Exhibits 1 through

9   4, do you, can you just look at that and tell me if you

10  recognize what that is?

11  A    Yes, this is, is a photocopy of the money that I was

12  provided that day that I used to purchase the drugs.  It

13  was $30 in all.

14  Q    And do you photocopy both sides of the money?

15  A    We do, yes.

16  Q    And those photocopy -- when were those photocopies

17  taken?

18  A    That morning.

19  Q    Prior to you going out?

20  A    Yes.  That was the same -- that was the photocopy we

21  used to match up the bills recovered from Mr. Banks after

22  he was arrested.

23  Q    Thank you.

24       MS. PLATT: I will publish that to the grand jury.

25  Q    And just -- Sergeant Detective Keenan, in your

1   experience is it -- when you do field tests, whether

2   they're positive or negative, do you rely on that as an,

3   as a clear definition of what the substance is?

4   A     No.

5   Q     Do you ever rely on the field test?

6   A     No.

7   Q     And why is that?

8   A     Cause what it is, it's a field test, a presumptive

9   test, and they need to get a real analysis of it you have

10  to sent it to the lab and professional lab people to do

11  their, do their thing and see what the substance actually

12  is.

13        MS. PLATT: I have no further questions.  Does

14  anybody have any questions?

15        JUROR: The ninja star, it's not, it's not considered

16  a dangerous weapon or anything?

17        MS. PLATT: You can ----

18  A     Yeah, yeah, it is one of the dangerous weapons

19  listed and he was actually charged with that on that day,

20  possession of a dangerous weapon.

21        MS. PLATT: Any other questions?

22                    (No Response from Jurors)

23        Okay.  Thank you.

24        WITNESS: Thanks.

25                 (Whereupon the witness left the room)

1     MS. PLATT: Okay.  Based on the testimony you've

2     heard and the evidence you've received during the course

3     of the investigation, I'd ask you to consider the

4     following charges against Jeffrey Banks:

5          First, distribution of cocaine;

6          Distribution of cocaine in a school zone;

7          Possession with intent to distribute cocaine; and

8          Possession with intent to distribute cocaine in a

9     school zone; and

10         Then the carrying of the dangerous weapon.

11         Thank you.  Yeah, I've got to give you that.

12         (Whereupon Assistant District Attorney left room)

13

14    **(Grand Jury called to order.)**

15    **(10:35 A.M.)**

16         MS. PLATT:  Good morning, again.  I am informed that

17    the grand jury has returned a true bill against Jeffrey

18    Banks on the charges of distribution of cocaine, as well

19    as possession with intent cocaine.  At this time I'm

20    recalling Sergeant Detective Keenan to the stand.

21

22                    DONALD KEENAN, PREVIOUSLY SWORN

23

24

25    Q    Good morning again, Sergeant Detective Keenan.  I'll

1  remind you that you are still under oath.

2  A    Good morning.

3  Q    Now, the grand jury has in fact returned a true bill

4  for Mr. Banks with regard to the distribution of a

5  cocaine substance as well as possession with intent to

6  distribute cocaine.  Do you have any further information

7  on Jeffrey Banks relative to convictions for a similar or

8  like offense?

9  A    Yes.

10  Q    And what is that?

11  A    That on April 28, 2004, Mr. Jeffrey Banks was

12  convicted in Plymouth Superior Court for distribution of

13  Class B, Docket Number 200200486.

14      MS. PLATT: Thank you.  Do you have -- does anybody

15  have any questions?

16                 (No Response from Jurors)

17      WITNESS: Have a good day.

18      MS. PLATT: Thank you.

19                 (Whereupon the witness left the room)

20      Okay.  Ladies and gentlemen, based on the testimony

21  that you just heard, I'd ask you to consider the

22  following charges:

23      Distribution of a cocaine substance subsequent

24  offense;

25      As well as possession with intent to distribute a

1    cocaine substance as a subsequent offense.

2         Thank you.

3

4              (Whereupon Hearing Concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

    I, JACQUELYN A. HEALEY, COURT REPORTER, DO HEREBY
CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
TRANSCRIPT FROM THE JAVS RECORDING OF THE SUFFOLK COUNTY
GRAND JURY PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

    I, JACQUELYN A. HEALEY, FURTHER CERTIFY THAT THE
FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE
OF THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT.

    I, JACQUELYN A. HEALEY, FURTHER CERTIFY THAT I
NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY
OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS
TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR
OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.



JACQUELYN A. HEALEY

COURT REPORTER

JULY 29, 2011

SUFFOLK COUNTY GRAND JURY - BOSTON

3 PEMBERTON SQUARE

BOSTON, MASSACHUSETTS 02114

(617) 367-6911

PROCEEDINGS RECORDED BY JAVS.

TRANSCRIPT PRODUCED FROM COMPUTER.

VOLUME:     I
PAGES:      1-14
EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                               \*

COMMONWEALTH OF MASSACHUSETTS,   \*
                               \*

           Plaintiff,       \*
                               \*

v.                               \*  Docket No. SUCR2011-10667
                               \*

JEFFREY BANKS,                   \*
                               \*

           Defendant      \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MOTION HEARING
BEFORE THE HONORABLE CAROL BALL

APPEARANCES:

For the Commonwealth:
NICOLE CORDEIRO, ESQUIRE
Suffolk County District Attorney's Office
1 Bulfinch Place, 3rd Floor
Boston, Massachusetts  02114-2997

For the Defendant:
SHANNON McAULIFFE, ESQUIRE
Massachusetts Public Counsel Services
One Congress Street
Boston, Massachusetts  02114

Boston, Massachusetts
Courtroom 704
June 14, 2012

Transcript produced by Approved Court Transcriber Cindy
Crowley

1 | (12:04 p.m.)

2 | (Defendant present.)

3 |     THE COURT: Opposition in this case. Let me ask you this

4 | question. What, Ms. McAuliffe, would you gain from having the

5 | wipe available that is not -- or potentially -- that is not

6 | already accomplished by the fact which is testifiable which

7 | would be testified to at trial that the wipe was disposed of?

8 |     MS. McAULIFFE: Okay. Well, it's the wipe and the portion

9 | of the drugs that tested negative. So those were the -- both

10 | of the things that were destroyed, and so I think there's

11 | prejudice because they were both destroyed, and with the --

12 |     THE COURT: Well, the portion of the drugs that were

13 | tested negative were eaten up in the testing, I'm assuming.

14 |     MS. McAULIFFE: Well, no. He said he -- he said he

15 | probably threw them on the ground. No. That's not true. In

16 | the Grand Jury he says he tested -- he broke off --

17 |     THE COURT: I know. But my point is the evidence is

18 | irrevocable -- irrefutable that at the time of the arrest they

19 | streaked -- they drug -- they tested, the strip tested the

20 | drugs and said it was counterfeit drugs, and the jury is going

21 | to hear that.

22 |     MS. McAULIFFE: That's true.

23 |     THE COURT: And then they send it for routine testing. It

24 | turns out there are some that's --

25 |     MS. McAULIFFE: If they're the drugs that actually that

```
1   they sent, but --

2        THE COURT:  Yeah.  But that's a whole other issue.

3        MS. McAULIFFE:  -- there was a -- in the Grand Jury, he

4   says that he took a portion of the rock, --

5        THE COURT:  Right.

6        MS. McAULIFFE:  -- he tested it, it came back negative.

7   Now what he is saying and what Ms. Cordeiro said in her

8   opposition is that now it's our -- apparently a,

9   quote-unquote, crumb which is not what the Grand Jury minutes

10  say at all.

11       So let's say we have the portion that he tested.

12       THE COURT:  That's fine.

13       MS. McAULIFFE:  So you take --

14       THE COURT:  That's impeachment material.

15       MS. McAULIFFE:  So you -- let's say you take a portion of

16  the rock and you go like this and it turns -- it doesn't turn

17  blue.

18       THE COURT:  Right.

19       MS. McAULIFFE:  And then you save it, and then you send

20  the rest of them off to the lab.

21       THE COURT:  Right.

22       MS. McAULIFFE:  Now -- that come back positive.  Now

23  there's got to be some explanation as to why this portion of

24  the rock did not turn --

25       THE COURT:  Um-hmm.
```

1     MS. McAULIFFE: -- and the rest did if they match. So I
2  could have hired an expert to test this portion that was
3  tested.

4     THE COURT: I think that's true. The one thing I see
5  about this motion that I say to the Commonwealth is that I'm
6  not sure it's dismissible, but I do think that you may be
7  foreclosed from explaining the erroneous negative. I mean
8  that's the only thing because any explanation she's now not
9  able to test. Do you understand what I'm trying to say?
10    MS. CORDEIRO: Yes.

11    MS. McAULIFFE: And what's interesting is in the Grand --
12    THE COURT: Which I gather that, you know, there are
13  explanations for why this could have happened, that it was
14  mixed badly, that if he waited longer maybe this strip would
15  have changed, bla, bla, bla. And I can see that the problem
16  there is that the defense doesn't have an opportunity to test
17  those explanations against the real stuff. So I can see that.
18    MS. McAULIFFE: And the problem is that's exactly what
19  happens in the Grand Jury minutes is he says that --

20    THE COURT: But then you've got that to -- then, you know,
21  in other words, to be frank, I read this. I don't see any
22  evidence of bad faith because I've seen a million of these
23  cases. I think they routinely destroy the strip.

24    MS. McAULIFFE: And the drugs that come back negative? I
25  don't think they routinely do that at all. I think under

1  Brady they're supposed to preserve it.  Absolutely.

2      You take a portion of the rock, you go like this, --

3      THE COURT:  Well --

4      MS. McAULIFFE:  -- and you need to save it.

5      THE COURT:  Well, in other words, I'm not -- I don't see

6  any bad faith on the part of the cops here.  If anything --

7      MS. McAULIFFE:  But we don't need to show bad faith.

8      THE COURT:  -- the difference I'd charge him with

9  counterfeited not with --

10      MS. McAULIFFE:  I understand, Judge, but we don't --

11      THE COURT:  So I don't see any, A, any bad faith.  So I

12  don't think any motion to dismiss lies, but I do think that

13  you need to be protected against prejudice by virtue of the

14  fact the stuff wasn't saved, and it seems to me that ordering

15  that the Common -- that the evidence shall reflect and shall

16  reflect that this field test was negative and the Commonwealth

17  is foreclosed from explaining what they believe -- offering

18  any explanation as to what -- why the test was negative when

19  they now have evidence that the drugs -- stuff was drugs.

20      MS. McAULIFFE:  Judge, can I just ask you?  What do you

21  think there being no bad faith actually bares on this

22  question?  Because the law in the Commonwealth has nothing to

23  do with bad faith.  If I can show under Neil, under Henderson

24  and Williams, all I need to show is that what was not saved,

25  what was destroyed, was potentially exculpatory.  After that,

1  it's a balancing test. It has absolutely nothing to do with

2  bad faith. Youngblood is not the law here, and that's what my

3  motion says and that's what my opposition says. So now it's

4  just a balancing test. All we have to balance is, one, the

5  Commonwealth's culpability -- and again here definitely

6  culpable, not -- it's not lost, stolen or, you know, there's

7  been a fire.

8      The second is the materiality of the evidence which I

9  think we all agree is absolutely Brady material. This is

10  constitutional, exculpatory, material evidence.

11      And the third thing that you weigh is prejudice to the

12  defendant. And again we have excuses, rationalizations, which

13  you can exclude, but we also have -- we've lost the ability

14  now to say the drugs that went to the lab -- given Dookhan,

15  these Dookhan problems, maybe those weren't the drugs that

16  were sent, and if we had the portion that was tested --

17      THE COURT: I think this Dookhan thing -- I mean I don't

18  blame the defense Bar, but I think this Dookhan thing is

19  completely overblown.

20      MS. McAULIFFE: I don't. I think she's -- I think she's

21  guilty of a crime. I mean she -- not only did she breach

22  protocol, she cooked the books.

23      THE COURT: Lost her job. She didn't cook the --

24      MS. McAULIFFE: She did, no. Did you see -- in my exhibit

25  which is a letter from the Department of Health and the state

1   laboratory, it says it was not signed out.  When they
2   discovered it, they went back a day later, and her signature
3   was there, and it appears that she put it there later.  That
4   is --

5       THE COURT:  And they can identify the cases that this
6   happened on?  I mean I do think this is being overblown.

7       MS. McAULIFFE:  That is cooking the books.  I mean that is
8   forgery.  Adding your -- when you know you're in trouble,
9   going back and adding your signature later.

10      So again, I don't think that bad faith has anything to do
11  with it.  I think that under the balancing test that this case
12  absolutely should be dismissed.

13      Now we're left in a situation with if the only remedy is
14  you're going to exclude their explanations, then does that
15  mean if I call an expert to say that it's impossible that that
16  happened, then of course that's going to open the door to
17  their explanations, and there's going to be actually no
18  sanction, and they can destroy things like this with impunity,
19  and I don't think that that's what the case law says.  I think
20  it's very clear under the balancing test.

21      THE COURT:  I think the case law makes it clear that a
22  dismissal of a case in circumstances where evidence is
23  destroyed is the last possible result because you balance the
24  public's interest in seeing that crime is deterred, et cetera,
25  and only if there isn't another remedy to solve the problem,

1    and I think the remedy here is what I say it is.

2       I assume, Ms. Cordeiro, you have no objection to me

3    entering such an order?

4       MS. CORDEIRO: No.

5       MS. McAULIFFE: Judge, so -- and now on the last date we

6    were here, I asked for expert funds which you gave me, and you

7    asked me to wait the six weeks until we had this hearing

8    because I believe you thought that you were going to be

9    allowing the motions. So can I now use those expert --

10       THE COURT: No. I don't think I thought I was going to

11    be --

12       MS. McAULIFFE: -- funds?

13       THE COURT: I wasn't going to be -- if I thought I was

14    going to be allowing the motions, I would've said -- denied it

15    because there would be no reason to spend the money.

16       MS. McAULIFFE: You told me not to spend it until after

17    today.

18       THE COURT: Right. Until we heard today. So now you can

19    spend the money.

20       So I'm going to deny the motion. However, I am going to

21    order that the Commonwealth be -- what's the word I'm looking

22    for? Not forbidden. -- be -- I'll figure it out.

23       MS. CORDEIRO: Your Honor, may I suggest that this be

24    taken up with the trial judge?

25       THE COURT: No. Not this particular order. I mean I hear

1    you.  I thought about that, but I don't think we can get this
2    case ready for trial without the order being made prior to two
3    weeks before you go to trial on the case.

4       MS. CORDEIRO:  After rethinking it, my concern, at least
5    at this point, Your Honor, is that I haven't had a chance to
6    just review case law with respect to that particular
7    limitation.

8       THE COURT:  Well, that's too bad.

9       MS. CORDEIRO:  Okay.  Can I just -- can I note my
10   objection on the record?  I apologize.  Thank you.

11      THE COURT:  I mean the fact of the matter is I saw the
12   explanation which I mean, frankly, makes some logical sense.
13   But it's clear to me that if the defense had this stuff, their
14   expert might be able to test the stuff against those
15   explanations.

16      MS. CORDEIRO:  I completely understand the Court's
17   reasoning, Your Honor.

18      THE COURT:  Right.

19      MS. CORDEIRO:  I'd just like to look at it a little bit
20   more, that's all.

21      THE COURT:  Okay.  It's under advisement.

22      MS. McAULIFFE:  Judge, can we -- this case is going to
23   have to be transferred.  Does it make sense to get a status
24   date in July, for counsel?

25      THE COURT:  Jimmy, do you have the original on this?

```
1          THE CLERK:  Yes.  (Indiscernible at 12:12:31 -- low
2   audio.)
3          MS. McAULIFFE:  July 12th.
4          THE COURT:  (Indiscernible at 12:12:32 -- garbled speech)
5   original motion?
6          THE CLERK:  Yes.  Number 16; right?  Do you need the
7   opposition?
8          THE COURT:  No.  But you do have it in the file?
9          THE CLERK:  (Indiscernible at 12:12:45 -- garbled speech)
10  16.
11         THE COURT:  Yes.
12         THE CLERK:  If it's the opposition (indiscernible at
13  12:12:51 -- low audio) I'll take it.  (Indiscernible at
14  12:12:54 -- low audio).
15         THE COURT:  This isn't the Commonwealth's.  Okay.  I mean,
16  I've got this here.
17         THE CLERK:  In response to Commonwealth's opposition
18  (indiscernible at 12:13:05 -- simultaneous speech).
19         THE COURT:  That's different.  Opposition to
20  (indiscernible at 12:13:07 -- garbled speech).
21         THE CLERK:  Okay.  This matter is continued to July 12th
22  for status re:  counsel.  Jail list.
23         (Court recessed at 12:13:16.)
24         (Court resumed at 12:13:34.)
25         THE CLERK:  Yes.
```

1    MS. CORDEIRO:  Thank you very much.

2    THE CLERK:  That will be in the magistrate for counsel.

3    MS. McAULIFFE:  Thank you.

4    MS. CORDEIRO:  Thank you, Your Honor.  Thank you,

5 Mr. Clerk.

6    THE COURT:  Yeah.

7    (Court adjourned until July 12, 2012.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**The Commonwealth of Massachusetts**
**ADMINISTRATIVE OFFICE OF THE TRIAL COURT**
**Office of Transcription Services (OTS)**
**Two Center Plaza**
**Boston, Massachusetts 02108**

# AUDIO ASSESSMENT FORM (AAF)

*Approved Court Transcriber: Complete one (1) Audio Assessment Form (AAF) for each volume of transcript, attach the original AAF to the next to last page of each volume of transcript, and FAX a copy of the AAF to OTS at 617-878-0762.*

**TODAY'S DATE:** 9/20/12          **TRANSCRIBER NAME:** Cindy J. Crowley

**CASE NAME:** Comm. v. Jeffrey Banks          **DOCKET NO.:** SUCR2011-10667

**JUDGE:** Carol Ball          **RECORDING DATE:** June 14, 2012

**TRANSCRIPT VOLUME:** I   **OF** I

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**QUALITY OF AUDIO:**
(check one)
☒ excellent   ☐ good   ☐ fair   ☐ poor

**TYPE OF AUDIO:**
(check one)
☒ CD   ☐ TAPE

(check all that apply)
☐ background noise

☒ low audio

☐ low audio at sidebar

☒ simultaneous speech

☐ speaking away from microphone

☒ garbled speech

☐ rapid speech

**TIME STAMP or INDEX NUMBER**

12:12:31; 12:12:51; 12:12:54

12:13:05

12:12:32; 12:12:45; 12:13:07

**COMMENTS:**

## CERTIFICATION

I, Cindy J. Crowley, an Approved Court Transcriber, do hereby certify that the foregoing is a true and accurate transcript from the audio recording provided to me of the Suffolk Superior Court proceedings in the above-entitled matter.

I, Cindy J. Crowley, further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

I, Cindy J. Crowley, further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

*Cindy J. Crowley*

Cindy J. Crowley
September 20, 2012
146 Milton Street
Dorchester, Massachusetts    02124
617-436-0398
cindy.crowley@comcast.net

## 1

**12** [1] - 11:7
**12:04** [1] - 2:1
**12:12:31** [1] - 10:1
**12:12:33** [1] - 10:4
**12:12:45** [1] - 10:9
**12:12:51** [1] - 10:13
**12:12:54** [1] - 10:14
**12:13:05** [1] - 10:18
**12:13:07** [1] - 10:20
**12:13:16** [1] - 10:23
**12:13:34** [1] - 10:24
**12th** [2] - 10:3, 21
**15** [2] - 10:6, 10

## 2

**2012** [1] - 11:7

## A

**ability** [1] - 6:13
**able** [2] - 4:9; 9:14
**absolutely** [4] - 6:1; 6:1, 9; 7:12
**accomplished** [1] - 2:6
**adding** [2] - 7:8
**adjourned** [1] - 11:7
**advisement** [1] - 9:21
**agree** [1] - 6:9
**allowing** [2] - 8:9, 14
**apologize** [1] - 9:10
**arrest** [1] - 2:18
**assure** [1] - 8:2
**assuming** [1] - 2:13
**audio** [2] - 10:2, 13
**audio)** [1] - 10:14
**available** [1] - 2:5

## B

**bad** [6] - 4:22; 5:6, 11, 21, 23; 6:2; 7:10; 8:5
**badly** [1] - 4:14
**balance** [2] - 6:4; 7:23
**balancing** [4] - 6:1, 4; 7:11, 20
**Barry** [1] - 6:18
**bares** [1] - 6:21
**bit** [1] - 9:19
**bla** [2] - 4:15
**blame** [1] - 6:18
**blue** [1] - 3:17
**books** [2] - 6:22; 7:7
**Brady** [2] - 5:1; 6:9
**breach** [1] - 6:21
**broke** [2] - 2:16

## C

**case** [5] - 2:3; 7:11, 19, 21-22; 9:2, 8, 22
**cases** [2] - 4:23; 7:5
**cetera** [1] - 7:24
**chance** [1] - 9:5
**changed** [1] - 4:15
**charge** [1] - 5:8
**circumstances** [1] - 7:22
**clear** [3] - 7:20; 9:13
**CLERK** [9] - 10:1, 6, 9, 12, 17, 21, 25; 11:2
**Clerk** [1] - 11:5
**Common** [1] - 5:15
**Commonwealth** [4] - 4:5; 5:16, 22; 8:21
**Commonwealth's** [4] - 8:5; 10:15, 17
**completely** [2] - 6:19; 9:18
**concern** [1] - 9:4
**constitutional** [1] - 6:10
**continued** [1] - 10:21
**cook** [1] - 6:23
**cooked** [1] - 6:22
**cooking** [1] - 7:7
**cops** [1] - 5:8
**Cordeiro** [2] - 3:7; 6:2
**CORDEIRO** [9] - 4:10; 8:4, 23; 9:4, 9, 16, 19; 11:1, 4
**counsel** [3] - 9:24; 10:22; 11:2
**counterfeit** [1] - 2:20
**counterfeited** [1] - 5:9
**course** [1] - 7:16
**Court** [3] - 10:23; 11:7
**COURT** [37] - 2:3, 12, 17, 23; 3:2, 5, 12, 14, 18, 21, 25; 4:4, 12, 20; 5:3, 5, 8, 11; 6:17, 23; 7:5, 21; 8:10, 13, 18, 25; 9:8, 11, 18, 21, 25; 10:4, 8, 11, 15, 19; 11:6
**Court's** [1] - 9:16
**crime** [2] - 6:21; 7:24
**crumb** [1] - 3:9
**culpability** [1] - 6:5
**culpable** [1] - 6:6

## D

**date** [2] - 8:5; 9:24
**Defendant** [1] - 2:2
**defendant** [1] - 6:12
**defense** [5] - 4:16; 6:18; 9:13
**definitely** [1] - 6:5
**denied** [1] - 8:14
**deny** [1] - 8:20
**Department** [1] - 6:25
**destroy** [2] - 4:23; 7:18
**destroyed** [4] - 2:10; 5:25; 7:23
**deterred** [1] - 7:24
**difference** [1] - 5:8
**different** [1] - 10:19

**discovered** [1] - 7:2
**dismiss** [1] - 5:12
**dismissal** [1] - 7:22
**dismissed** [1] - 7:12
**dismissible** [1] - 4:6
**disposed** [1] - 2:7
**Dookhan** [2] - 6:14, 17
**door** [1] - 7:16
**drug** [1] - 2:19
**drugs** [15] - 2:9, 12, 20, 25; 4:24; 5:19; 6:14

## E

**eaten** [1] - 2:13
**entering** [1] - 8:3
**erroneous** [1] - 4:7
**et** [1] - 7:24
**evidence** [7] - 2:17; 4:22; 5:15, 19; 6:8, 10; 7:22
**exactly** [1] - 4:18
**exclude** [2] - 6:13; 7:14
**exculpatory** [2] - 6:26; 6:10
**excuses** [1] - 6:12
**exhibit** [1] - 6:24
**expert** [5] - 4:2; 7:15; 8:6, 9; 9:14
**explaining** [2] - 4:7; 5:17
**explanation** [5] - 3:23; 4:8; 5:16; 9:12
**explanations** [5] - 4:13, 17; 7:14, 17; 9:15

## F

**fact** [3] - 2:6; 5:14; 9:11
**faith** [5] - 4:22; 5:6, 11, 21, 23; 6:2; 7:10
**field** [1] - 5:16
**figure** [1] - 8:22
**file** [1] - 10:6
**fine** [1] - 3:12
**fire** [1] - 6:7
**forbidden** [1] - 8:22
**foreclosed** [2] - 4:7; 5:17
**forgery** [1] - 7:8
**frank** [1] - 4:21
**frankly** [1] - 5:12
**funds** [2] - 8:6, 12

## G

**gain** [1] - 2:4
**garbled** [3] - 10:4, 9, 20
**gather** [1] - 4:12
**given** [1] - 6:14
**Grand** [5] - 2:16; 3:3, 9; 4:11, 19
**ground** [1] - 2:15
**guilty** [1] - 6:21

## H

**Health** [1] - 6:25
**hear** [2] - 2:21; 9:25
**heard** [1] - 8:18
**hearing** [1] - 8:7
**Henderson** [1] - 6:23
**hired** [1] - 4:2
**hmm** [1] - 3:25
**Honor** [4] - 8:23; 9:5, 17; 11:4

## I

**identify** [1] - 7:5
**impeachment** [1] - 3:14
**impossible** [1] - 7:15
**impunity** [1] - 7:18
**indiscernible** [7] - 10:1, 4, 9, 12-13, 18, 20
**interest** [1] - 7:24
**interesting** [1] - 4:11
**irrefutable** [1] - 2:18
**irrevocable** [1] - 2:18
**issue** [1] - 3:2

## J

**Jail** [1] - 10:22
**Jimmy** [1] - 9:25
**job** [1] - 6:23
**judge** [2] - 8:24; 9:22
**Judge** [5] - 5:10, 20; 8:5
**July** [4] - 9:24; 10:3, 21; 11:7
**Jury** [4] - 2:16; 3:3, 9; 4:19
**jury** [1] - 2:20

## L

**lab** [2] - 3:20; 6:14
**laboratory** [1] - 7:1
**last** [2] - 7:23; 8:5
**law** [5] - 5:22; 6:2; 7:19, 21; 8:8
**least** [1] - 9:4
**left** [1] - 7:13
**letter** [1] - 6:25
**lies** [1] - 5:12
**limitation** [1] - 9:7
**list** [1] - 10:22
**logical** [1] - 9:12
**look** [1] - 6:19
**looking** [1] - 6:21
**lost** [2] - 6:8, 13
**Lost** [1] - 6:23
**low** [2] - 10:1, 13

## M

**magistrate** [1] - 11:2
**match** [1] - 4:1

material [3] - 3:14; 6:9
materiality [1] - 6:8
matter [2] - 9:11; 10:21
McAuliffe [28] - 2:4, 8, 14, 22, 25; 3:3, 6, 13, 15, 19, 22; 4:1, 11, 18, 24; 5:4, 7, 10, 20; 6:20, 24; 7:7; 8:5, 12, 16; 9:22; 10:3; 11:3
mean [10] - 4:7; 6:17, 21; 7:6, 15; 8:25; 9:11; 10:15
might [1] - 9:14
million [1] - 4:22
minutes [2] - 3:9; 4:19
mixed [1] - 4:14
money [2] - 6:16, 19
motion [5] - 4:5; 5:12; 8:3; 8:20; 10:5
motions [2] - 8:9, 14
MR [59] - 2:8, 14, 22, 25; 3:3, 6, 13, 15, 19, 22; 4:1, 10-11, 18, 24; 5:4, 7, 10, 20; 6:20, 24; 7:7; 8:4, 12, 16; 9:4, 9, 16, 19, 22; 10:3; 11:1, 3

**N**

need [5] - 5:4, 7, 13, 24; 10:9
negative [7] - 2:9, 13; 3:6; 4:7, 24; 5:16, 18
Neil [1] - 5:23
note [1] - 9:9
nothing [2] - 6:22; 6:1
Number [1] - 10:6

**O**

objection [2] - 8:2; 9:10
offering [1] - 5:17
one [2] - 4:4; 6:4
open [1] - 7:19
opportunity [1] - 4:16
opposition [7] - 2:3; 3:8; 6:3; 10:7, 12, 17, 19
order [4] - 8:3, 21, 25; 9:2
ordering [1] - 5:14
original [2] - 9:26; 10:5
overblown [2] - 6:19; 7:6

**P**

p.m [1] - 2:1
part [1] - 5:6
particular [2] - 8:25; 9:5
point [2] - 2:17; 9:5
portion [6] - 2:8, 12; 3:4, 11, 15, 23; 4:2; 5:2; 6:16
positive [1] - 3:22
possible [1] - 7:23
potentially [2] - 2:5; 5:25
prejudice [3] - 2:11; 5:13; 6:11
present [1] - 2:2
preserve [1] - 5:1

problem [3] - 4:15, 18; 7:25
problems [1] - 6:15
protected [1] - 5:13
protocol [1] - 6:22
public's [1] - 7:24
put [1] - 7:3

**Q**

quote [1] - 3:9
quote-unquote [1] - 3:9

**R**

rationalizations [1] - 6:12
re [1] - 10:22
read [1] - 4:21
ready [1] - 9:2
real [1] - 4:17
reason [1] - 8:15
reasoning [1] - 9:17
recessed [1] - 10:23
record [1] - 9:10
reflect [1] - 6:15
remedy [3] - 7:13, 25; 8:1
respect [1] - 9:5
response [1] - 10:17
rest [2] - 3:20; 4:1
result [1] - 7:23
resumed [1] - 10:24
rethinking [1] - 8:4
review [1] - 9:6
rock [4] - 3:4, 18, 24; 6:2
routine [1] - 2:23
routinely [2] - 4:23, 25

**S**

sanction [1] - 7:18
save [2] - 3:19; 5:4
saved [2] - 5:14, 24
saw [1] - 9:11
second [1] - 6:8
see [7] - 4:4, 15, 17, 21; 5:5, 11; 6:24
seeing [1] - 7:24
send [2] - 2:23; 3:19
sense [2] - 9:12, 23
sent [2] - 3:1; 6:16
shall [2] - 6:15
show [3] - 6:7, 23
signature [2] - 7:2, 9
signed [1] - 7:1
simultaneous [1] - 10:18
situation [1] - 7:13
six [1] - 8:7
solve [1] - 7:25
speech [2] - 10:4, 9
speech] [2] - 10:18, 20
spend [3] - 8:15, 19
state [1] - 6:25

status [2] - 9:23; 10:22
stolen [1] - 6:6
streaked [1] - 2:19
strip [3] - 2:19; 4:14, 23
stuff [5] - 4:17; 5:14, 19; 9:13
suggest [1] - 8:23
supposed [1] - 5:1

**T**

test [10] - 4:2, 9, 16; 6:16, 18; 6:1, 4; 7:11, 20; 9:14
tested [6] - 2:9, 13, 16, 19; 3:6, 11; 4:3; 6:16
testifiable [1] - 2:6
testified [1] - 2:7
testing [2] - 2:13, 23
THE [45] - 2:9, 12, 17, 23; 3:2, 6, 12, 14, 16, 21, 25; 4:4, 12, 20; 5:3, 5, 8, 11; 6:17, 23; 7:5, 21; 8:10, 13, 18, 25; 9:8, 11, 18, 21, 25; 10:1, 4, 8, 8-9, 11-12, 15, 17, 19, 21, 25; 11:2, 6
third [1] - 6:11
threw [1] - 2:15
today [2] - 8:17
took [2] - 3:4
transferred [1] - 9:23
trial [4] - 2:7; 8:24; 9:2
trouble [1] - 7:8
true [3] - 2:15, 22; 4:4
trying [1] - 4:9
turn [2] - 3:16, 24
turns [2] - 2:24; 3:16
two [1] - 9:2

**U**

um-hmm [1] - 3:25
under [6] - 4:25; 5:23; 7:11, 20; 9:21
unquote [1] - 3:9
up [2] - 2:13; 8:24

**V**

virtue [1] - 5:13

**W**

wait [1] - 8:7
waited [1] - 4:14
weeks [2] - 8:7; 9:3
weigh [1] - 6:11
whole [1] - 3:2
Williams [1] - 5:24
wipe [2] - 2:5, 7
word [1] - 8:21
words [2] - 4:21; 5:5
would've [1] - 8:14

**Y**

youngblood [1] - 6:2

Cindy J. Crowley
Approved Court Transcriber
146 Milton Street, Dorchester, Massachusetts 02124
617-436-0398

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARTMENT
                                               NO.  SUCR 2011-10667

COMMONWEALTH

v.

JEFFREY BANKS

# COMMONWEALTH'S SECOND NOTICE OF DISCOVERY

Now comes the Commonwealth in the above-captioned matter and respectfully

states that it has provided counsel for the defendant with copies of the following

discovery material:

- (1)    Notice of Expert Witness-Chemists;

- (2)    Chemists' Bench Notes (22 pages).

Please be advised that the Commonwealth intends to file a Notice of Expert
Witness to explain how illegal drugs are bought and sold in the Boston area, and
to give expert testimony related to the case at bar.

                                        Respectfully Submitted
                                        For the Commonwealth

                                        DANIEL F. CONLEY
                                        DISTRICT ATTORNEY

                                        By:  T. Platt

                                        Tonya Platt
                                        Assistant District Attorney
                                        One Bulfinch Place
                                        Boston, MA  02114
                                        (617) 619-4000

Dated: November 17, 2011

## Certificate of Service

I, Nicole Cordeiro, standing in for ADA Tonya Platt, do hereby certify that I caused a copy of this Notice of Discovery 2 to be hand served to counsel of record for the defendant, Tim Brown.

Nicole Cordeiro
Assistant District Attorney
One Bulfinch Place
Boston, MA 02114
617-619-4275
BBO#668039

DATE: 11-17-11

$\mathcal{D}l^C$

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS.**

### SUPERIOR COURT DEPARTMENT
### INDICTMENT. NO.: 2011SUCR10667

#### COMMONWEALTH

**V.**

#### JEFFREY BANKS

## COMMONWEALTH'S NOTICE OF EXPERT WITNESS

Now comes the Commonwealth with disclosure of the expert witness it intends to call at the above referenced trial:

**Expert Witnesses:**

Annie Dookhan (Chemist)
Kate Corbett (Chemist)

***The above listed witnesses are being called by the Commonwealth for the purposes of giving the defendant an opportunity to confront said witnesses on the stand. In the event that the defendant does not wish to confront said witnesses and stipulate to the subject narcotics as testing positive for the respective controlled substances as alleged, the above listed witnesses will not be called by the Commonwealth***

**Contact Information:**

Crime Laboratory
59 Horse Pond Road
Sudbury, MA 01776
(508) 358-3110

## Expected Testimony:

It is expected that both chemists will testify as to their practices and procedures in testing submitted items at the lab. The witness will further testify as to the testing conducted in the present case.

Respectfully submitted,
For the Commonwealth,

DANIEL F. CONLEY
DISTRICT ATTORNEY

7. Platt

Tonya Platt
Assistant District Attorney
Suffolk District Attorney's Office
One Bulfinch Place
Boston, MA 02114
(617) 619-4000



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
William A. Hinton State Laboratory Institute
305 South Street, Jamaica Plain, MA 02130
617-983-6622

**Deval Patrick**
Governor

**Timothy P. Murray**
Lt. Governor

**Judyann Bigby, MD**
Secretary

**John Auerbach**
Commissioner

DATE RECEIVED: 12/16/2010
DATE ANALYZED: 03/07/2011

NO. B10-14541

I hereby certify that the Substance
Contained in 2 plastic bags
Submitted by P.O. Diana Lopez of the Boston D.C.U. Police Dept.
MARKED: B10-14541

Has been examined with the following results:
The substance was found to contain:
Cocaine, a derivative of Coca leaves, as defined in Chapter 94 C, Controlled
Substance Act, Section 31, Class B.
2 items were received and 1 was selected and analyzed.

NET WEIGHT: 0.12 grams (analyzed item only)

DEFENDANT: BANKS, JEFFREY

ASSISTANT ANALYST

Annie Dookhan

Kate Corbett

On this date March 8, 2011, before me, the undersigned notary public, personally appeared the above signed
subscriber(s), having proved to me through Department of Public Health documentation to be the person(s) whose
name(s) is/are signed on this certificate and to be (an) assistant analyst(s) of the Department of Public Health, and
who swore to me that the contents of this document are truthful and accurate to the best of his/her/their knowledge
and belief.

Della C. Saunders
Notary Public
Commonwealth of Massachusetts
My commission expires on
August 23, 2013

Della C. Saunders, NOTARY PUBLIC
My commission expires on August 23, 2013

Chapter 111, Section 13 of the General Laws
This certificate shall be sworn to before a Justice of the Peace or Notary Public, and the jurat shall contain a
statement that the subscriber is the analyst or assistant analyst of the department. When properly executed, it shall
be prima facie evidence of the composition, quality, and the net weight of the narcotic or other drug, poison,
medicine, or chemical analyzed, and the court shall take judicial notice of the signature of the analyst or assistant
analyst, and of the fact that he/she is such.



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
William A. Hinton State Laboratory Institute
305 South Street, Jamaica Plain, MA 02130
617-983-6622

**Deval Patrick**
Governor

**Timothy P. Murray**
Lt. Governor

**Judyann Bigby, MD**
Secretary

**John Auerbach**
Commissioner

**DATE RECEIVED:** 12/16/2010
**DATE ANALYZED:** 03/07/2011

**NO.** B10-14542

I hereby certify that the Substance
Contained in 6 plastic bags
Submitted by P.O. Diana Lopez of the Boston D.C.U. Police Dept.

**MARKED:** B10-14542

Has been examined with the following results:
The substance was found to contain:
Cocaine, a derivative of Coca leaves, as defined in Chapter 94 C, Controlled
Substance Act, Section 31, Class B.
6 items were received and 1 was selected and analyzed.

**NET WEIGHT:** 0.16 grams (analyzed item only)

**DEFENDANT:** BANKS, JEFFREY

**ASSISTANT ANALYST**          Annie Dookhan          Kate Corbett

On this date March 8, 2011, before me, the undersigned notary public, personally appeared the above signed
subscriber(s), having proved to me through Department of Public Health documentation to be the person(s) whose
name(s) is/are signed on this certificate and to be (an) assistant analyst(s) of the Department of Public Health, and
who swore to me that the contents of this document are truthful and accurate to the best of his/her/their knowledge
and belief.



Delia C. Saunders
Notary Public
Commonwealth of Massachusetts
My commission expires on
August 23, 2013

Delia C. Saunders, NOTARY PUBLIC
My commission expires on August 23, 2013

Chapter 111, Section 13 of the General Laws
This certificate shall be sworn to before a Justice of the Peace or Notary Public, and the jurat shall contain a
statement that the subscriber is the analyst or assistant analyst of the department. When properly executed, it shall
be prima facie evidence of the composition, quality, and the net weight of the narcotic or other drug, poison,
medicine, or chemical analyzed, and the court shall take judicial notice of the signature of the analyst or assistant
analyst, and of the fact that he/she is such.

DIC



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
### William A. Hinton State Laboratory Institute
### 305 South Street, Jamaica Plain, MA 02130

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

JUDYANN BIGBY, MD
SECRETARY

JOHN AUERBACH
COMMISSIONER

10/7/11

Tonya Platt
Assistant District Attorney, Suffolk County

Dear ADA Platt,

Enclosed is the information you requested in regards to Commonwealth vs. Jeffrey Banks. Included are copies of the following:

1. Curriculum Vitae for Annie Dookhan and Kate Corbett.

2. Drug Analysis Laboratory Receipt.

3. Control Cards with analytical results for samples # B10-14541 & B10-14542.

4. Analysis sheets with custodial chemist's hand notations and test results.

5. GC/Mass Spectral analytical data for samples # B10-14541 & B10-14542.

Annie Dookhan was the custodial chemist and performed the preliminary testing and net weight for this sample. Kate Corbett was the confirmatory chemist and analyzed the GC/MS data for this sample.

If you have any questions about these materials, please call me at the number below.

Sincerely,

Annie Dookhan
Chemist II
Drug Analysis Lab
Jamaica Plain, MA. 02130
(617) 983-6622



## Certificate of Service

I, Nicole Cordeiro, standing in for ADA Tonya Platt, do hereby certify that I caused a copy of this Notice of Expert to be hand served to counsel of record for the defendant, Tim Brown.

Nicole Cordeiro
Assistant District Attorney
One Bulfinch Place
Boston, MA 02114
617-619-4275
BBO#668039

DATE: 11-17-11

No. B10-14541

City: Boston D.C.U. Police Dept.

Officer: P.O. Diana Lopez

Def: BANKS, JEFFREY

Amount:

No. Cont:  2    Cont: pb

Date Rec'd: 12/16/2010

Gross Wt.:  1.79

Date Analyzed: 3/7/11

Subst: SUB

No. Analyzed: 1

Net Weight: 0.12

# Tests: 2

Prelim: cocaine (10)    Findings: Cocaine

No. B10-14542

City: Boston D.C.U. Police Dept.

Officer: P.O. Diana Lopez

Det: BANKS, JEFFREY

Amount:

No. Cont: 6    Cont: pb

Date Rec'd: 12/16/2010

Gross Wt.: 6.27

Date Analyzed: 3/7/11

Subst: SUB

No. Analyzed: 1

Net Weight: 0.16

# Tests: 6 & O

Prelim: cocaine ⑩    Findings: Cocaine

· 2 CAC

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
NO. SUCR 2012-~~10863~~
11155

## COMMONWEALTH

### VS.

### ANNIE DOOKHAN

## COMMONWEALTH'S STATEMENT OF THE CASE

Now comes the Commonwealth and offers the following statement of facts. This statement does not constitute a bill of particulars, nor does it recite all the facts known to the Commonwealth, rather it is a summary of the facts.

The defendant, Annie Dookhan, was employed as a chemist in the drug analysis unit of the Hinton State Lab in Jamaica Plain, which tested drug evidence submitted by law enforcement across the state. The defendant was hired as a Chemist I in 2003, promoted to Chemist II in 2005, and resigned in March of 2012. In her capacity as a chemist, Dookhan would analyze drug evidence and at times testify in court as to her findings.

Until June of 2011, her work product was consistently the highest in the lab among her co-workers. In June a problem was discovered with the defendant's work. An evidence officer was in the process of scanning some drug samples back into the drug safe, when she discovered 90 samples of drugs had not been properly scanned out of the drug safe and that there was no

**FILED**

DEC 20 2012

chemist assigned to the sample. Dookhan's name appeared on the control card as the primary chemist but in the evidence log book there were no initials of an evidence officer signing out the drug samples to her. On June 20, three of the defendant's supervisors met to discuss the problem and observed that there were no evidence officer initials in the log book for those 90 samples.

The next day, when Dookhan was confronted with the log book, the initials of Gloria Philips had suddenly appeared in the book. Dookhan denied knowledge of the discrepancies with the log book. She claimed to not remember how the samples got into her possession in the first place. Dookhan later confessed to investigators that she had written in Gloria Phillips' initials. During the investigation, it was determined that Dookhan did not follow proper protocol for signing out drug samples from the evidence room, and further tampered with evidence by forging the initials of an evidence officer to cover-up her misconduct.

In July of 2012, in accordance with legislation, control of the drug lab was transferred from Department of Public Health to Executive Office of Public Safety and Security. As a result of this transfer, a more extensive investigation into Dookhan's practices was initiated by the State Police. Massachusetts State Police investigators interviewed all the employees of the lab and questioned them about defendant's lab practices. The defendant was interviewed by investigators on August 28, 2012 and she admitted to "dry labbing" some of the samples. "Dry labbing" is the term used for the practice of merely visually identifying samples

instead of performing the required chemical test. It was discovered that Dookhan would assemble multiple drug samples from different cases that appeared to be the same substance. She would then perform the chemical tests on a few of the samples to verify that the samples were in fact the drug she believed they were, and if those were positive, would assume all the samples were positive without performing the necessary chemical tests.

Typically, a small amount of the drug sample is mixed into a vial by the primary chemist and then sent to a second testing stage to confirm the initial results. If the second test does not confirm the initial results, the vial is sent back to the primary chemist to concentrate and resubmit. When samples were sent back to Dookhan in this stage, she tampered with the vials before resubmitting them in order to make them consistent with the inaccurate and positive results reached as a result of her "dry labbing." Recent testing done on these samples by the Massachusetts State Police Crime Laboratory corroborates these allegations. Investigators were able to retest samples because Dookhan only altered the substances while they were in the testing vials. She did not alter the original samples.

The Commonwealth identified six specific instances where Dookhan tampered with the testing vials. Five of those cases originated in Suffolk County: Jeffrey Banks, Paul Flannelly, Stephen Goudreau, Paul Reeves, and Michael Vasquez. One case is from Bristol County: Eliezer Santiago. In the case of Jeffrey Banks, the drug certificate sworn by Dookhan that the substance was

cocaine was submitted to a Suffolk County grand jury. The grand jury relied on the drug analysis to indict Banks.

In a review of the defendant's work emails, investigators found a discovery packet that had been emailed to a prosecutor for a pending criminal case that contained an altered test. In that packet, Dookhan submitted a print out for a test designed to quantify the drug sample. In organizing the discovery information, the defendant realized that she had not printed out, or never ran, the quantifying analysis. To cover this mistake, the defendant ran the test using that the case sample number and submitted it with the discovery packet. The defendant obliterated the date the test was run. This particular machine has no capacity to save past analyses and the print date on the bottom of the document states May 5, 2011, nearly six months after the drug samples were returned to the submitting police agency. Again, the sample was not contaminated; in fact, it was no longer at the lab when this test was performed.

In fourteen separate criminal trials, the defendant testified as an expert witness regarding her job as a chemist in the drug lab. While under oath, she stated that she had a Master's degree in Chemistry from UMass Boston. This testimony was relied upon to establish a foundation for her credibility as an expert and the veracity of the drug certificate admitted into evidence. Further investigation revealed that she did not hold a Master's in Chemistry from the University of Massachusetts nor was she ever enrolled as a student in master's level classes.

The defendant also perjured herself during her testimony in the Suffolk County trial of <u>Commonwealth v. Blue</u>. In that case, Dookhan testified that she had a Master's in Chemistry and was in charge of quality control. A review of the questioning by the prosecuting and defense attorney, as well as their closing arguments, reveals that Dookhan's qualifications were a material fact in the trial.

Respectfully submitted

For the Commonwealth,

MARTHA COAKLEY
ATTORNEY GENERAL

By:

Anne K. Kaczmarek
BBO# 644812
Assistant Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 727-2200 x2677

December 20, 2012



*The Commonwealth of Massachusetts*

**DISTRICT ATTORNEY OF SUFFOLK COUNTY**
**DANIEL F. CONLEY**

Major Felony Unit
1 Bulfinch Place, Suite 300
Boston, MA 02114
P: 617-619-4000
F: 617-619-4175

June 1, 2012

Shannon McAuliffe
CPCS
One Congress Street, Suite 102
Boston, MA 02108

Re:    Commonwealth v. Jeffrey Banks

Dear Attorney McAuliffe:

Enclosed, please find a discovery packet in response to your Third Motion for Discovery which requests chain of custody information; and information regarding a breach of protocol by a Department of Public Health chemist with respect to drug samples in several Norfolk County cases. While not named in the DPH letter enclosed, the chemist who was investigated is Annie Dookhan, the chemist who analyzed the substances in our case. *Please be advised that the substances involved in our case are not among the samples mention in the DPH letter and there is no evidence that cases from any other county were implicated.*

Enclosed in this packet are the following documents related to the breach of protocol at the DPH:

(1) Letter from the Department of Public Health to District Attorney Michael Morrissey, dated February 1, 2012 with a list of cases (3 pages);
(2) Letter from the Department of Public Health to District Attorney Michael Morrissey, dated February 21, 2012;
(3) Letter from the Department of Public Health to District Attorney Daniel Conley, dated April 20, 2012 (1 page); and
(4) Department of Public Health Drug Lab procedures, last updated September 29, 2012 (24 pages).

*The above listed documentation responds to Paragraphs 5 and 6 of your Third Motion for Discovery.*

*The below listed discovery is all the evidence in the Commonwealth's care, custody and control which responds to Paragraphs 8, 9, 10, and 11.*

(5) Copy of drug receipt for samples B10-14541 and B10-14542 (1 page)
(6) Copies of electronic record of evidence transfer for samples B10-14541 and B10-14542 (2 pages)

(7) Redacted copy of logbook documenting evidence transfer for samples B10-14541 and B10-14542 (1 page)

(8) Control cards for samples B10-14541 and B10-14542 (1 page)

(9) Copies of Drug Powder Analysis Forms for samples B10-14541 and B10-14542 (2 pages)

(10) Copy of Drug Lab/MS Control Sheet for samples B10-14541 and B10-14542 (1 page)

(11) Redacted copy of Sample Pickup Receipt for samples B10-14541 and B10-14542

(12) Copy of prerecorded Buy Money which has been returned to circulation. (See Commonwealth v. Narea, 454 Mas 1003 (2009); Commonwealth v. Kee, 449 Mass. 550 (2007)). (4 pages)

   a. Buy money was provided in discovery to defense counsel on August 10, 2011.

(13) CAD sheet (1 page)

(14) Drug Control Log- BPD; Previously provided in discovery on August 10, 2011. (1 page).

*In response to Paragraph 7, the Commonwealth states:*

   a. May 1, 2012
   b. No.

*As noted on record in court on May 2, 2012, the Commonwealth has already complied with Paragraphs 1 through 4.*

Sincerely,

Nicole Cordeiro
Assistant District Attorney



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
250 Washington Street, Boston, MA 02108-4619

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

JUDYANN BIGBY, MD
SECRETARY

JOHN AUERBACH
COMMISSIONER

February 1, 2012

Michael W. Morrissey, Norfolk District Attorney
Norfolk District Attorney's Office
45 Shawmut Road
Canton, MA, 02021

Dear District Attorney Morrissey,

I am writing to inform you that we are currently investigating a possible breach of protocol with respect to ninety drug samples tested at the William A. Hinton State Laboratory Institute. These ninety samples were received exclusively from Norfolk County and assigned for analysis on the same day. Attached is a list of the control numbers for the samples identified in the . investigation.

At this time, there is no evidence that this had an impact on the integrity of the samples or the accuracy of the sample analysis. Please be assured that measures were immediately taken to ensure proper compliance with protocol procedures.

Additional information will be provided upon completion of the investigation.

Sincerely,

Linda Han, MD, MPH, Director
Bureau of Laboratory Sciences

| Laboratory Number | Submitting Agency | Defendant(s) |
|---|---|---|
| B11-04265 | Quincy PD | FERRANTE, PAUL |
| B11-04266 | Quincy PD | FERRANTE, PAUL |
| B11-04267 | Quincy PD | FERRANTE, PAUL |
| B11-04268 | Quincy PD | FERRANTE, PAUL |
| B11-04269 | Quincy PD | FERRANTE, PAUL |
| B11-04270 | Quincy PD | BURKE, JULIAN |
| B11-04271 | Quincy PD | BURKE, JULIAN |
| B11-04272 | Quincy PD | BURKE, JULIAN |
| B11-04273 | Quincy PD | BURKE, JULIAN |
| B11-04274 | Quincy PD | BURKE, JULIAN |
| B11-04275 | Quincy PD | JONES, ARN |
| B11-04276 | Quincy PD | KYLE, CATLIN & BURKE, ELIZABETH |
| B11-04277 | Quincy PD | KYLE, CATLIN & BURKE, ELIZABETH |
| B11-04278 | Quincy PD | DAGRACA, MANUEL & FERGUSON, ADRIAN |
| B11-04279 | Quincy PD | DAGRACA, MANUEL & FERGUSON, ADRIAN |
| B11-04280 | Quincy PD | FAT BLACK MALE CB#1 |
| B11-04281 | Quincy PD | O'SULLIVAN, EDWARD & FERRANTE, PAUL |
| B11-04282 | Quincy PD | LOPEZ, GLENDIS |
| B11-04283 | Quincy PD | GILLIS, STACY |
| B11-04284 | Quincy PD | GILLIS, STACY |
| B11-04285 | Quincy PD | GILLIS, STACY |
| B11-04286 | Quincy PD | MANCHESTER, CRAIG ET AL |
| B11-04287 | Quincy PD | MANCHESTER, CRAIG ET AL |
| B11-04288 | Quincy PD | MANCHESTER, CRAIG ET AL |
| B11-04290 | Quincy PD | JACKSON, CHRISTOPHER |
| B11-04291 | Quincy PD | JACKSON, CHRISTOPHER |
| B11-04292 | Quincy PD | JACKSON, CHRISTOPHER |
| B11-04293 | Quincy PD | KRAKOFSKY, MICHAEL |
| B11-04294 | Quincy PD | GENTRY, KIM |
| B11-04295 | Quincy PD | STEVENS, MARK |
| B11-04296 | Quincy PD | STEVENS, MARK |
| B11-04297 | Quincy PD | FEETHAM, RANDY |
| B11-04298 | Quincy PD | DANIELI, DAVID |
| B11-04299 | Quincy PD | DANIELI, DAVID |
| B11-04300 | Quincy PD | CB # 2 |
| B11-04302 | Quincy PD | CALLAHAN, MICHAEL |
| B11-04303 | Quincy PD | CALLAHAN, MICHAEL |
| B11-04304 | Quincy PD | CB # 1 (GRAFTON ST.) |
| B11-04305 | Quincy PD | CB # 1 (WHITE MALE QUINCY CTR.) |
| B11-04306 | Quincy PD | JONES, KERRI ET AL |
| B11-04307 | Quincy PD | JONES, KERRI ET AL |
| B11-04308 | Quincy PD | JONES, KERRI ET AL |
| B11-04309 | Quincy PD | JONES, KERRI ET AL |
| B11-04310 | Quincy PD | JONES, KERRI ET AL |
| B11-04311 | Quincy PD | JONES, KERRI ET AL |
| B11-04312 | Quincy PD | HAWKER, JOSEPH & ROSE, RYAN |
| B11-04313 | Quincy PD | VILLAR, CRUZ & MELENDEZ, CHRISTOPHER |
| B11-04314 | Quincy PD | HARDESTY, DANIEL ET AL |
| B11-04315 | Quincy PD | ETHERIDGE, TORREY & HOOKER, LATEYA |
| B11-04316 | Quincy PD | ETHERIDGE, TORREY & HOOKER, LATEYA |
| B11-04317 | Quincy PD | ETHERIDGE, TORREY & HOOKER, LATEYA |

| | | |
|---|---|---|
| B11-04318 | Quincy PD | OLSEN, KYLE |
| B11-04319 | Quincy PD | OLSEN, KYLE |
| B11-04320 | Quincy PD | OLSEN, KYLE & DIZOGLIO, JOHN |
| B11-04321 | Quincy PD | HARDESTY, DANIEL |
| B11-04322 | Quincy PD | FRANCESCHINI, ANTHONY |
| B11-04323 | Quincy PD | FRANCESCHINI, ANTHONY |
| B11-04324 | Quincy PD | FRANCESCHINI, ANTHONY |
| B11-04325 | Quincy PD | DIAZ, JOSE |
| B11-04326 | Quincy PD | DIAZ, JOSE |
| B11-04327 | Quincy PD | DIAZ, JOSE |
| B11-04328 | Quincy PD | DIAZ, JOSE |
| B11-04329 | Quincy PD | DIAZ, JOSE |
| B11-04330 | Quincy PD | OLIVEIRA, RONEI |
| B11-04331 | Quincy PD | DIZOGLIO, JOHN |
| B11-04332 | Quincy PD | DIZOGLIO, JOHN |
| B11-04333 | Quincy PD | SOTO, IMER & SOTO, REMY |
| B11-04334 | Quincy PD | CHAVIS, ANTHONY |
| B11-04335 | Quincy PD | RIVERA, ENRIQUE |
| B11-04336 | Quincy PD | CB #3 LORENZANO, SALVATORE & UNKNOWN H/M |
| B11-04337 | Quincy PD | CB #2 LORENZANO, SALVATORE & UNKNOWN H/M |
| B11-04338 | Quincy PD | CB #4 LORENZANO, SALVATORE & UNKNOWN H/M |
| B11-04339 | Quincy PD | CB #1 LORENZANO, SALVATORE & UNKNOWN H/M |
| B11-04340 | Quincy PD | KYLLER, GREGG |
| B11-04341 | Quincy PD | COAKLEY, LEE |
| B11-04342 | Quincy PD | COAKLEY, LEE |
| B11-04343 | Quincy PD | COAKLEY, LEE |
| B11-04344 | Quincy PD | COAKLEY, LEE |
| B11-04345 | Quincy PD | COAKLEY, LEE |
| B11-04346 | Quincy PD | HARDESTY, DANIEL |
| B11-04347 | Quincy PD | KYLLER, GREGG & COAKLEY, LEE |
| B11-04348 | Quincy PD | HARDESTY, DANIEL |
| B11-04349 | Quincy PD | HARDESTY, DANIEL |
| B11-04350 | Quincy PD | KEEFE, TERRENCE & KEEFE, PATRICIA |
| B11-04351 | Quincy PD | KEEFE, TERRENCE & KEEFE, PATRICIA |
| B11-04352 | Quincy PD | DIAZ, JOSE & COX, MICHAEL |
| B11-04353 | Wellesley PD | GRUBER, MAXWELL |
| B11-04354 | Wellesley PD | MOODY, JAKE |
| B11-04355 | Wellesley PD | SHERMAN, JEANNE |
| B11-04356 | Wellesley PD | CORDOVA, MATTHEW |
| B11-04357 | Wellesley PD | CORTES, SIXTA |
| B11-04358 | Wellesley PD | BRENNAN, TIMOTHY |
| B11-04359 | Wellesley PD | BRENNAN, TIMOTHY |



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Public Health
## 250 Washington Street, Boston, MA 02108-4619

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**JUDYANN BIGBY, MD**
SECRETARY

**JOHN AUERBACH**
COMMISSIONER

February 21, 2012

Michael W. Morrissey, Norfolk District Attorney
Norfolk District Attorney's Office
45 Shawmut Road
Canton, MA 02021

Dear District Attorney Morrissey,

As I indicated in my letter to you dated February 1, 2012, I am providing additional information based on the investigation concerning a breach of protocol at the William A. Hinton State Laboratory Institute ("the Lab"). Further detail is provided below:

The Lab's protocols for handling evidence samples require that all samples received for testing be given a unique sample identifier called an evidence control number. The Lab uses the control number to track the samples as they undergo the testing process. The control numbers are initially entered into a computer tracking system and log book when first received by the Lab, and a card (control card) containing the control number is attached to the sample. When the samples are transferred out of the evidence office for testing, they are manually recorded in the office log book (log book) and computer tracking system. An evidence officer is required to record his/her initials, the date of the transfer and the initials of the chemist accepting receipt of the sample(s) in the log book. The chemist receiving the sample is required in the presence of the evidence officer to record his/her initials signifying his/her receipt. The chemist also initials the control card after completing the testing process.

These protocols have been consistently followed with regard to the drug samples, ensuring that the integrity of the samples is protected and providing drug analytical results that are expertly prepared and accurate.

Because of the mechanisms in place to identify problems, Laboratory personnel quickly became aware of a potential breach in its recording protocols on June 16, 2011 when an evidence officer noted that the information displayed on the computer for a case did not show the sample(s) for that case as having been assigned to the chemist identified on the control card. This process was repeated for other samples in the same batch with the same results. Further investigation revealed no entries in the log book recording a transfer of these samples from the evidence office to the chemist for testing on June 14, 2011.

The evidence officer immediately contacted her supervisor to alert her of the irregularity. The supervisor, in turn, on June 20th brought this to the attention of her supervisor, the Laboratory's Director of the Division of Analytic Chemistry and, in addition, to my attention and the attention of the Supervising Chemist for the Analysis Section. On the same day, June 20th, they all examined the log book and confirmed that there had been no recording of a transfer of these samples from the evidence office to the chemist for testing on June 14th. On June 21st, when the log book was reexamined, entries did appear showing a transfer of the samples from the evidence office to the chemist. It appeared that these entries were made by the chemist after June 14th.

The chemist involved in this case has been employed by the Department for eight years. Prior to this incident, she had no personnel issues and was well respected for the accuracy of her work and her dedication to the Laboratory's mission. In review of the incident, the managers at the Laboratory did not believe there was any reason to believe that the integrity of the samples had been affected by the breach in protocol or the late entries in the log book. However, the chemist was removed from all responsibilities involving laboratory analysis as of June 21, 2011.

The Commissioner's office first became aware of this incident on December 1. The Laboratory managers had not reported this incident to the DPH Central Office because they did not appreciate its potential legal significance and because of their opinion that the integrity of the test results had not been affected. The Central Office conducted its own investigation of the incident and confirmed that there was no evidence to suggest that the integrity of the results was impacted

by the documentation issue with the log book. The Department's Human Resources Division is reviewing what appropriate disciplinary actions should be taken.

Within the single batch that shared this documentation breach, there were a total of 90 evidence samples, all of which were from Norfolk County.

The Department has taken a number of steps to minimize any reoccurrence of this nature. The Laboratory revised and strengthened its protocols for handling test samples. The new protocols include more secure, redundant mechanisms for tracking and transferring samples, and limit direct access to the samples to the evidence officers.

Please let me know if you have any questions concerning this additional information.

Sincerely,

Linda Han, MD, MPH, Director
Bureau of Laboratory Sciences



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
### William A. Hinton State Laboratory Institute
### 305 South Street, Jamaica Plain, MA 02130

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**JUDYANN BIGBY, MD**
SECRETARY

**JOHN AUERBACH**
COMMISSIONER

April 20, 2012

District Attorney Daniel F. Conley
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114

Dear District Attorney Conley,

I am writing to inform you that we investigated a breach of the recording protocol with respect to a single batch of ninety drug samples tested at the William A. Hinton State Laboratory Institute on June 14, 2011. At the conclusion of our investigation, there was no evidence that this breach in protocol had any impact of the integrity of the samples or the accuracy of the sample analysis. In addition, these samples were received exclusively from Norfolk County; no samples from any other county were involved.

Please be assured that measures were immediately taken to ensure the continued proper compliance with protocol procedures.

Sincerely,

Linda Han, MD, MPH, Director
Bureau of Laboratory Sciences

Commonwealth of Massachusetts
Department of Public Health
State Laboratory Institute

Policies and Procedures
Drug Analysis Laboratories
Updated September 29, 2004

Boston Laboratory
State Laboratory Institute
305 South Street
Jamaica Plain, MA 02130
(617) 983-6622

1

# Table of Contents

I     Introduction                                          3

II    Submittal of Evidence                                 4

III   Chain of Custody                                      8

IV    Analysis Procedures                                   10

V     Certificates Reports and Testimony                    13

APPENDIX I      Mailing Procedures                          15

APPENDIX II     Drug Laboratory Receipt                     17

APPENDIX III    Defense Analysis Procedure                  18

APPENDIX IV     Methods of Analysis                         20

# INTRODUCTION

The Massachusetts Department of Public Health (DPH) provides analyses of narcotic drugs, controlled substances and certain alcoholic beverages for law enforcement agencies and appropriate organizations in the Commonwealth of Massachusetts as described in Chapter 111, Sections 11 and 12 of the Massachusetts General Laws. These services are provided at two laboratories, the Jamaica Plain Laboratory which serves Eastern Massachusetts and the Amherst Laboratory, which serves Western Massachusetts.

The analyses provided by the DPH Drug Analysis Laboratories are intended for use in law enforcement and prosecution of criminal cases. It is the responsibility of the Department to provide analyses in an accurate and timely manner and to furnish Certificates of Analysis describing the results of these analyses. These certificates are accepted as prima facie evidence in Massachusetts under Chapter 111, Section 13, of the Massachusetts General Laws. All submissions to the laboratory are kept secure and records are kept of all evidence transfers. The laboratory personnel provide analytical advice for submitting agencies and, when necessary, furnish expert testimony in court. The Department of Public Health prepares monthly and yearly reports describing the number and types of items submitted to the laboratory by each town. This data is analyzed to monitor changes in sample type, and trends in drug arrests. Assessments of important changes are communicated to the appropriate agencies. These reports are available to authorized persons in Public Health and to Law Enforcement Agencies.

Note: The Laboratory interprets the definition of a "CASE" as, all material submitted to the lab at the same time and for the same defendant(s). A case can consist of several items, also referred to as samples. Each item or sample may consist of several specimens. For example, a case submitted on 02/10/2004, consists of one bag of vegetable matter, 23 plastic bags of white powder, and one plastic vial containing a tablet. This is one case with 3 separate samples or items. The second item or sample contains 23 specimens.

## II. Submittal of Evidence

Authorized representatives of law enforcement agencies may submit samples to the Department of Public Health Laboratories either directly or through the mail.

### 1. Mailed Submittal

Only cases that will be charged as misdemeanors may be mailed to the laboratory. Cases may be submitted REGISTERED mail, by following the procedures described in APPENDIX I (MAILING PROCEDURES FOR DRUG SAMPLE SUBMISSIONS).

### 2. Direct Submittal

Suspected drug cases are submitted to the Jamaica Plain and Amherst Laboratories during the hours posted at each site. Police officers will show proper identification (a police I.D. and a Massachusetts drivers license) when delivering and picking up items (samples). Items will not be accepted or returned to representatives of police agencies, unless that person provides positive identification as an agent of the submitting police department.

## Requirements for Submitting Suspected Drugs for Analysis

A) A completed drug receipt form (APPENDIX II) must be submitted with each case. The receipt must contain information for only one case and be clearly legible. The receipt must include the following:

* Name of submitting agency
* Name of submitting officer
* The name(s) of the defendant(s) or an appropriate designation, such as "Under Investigation", should be placed in the name block of the receipt
* Date of submittal
* Description of item(s) submitted

B) Evidence must be separated into similar types by the submitting department, and placed into plastic bags according to the following categories:

* Powders and Substances (substances such as cocaine base "crack")
* Residues
* Capsules, pills, and tablets (Pharmaceuticals)
* Vegetable Matter
* Others

4

C) Items must be packaged to prevent loss of material or cross contamination.

D) Pharmaceuticals should be submitted with labels if present.

E) Liquids must be submitted in leak proof containers.

F) Hypodermic needles or other sharps should be submitted for analysis only if they are the sole item in a particular case and if there is reason to believe they contain a controlled substance. Syringes must be delivered in protective containers. Analysis of syringes will be done only after they have been autoclaved. A Certificate of Analysis stating that the needle was NOT TESTED is available if a certificate is needed for court purposes, or for destruction purposes.

G) Evidence recovered from body cavities or other hazardous areas should be marked as such, and the DPH Laboratory Evidence Officer should be notified at the time of submission.

## Submittal Procedure

1) Submitting officers must alert the DPH Laboratory Evidence Officer to unusual circumstances concerning a sample (eg. Wet sample, broken glass, hazardous material).

2) The submitting officer will submit evidence to the laboratory in a sealed and initialed plastic bag.

3) The sealed evidence bag will be given to the Laboratory Evidence Officer who will weigh the evidence bag and note the gross weight on the receipt.

4) The Laboratory Evidence Officer will assign a Laboratory Evidence Control Number to the sample and record this number on the receipt along with the gross weight.

5) The sample will be placed in a manila envelope, and a bar coded sticker with the evidence control number will be affixed to the envelope.

6) The Laboratory Evidence Officer will initial and date the receipt, and give a copy of the receipt to the submitting officer. The laboratory will keep the original receipt.

7) Laboratory Control Cards will be generated from the data on the receipt, and a control card for each item will be placed in the corresponding manila envelope.

8) The envelope will be stored in the laboratory evidence safe until it is assigned to a chemist.

9) After completing analysis, the chemist will seal the evidence in a plastic bag and put their identifying mark and sample number on the bag. The bag and the Certificate of Analysis for that sample will be placed in the original manila envelope and will be returned to the laboratory evidence office. It will be stored in the evidence safe until being picked up by the submitting department.

## Restrictions for Sample Submittal

The following restrictions apply to items submitted for analysis to the Department of Public Health Laboratories.

### 1. Forensic Samples Other Than Drugs

Forensic samples other than drugs (e.g. ballistics, explosives, fingerprints, etc.) will not be accepted and should be submitted to the State Police Crime Laboratory.

### 2. Biologic Samples

Biologic samples such as body fluids, excreta and tissues will not be accepted by the Department of Public Health Laboratories and should be submitted to the regional Medical Examiner's Laboratory for forensic analysis.

### 3. Drug Samples Pertaining to Medical Examiner Investigations

Toxicological samples relating to investigations of the Medical Examiner will not be accepted and should be submitted to the regional Medical Examiner's Laboratory.

## 4. Previously Analyzed Items

a. Items analyzed by Forensic Laboratories other than Department of Public Health Laboratories

Items that have been analyzed by another forensic laboratory will be accepted for reanalysis only at the request of the original testing laboratory and with the approval of the Director of the DPH Drug Analysis Laboratories.

b. Items analyzed by a Department of Public Health Laboratory

A DPH Drug Analysis Supervisor must approve requests for re-analysis, or for additional testing of samples done by a DPH laboratory. The request should be transmitted to the laboratory by mail or fax. The DPH Drug Analysis Laboratory fax numbers are Boston- ( 617) 983-6625, and Amherst-(413)545-2608. If a defense analysis is to be performed, the procedure described in Appendix III will be followed.

## 5. Improperly Packaged Items

Items that are not packaged according to the requirements of the laboratory will not be accepted. Packaging deficiencies may be remedied at the time of sample submission if possible.

## 6 Alcoholic Beverages.

Alcoholic beverages seized in their original sealed container are not accepted for analysis. Suspected alcoholic beverages seized in open containers may be submitted to the laboratory for analysis.

## 7. Vegetable Matter

Preferably, " green" plants should be allowed to dry before sealing them in plastic bags. If not dried, the plant material may decompose, and become difficult to handle and analyze. Contact the DPH Drug Analysis Laboratory (617) 983-6622 regarding submission of this type of sample.

Note: M.G.L. C. 94 S.31 states that the mature stalks of marijuana plants are not controlled. The net weight will not include root balls, rocks, flowerpots, sticks, "mature stalks" and other extraneous materials.

III.                                Chain of Custody

Written records of the chain of custody of a sample are maintained from the time
the evidence is received into the laboratory through the time the evidence is
returned to the submitting agency.

### 1)  Receipts

The submitting officer must submit a completed drug receipt form
(APPENDIX II) for each case submitted to the laboratory. The receipt
must contain the names of the submitting agency and submitting officer,
the date of sample submission and a brief description of each item of
evidence submitted. The names(s) of the defendant(s) should be clearly
printed or typed, Last name first, First name last, which is how the names
will appear on the Certificate of Analysis. If the names are unknown, or
are not provided for security reasons on the drug receipt form, the notation
" Under Investigation" or other appropriate designation should be written
in the defendants name block on the drug receipt form. The Certificate of
Analysis will use the description provided on the drug receipt form. A
copy of the receipt will be given to the submitting officer.

#### a.  Evidence Control Number
The Laboratory Evidence Officer will assign a Laboratory
Evidence Control Number for each item submitted to the DPH
Laboratory. Questions or referrals regarding an item (sample)
should be referenced by the evidence control number.

#### b.  Gross Weight

The Laboratory Evidence Officer in the presence of the
submitting officer will determine the gross weight of each heat
sealed plastic evidence bag. This gross weight will be recorded
on the drug receipt. The gross weight includes the substance, and
packaging material.

c.  Changes

Occasionally the evidence description printed on the Certificate
of Analysis will differ from the description on the drug receipt.
This will occur when the analyst opens an evidence bag and finds
something that was not properly described on the receipt. For
example, if a sample described as containing 22 plastic bags
actually contains 22 paper packets, the description will be
changed.

2)  Evidence Transfers

A record is kept of all transfers of evidence within the laboratory, as well
as all transfers between the laboratory and the submitting agency.

IV.                       Analysis Procedures

The Laboratory has established policies and guidelines to standardize
analytical testing. These policies and guidelines aid analysts in choosing
appropriate procedures for analyzing samples.

## 1) Sample Analysis

The Laboratory follows the recommendations of the Scientific
Working Group for the Analysis of Seized Drugs (SWGDRUG) report of
2003, for the methods used in the identification of illicit drugs. Appendix
IV.

## 2) Extent of Analysis

Many of the items (samples) submitted to the laboratory consist of large
numbers of similar specimens. An example is powder in 500 glassine
bags. Analysis of each specimen in a sample is not necessary in order to
establish the identity of all individual specimens. Accepted forensic
laboratory practice is to analyze a representative number of the specimens.

## 3) Timely Analysis

The goal of the Laboratory is to complete analysis of most samples, on
average, within one month of the date submitted to the laboratory. Certain
types of samples may require special handling and more time for analysis
may be required. Wide variation in the number of samples submitted to
the laboratory at certain times, and changing patterns in illicit drug
seizures, result in variability of time needed to complete analysis.

## 4) Quantitation (Assay)

Quantitation is the measurement of the percentage of controlled substance
present in a sample. Quantitations are done routinely for
Tetrahydrocannabinol (THC) samples with a net weight greater than 1.0
gram, and for alcoholic beverage samples. A quantitative analysis for
cocaine or heroin samples will be done upon request from a District
Attorney's Office.

## 5) Visual Identification

A chemical analysis may not always be necessary for the identification of certain types of samples. Pharmaceuticals manufactured by licensed manufactures carry identifying imprints or markings. Clearly labeled pills, tablets, capsules, and other forms of pharmaceuticals, may be identified visually (ballistically). This method will not be used if there is ambiguity in the identification markings or if counterfeiting or tampering is suspected. A chemical analysis will be performed on these types of samples. The Certificate of Analysis for ballistically identified samples will state that the sample was identified by appearance and labeling. NOTE: The laboratory will provide a chemical analysis of any sample at the request of a District Attorney's Office.

## 6) Items (Samples) Not Tested

The analysis of certain minor items may be of little value to the prosecution of a case when a positive result has been determined for other more significant items in that case. Such items will be returned NOT TESTED. Examples:

### a) Redundant Residue ITEMS (SAMPLES)

When multiple residue items (samples) are submitted for a single case, the chemist will select the item most likely to test positive and report the remaining items as NOT TESTED. If the selected item tests negative, additional items will be tested. If the analysis of NOT TESTED samples are needed for the prosecution of a case, the District Attorney's Office may request that those samples be resubmitted for analytical testing.

### b) Multiple Residue SPECIMENS

When multiple residue specimens (paraphernalia) are submitted under one evidence control number, the chemist will chose a specimen most likely to test positive. If the selected specimen tests negative, another specimen will be tested.

### c) Numerous Submissions of Samples of Equal or Lower Class of Controlled Substance

Cases in which a large number of items (samples) are submitted may not need every item analyzed. In these circumstances, the analyst will meet with the Laboratory Supervisor and the most significant samples of the highest classes will be chosen for analysis. Those items (samples) not analyzed will be reported as

11

NOT TESTED. If the analysis of all items submitted in a case are essential to the prosecution of that case, the District Attorney's Office may request that the NOT TESTED items be resubmitted to the laboratory for analysis.

d) Samples Without Law Enforcement Value

Samples that are likely to be superfluous, such as residue on paraphernalia in the presence of a powder sample which has tested positive for a controlled substance, will be reported as NOT TESTED. If the item is essential to the prosecution of the case, the District Attorney's Office may request that the item be resubmitted for analysis.

## 7) Sample Resubmission

The Laboratory Supervisor will be notified of all sample resubmissions.

### A) Additional Testing

Requests for additional testing must be approved by the Supervisor of the Drug Analysis Laboratory, or their designee. Opening sealed samples will be done by the original analyst, or the Laboratory Supervisor if the original analyst is not available. The analyst will do a gross examination of the evidence bag prior to opening, and note its condition, relative to the evidence record on their analysis sheet. If a discrepancy is found in the condition of the evidence bag, it will not be opened and the Laboratory Supervisor will be notified.

### B) Evidence Control Numbers for Resubmittals

Samples returned to the laboratory for additional testing will be assigned a new evidence control number, which will be the original evidence control number plus R (e.g. Specimen # 123456 resubmitted for additional testing will be given the new control # 123456R).

## 8) Defense Analysis

A defense attorney may request, by means of a court order, an analysis by a defense chemist of evidence tested by the Public Health Drug Analysis Laboratory. The procedure for a defense analysis is described in APPENDIX III.

12

**V.**   CERTIFICATES, REPORTS, EXPERT TESTIMONY, AND ADVICE

### 1. Certificate of Analysis

Chapter 111, Section 13 of the Massachusetts General Laws states that properly executed Certificates of Analysis of the Department of Public Health are prima facie evidence in Massachusetts courts. Certificates of Analysis are provided for all samples submitted to the Drug Analysis Laboratory.

### 2. Reports

The Public Health Drug Analysis Laboratory provides monthly and yearly reports of submissions to the drug analysis laboratories. The reports include the number and type of drug items submitted and analyzed.

### 3. Testimony

Since Certificates of Analysis are accepted as prima facie evidence in the courts of Massachusetts, the need for direct testimony of an analyst should be infrequent. In cases where an analyst is required to testify, certain conditions should be sought.

a) The prosecutor should notify the analyst as far in advance as possible, and provide the laboratory certificate (evidence control) number(s) in question, so that records may be retrieved. Any specific issue that will require the testimony of a chemist should also be described.

b) Due to the demands on the laboratory, it is imperative that each analyst be away from the laboratory bench for as short a time as possible. If providing records related to the analysis is not sufficient, and the analyst is needed to testify, the prosecutor should arrange with the court, that the analyst spend the least amount of time that is necessary in court. Often having analysts "on call" will suffice. In most instances, analysts can be in court within an hour of being notified.

13

c) Subpoenas should be sent in advance of the court date, notifying any chemist of the need to provide testimony

d) The laboratory will provide information to defense counsel through the District Attorney's Office.

4. Records
Laboratory analytical data and custody records will be stored for 10 (ten) years from the date generated.

# APPENDIX I

## Mailing procedures for Drug Sample Submissions

### A. Instructions for Submitting Samples by Mail

1. Only MISDEMEANOR case samples may be submitted to laboratory by mail. Such samples must be sent by the U.S. Postal Service as REGISTERED mail. Samples received by any other mailing type such as certified mail, will be returned unopened via registered mail at the submitting agency's expense. Felony case samples must be submitted personally by an official representative of the submitting agency.

2. Make all mailings to the Evidence Officer in your area.

3. Furnish names of defendants, if known.

4. Report information that may be pertinent to the laboratory examination.

5. Reference previous correspondence on the case, if any.

6. Establish a petty cash account in a minimum amount of $25.00 with the Drug Laboratory Evidence Office, to provide for return postage.

7. Return postage may be omitted if a representative of the submitting agency will pick up the analyzed sample. The laboratory should be notified in advance if the completed sample is to be picked up by a representative of the submitting agency.

### B. How to Prepare Evidence for Shipment

1. Samples MUST be submitted by REGISTERED MAIL only.

2. Package the evidence carefully. Use suitable containers; such as, pillboxes, plastic bags, glass or plastic containers, etc. Liquids must be packaged in leak proof containers. Each sample should be packaged separately to avoid possible contamination. Label the outside of the package with the submitting agency name. Seal the container with tape.

3. Enclose the containers securely in a strong outer carton or envelope suitable for shipping.

4. Place a completed Drug Receipt Form (APPENDIX II) in the shipping container.

   * Receipt will be filled out as described in Section II-A

5. Wrap and seal the carton securely and mark it as "FRAGILE".

6. Address the package to the Evidence Officer of the Laboratory in your area.

7. Improperly packaged samples will be returned without analysis.

8. Numerous or large samples should be submitted personally by an official representative of the submitting agency.

C. Regional Public Health Drug Analysis Laboratories

   *Eastern Massachusetts*

   Evidence Officer
   Drug Laboratory
   State Laboratory Institute
   305 South Street
   Jamaica Plain, MA 02130
   (617) 983-6622

   *Western Massachusetts*

   Evidence Officer
   Drug Laboratory
   Western Massachusetts Public Health Center
   Stockbridge Road
   Amherst, MA 01002
   (413) 545-2601

The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Public Health
## State Laboratory Institute

**Boston Drug Laboratory**
Tel (617) 983-6622
Fax (617) 983-6625

**Amherst Drug Laboratory**
Tel (413) 545-2601
Fax (413) 545-2608

**Boston Hours**
8:00 – 11:00
2:00 – 4:00

**Amherst Hours**
9:00 – 12:00
1:00 – 4:00

# DRUG RECEIPT

City or Department: _____ Police Reference No.: _____

Name and Rank of Submitting Officer: _____

Defendant(s) Name (last, first, initial) _____

| Description of Samples | To be completed by Lab Personnel | |
| --- | --- | --- |
| | Gross Weight | Lab Number |
| | | |

## APPENDIX III

### Defense Analysis Procedure for the Massachusetts Department of Public Health Drug Analysis Laboratory

A) Reanalysis of a previously analyzed sample by a defense chemist

#### 1.Court Order

A copy of the court order must be submitted to the laboratory. The court order should provide the laboratory evidence control number (certificate of analysis number), the defendant's name and the name and address of the individual or institution to receive the sample.

#### 2. Licensed Analysts

Only analysts authorized under the provisions of Chapter 94C, Section 7 of the Massachusetts General Laws may perform examinations on controlled substances. The Drug Analysis Laboratory will require proper credentials to verify this authorization. Proper credentials consist of a Drivers license, a Drug Enforcement Administration License, and a Massachusetts Department of Public Health Controlled Substances Registration.

#### 3. Evidence Transfers

The District Attorney's Office should be notified by the Drug Analysis Laboratory of the time and date that the evidence will be transferred to the defense analyst. If the evidence is not in the custody of the Drug Analysis Laboratory at the time of the court order, the Laboratory will notify the District Attorney's Office, and the District Attorney's Office should make arrangements with the submitting agency to have the sample resubmitted to the laboratory.

The Supervisor of the Drug Analysis Laboratory should confer with the District Attorney or his/ her representative on what tests the defense chemist will perform. The amount of sample needed will depend on the amount of sample available and the type of analysis to be performed. If possible, the analyst of record for the sample should be present to open the evidence bag for sampling. The Laboratory Supervisor will provide the defense analyst with an agreed upon amount of sample and the defense chemist must sign a receipt indicating that they have received such sample.

18

## 4. Unused Sample

The unused portion of any sample taken for defense analysis must be returned to the Drug Analysis Laboratory bearing the appropriate laboratory evidence number and marked "Defense Analysis Sample". If multiple samples have been taken by a defense chemist, the samples must not be commingled

## 5) Equipment

Due to security, liability, and safety issues, the Department of Public Health will not provide any equipment for use by a defense analyst. The defense analyst must provide his/ her own equipment and analytical instrumentation for examination of a sample.

B) Defense analyst re-weighings of samples previously analyzed.

A defense chemist may come to one of the Department of Public Health Laboratories to reweigh a sample provided that they have a court order allowing such action. The defense chemist and defense attorney will contact the District Attorney's Office and have the submitting agency return the sample to the laboratory. When the sample has been returned to the laboratory, a mutually agreeable time will be arranged to have the defense chemist come in to reweigh the sample. The court order will be presented at that time. A secure room will be provided where the defense chemist may perform their procedure.

No admittance to the Drug Analysis Laboratory is allowed due to security, safety, and liability issues.

Any analytical balances or equipment needed to perform a reweighing will be provided by the defense chemist. No equipment will be provided by the Department of Public Health Laboratory. NOTE. A DEA License or Public Health registration identification is not required to perform a reweighing.

Recommendations of the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG): Report of 2003

## SWGDRUG Methods of Analysis

## Methods of Analysis/Drug Identification

### Section 1 Introduction

The purpose of Part III B* is to recommend minimum standards for the forensic identification of commonly seized drugs. It is recognized that the correct identification of a drug or chemical depends on the use of an analytical scheme based on validated methods and the competence of the analyst. SWGDRUG requires the use of multiple uncorrelated techniques. It does not discourage the use of any particular method within an analytical scheme and it is accepted that unique requirements in different jurisdictions may dictate the actual practices followed by a particular laboratory.

### Section 2 Categorizing Analytical Techniques

2.1 Techniques for the analysis of drug samples may be classified into three categories based on their discriminating power. Table 1 provides examples of these techniques listed in order of decreasing discriminating power from A to C.

| Category A | Category B | Category C |
|---|---|---|
| Infrared Spectroscopy | Capillary Electrophoresis | Color Tests |
| Mass Spectrometry | Gas Chromatography | Fluorescence Spectroscopy |
| Nuclear Magnetic | Ion Mobility Spectrometry | Immunoassay |
| Resonance Spectroscopy | | |
| Raman Spectroscopy | Liquid Chromatography | Melting Point |
| | Microcrystalline Tests | Ultraviolet Spectroscopy |
| | Pharmaceutical Identifiers | |
| | Thin Layer Chromatography | |
| | Cannabis only: Macroscopic Examination Microscopic Examination | |

*Part III B refers to the October 2003 report of the SWGDRUG committee.

## Section 3: IDENTIFICATION CRITERIA

SWGDRUG recommends that laboratories adhere to the following minimum standards:

3.1 When a validated Category A technique is incorporated into an analytical scheme, then at least one other technique (from either Category A, B or C) must be used.

   3.1.1 This combination must identify the specific drug present and must preclude a false positive identification

   3.1.2 When sample size allows, the second technique should be applied on a separate sampling for quality assurance reasons. When sample size is limited, additional measures should be taken to assure that the results correspond to the correct sample.

   3.1.3 All Category A techniques must have data that are reviewable.

3.2 When a Category A technique is not used, then at least three different validated methods must be employed.

   3.2.1 These in combination must demonstrate the identity of the specific drug present and must preclude a false positive identification.

   3.2.2 Two of the three methods must be based on uncorrelated techniques from category B.

   3.2.3 A minimum of two separate samplings should be used in these three tests. When sample size is limited, additional measures should be taken to assure that the results correspond to the correct sample.

   3.2.4 All Category B techniques must have reviewable data.

3.3 For the use of any method to be considered of value, test results must be considered "positive." While "negative" test results provide useful information for ruling out the presence of a particular drug or drug class, these results have no value toward establishing the forensic identification of a drug.

3.4 In cases where hyphenated techniques are used (e.g. gas-chromatography-mass spectrometry, liquid chromatography-diode array ultraviolet spectroscopy), they will be considered as separate techniques provided that the results from each are used.

3.5 Cannabis exhibits tend to have characteristics that are visually recognizable. Macroscopic and microscopic examinations of cannabis will be considered, exceptionally, as uncorrelated techniques from category B when observations include documented details of botanical features. Additional testing must follow the scheme outlined in sections 3.1 or 3.2

    3.5.1 For exhibits of cannabis that lack sufficient observable macroscopic and microscopic botanical detail (e.g. extracts or residues), Δ9-tetrahydrocannabinol (THC) or other cannabinoids must be identified utilizing the principles set forth in sections 3.1 and 3.2

3.6 Examples of reviewable data are

    3.6.1 printed spectra, chromatograms and photographs or photocopies of TLC plates.

    3.6.2 contemporaneous documented peer review for microcrystalline tests.

    3.6.3 recording of detailed descriptions of morphological characteristics for cannabis (only).

    3.6.4 reference to published data for pharmaceutical identifiers.

### Section 4: COMMENT

These recommendations are minimum standards for the forensic identification of commonly seized drugs. However, it should be recognized that they may not be sufficient for the identification of all drugs in all circumstances. Within these recommendations, it is up to the individual laboratory's management to determine which combination of analytical techniques best satisfies the requirements of its jurisdiction.

### SWGDRUG Methods of Analysis

## Quality Assurance and Quality Control

The Drug Analysis Laboratory makes every effort to ensure that its analyses are accurate and timely. Routine Quality Control and Quality Assurance procedures are employed by the Laboratory to accomplish this. The Department of Public Health State Laboratory Institute's Quality Control and Quality Assurance Section, provides independent oversight of these QA/QC procedures to ensure that proper compliance with accepted procedures are followed.

Massachusetts Department of Public Health
State Laboratory Institute
Drug Analysis Laboratory
305 South Street
Jamaica Plain, MA 02130

Policies and Procedures Document

Revised 9/29/2004

Approved:

Date __10/7/04__        By _____
                        Drug Analysis Laboratory Supervisor

Date __10/7/04__        By _____
                        Drug Analysis Laboratory Director

Date __10/7/04__        By _____
                        Quality Assurance Director

Date __10/7/04__.       By _____
                        State Laboratory Institute Director

24



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

December 10, 2012

**To:** Lieutenant Colonel Francis J. Matthews *[signature]* 12·13·12
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** **Annie Dookhan's key and the evidence safe lock at the Hinton Drug Lab.**

**Case #:** **2012-034-2589-0052**

1. In August, Detective Captain Joseph Mason and this officer began the investigation into the Department of Public Health (DPH) Drug Lab. As part of the investigation we interviewed current and former employees of the drug lab. As a result of the interviews and inspection of physical evidence we were able to determine that Chemist II Annie Dookhan had a key that worked on the evidence safe door lock. Her key worked until the lock was changed in early December 2011.

2. Lab Supervisor II Charles Salemi advised State Police Detective Captain Mason and I, in an interview on August 22, 2012, that after the June 2011 incident involving Dookhan and the 90 samples, Julie Nassif and Grace Connolly decided, on their own, to check the keys. Mr. Salemi stated that at some point the safe door lock mechanism was removed and changed. Mr. Salemi stated that on December 5th 2011 he gave the lock mechanism, which had been removed from the evidence safe door, to Grace Connolly. According to Mr. Salemi, Julie Nassif and Grace Connolly then checked Annie Dookhan's key on the original safe door lock. Dookhan's key worked on the safe door lock mechanism that had come from the safe door.

3. On November 30, 2012 Grace Connolly was interviewed by State Police investigators. Connolly is employed by the Department of Public Health as the Director of Administration and Finance for the Bureau's of Laboratory Sciences and Emergency Preparedness at the Hinton State Lab. Ms. Connolly was asked about the evidence door lock and Annie Dookhan's key. She advised that at some point Ms. Nassif told her that it had come to light that Annie Dookhan had access to the drug locker. Ms.Connolly suggested to Ms. Nassif that they should determine if Dookhan's key worked on the evidence

locker door. Ms. Connolly stated that they questioned how Annie Dookhan got in the locker and obtained the 90 samples. Ms. Connolly suggested that Dookhan's key may have unlocked the door. Ms. Connolly believes that on December 5[th,] Ms. Nassif retrieved the key that was assigned to Annie Dookhan and tested it on the lock that was still on the evidence safe door. Ms. Connolly was informed by Ms. Nassif that the key which was obtained from Dookhan worked on the evidence safe door lock. At that time Ms. Connolly advised Ms. Nassif that they needed to change the lock on the evidence safe door.

4. Ms. Connolly advised that a short time after the lock was changed, she was given the lock, to the evidence safe door that had been in place at the time of the June 2011 breach. Ms. Connolly advised that she knows she got Dookhan's key right after the lock was changed. Ms. Connolly instructed Ms. Nassif to give her the key. Ms. Nassif then brought her the key and placed it in an envelope. Ms. Nassif signed the front of the envelope, noting that it was Annie Dookhan's key. Ms. Connolly signed the back of the envelope, sealed the envelope, and signed over the seal. Ms. Connolly advised that the first time she sealed the envelope she forgot to put the key in. So she opened the envelope, with Ms. Nassif present, and put the key in and re-sealed it. She and Ms. Nassif then both re-signed the envelope. The envelope with the key was always with the lock.

5. Ms. Connolly advised that she secured the key and lock in her desk, where it remained until she brought them to the DPH Office located at 250 Washington Street Boston. Ms. Connolly does not remember the date she brought the key and lock to 250 Washington Street. Ms. Connolly stated that she gave them to Deputy Commissioner Monica Valdez Lupi. The key and lock stayed in Lupi's custody until Tuesday November 27, 2012, when this officer called Ms. Connolly. Ms. Connolly then went and picked the lock and key up and brought it back to her office. Ms. Connolly advised that she had called Ms. Lupi after speaking to this officer and Ms. Lupi advised that the key and lock were secured in her office filing cabinet. Ms. Connolly stated that on the 27th of November, 2012, she brought the key and lock back to her office and secured it in her desk. Ms. Connolly brought the key and lock to the interview on November 30th where it was given to Trooper Tom Mahon and this officer to take custody of them.

6. Julie Nassif was interviewed by State Police investigators on December 5, 2012. Nassif advised that from 2006 to September of 2012 she was in charge of the Division of Analytical Chemistry. The division included the Amherst and Boston drug labs along with the bio-threat lab. Ms. Nassif stated that at some point in early December, 2011, she asked Annie Dookhan for her key. Dookhan personally gave the key to Ms. Nassif. A short time later Ms. Nassif tried it in the original lock from the evidence safe door. Nassif advised that Dookhan's key worked on the evidence safe door lock. Nassif stated that she was present when Dookhan's key was tested. Ms. Nassif secured the key on December 5, 2011, the same day of the test. She put it in a white envelope sealed it and signed it with Grace Connolly. Grace Connolly took possession

of the envelope containing Dookhan's key.

7. On November 30, 2012 at approximately 1300 hours Trooper Thomas Mahon and this officer opened the envelope containing the Dookhan key which had been secured from Ms. Connolly. The key was tested on the evidence door lock which was also secured from Ms. Connolly. This is the lock that was on the evidence safe door at the time of the June 2011 breach. The key worked and opened the lock. The evidence was secured at the State Police evidence locker at the Office of the Attorney General.

Respectfully submitted,

*Robert M Irwin #1230*

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**     Lieutenant Colonel Francis J. Matthews, Commanding _FJM 12-13-12_
         Division of Investigative Services

**From:**   Detective Lieutenant Robert M. Irwin, Commanding
         MSP-AGO Detective Unit

**Subject:** **Interview of: Dr. Linda Han**



**Interview conducted on November 19, 2012, at approximately 1530
hours at 75 Park Plaza Boston MA. Present for the interview
Detective Captain Joseph Mason and Attorney Paul Kelly.**

**Case #:    2012-034-2589-0052**

1. Dr Linda Han advised that she attended Princeton University from 1984-1988.
   Dr. Han then went on to Harvard Medical School from 1988-1992, where she
   earned a degree in Pediatric Medicine. Dr. Han completed her residency at
   Massachusetts General Hospital from 1992-1996. She worked at the Center for
   Disease Control in Atlanta, GA, as a Medical Epidemiologist from 1996-1998.
   Dr. Han practiced Pediatrics in New Mexico from 1998-1999. She then practiced
   in Somerville from 1999-2002. In 2003 she completed her Master's in Public
   Health at the Harvard University School of Public Health. Dr. Han worked at the
   Department of Public Health (DPH) from 2003 to September 2012.

2. In 2003 Dr. Han worked as a contractor at DPH. Initially, she worked on
   tuberculosis resistance projects. In 2004 she became a full time employee and
   was named the Director of the Micro Biology Division. Dr. Han was appointed as
   the DPH Director in 2010.

3. Dr. Han advised that as Director she oversaw approximately 120-150 staff
   members. The staff was divided into three testing groups: Micro, Analytical, and
   Molecular. Dr. Han also oversaw the central security group as well.

4. Dr. Han advised that her responsibilities for both the Amherst and Jamaica Plain Labs included, but were not limited to: budget, personnel, facilities, grants, a small amount of science and partnerships with both state and federal agencies.

5. Dr. Han advised that she reported to DPH Commissioner John Auerbach. Julie Nassif was the Director of Analytical Chemistry Division. Ms. Nassif reported directly to Dr. Han. The Analytical Chemistry Division was broken down into the following areas: forensic drug labs in Jamaica Plain and Amherst, environmental chemistry, childhood lead screening, and chemical threat responses.

6. Dr. Han advised that the drug lab's Standard Operating Procedures (SOPs) needed to be updated. Drug lab personnel used the existing SOPs and the Scientific Working Group (SWG) Guidelines in daily operations. The SWG Guidelines are online and readily available to all lab employees. The SOP's were written by someone in the drug lab. She did not know by whom. Dr. Han stated that Ms. Nassif and other staff members in the drug lab had been in the process of writing testing SOP's for specific drugs. There was some discussion of seeking ASCLD/LAB accreditation at the lab. However, the lab would have needed more resources to implement it.

7. Dr. Han stated that, to her knowledge, there were no problems with Annie Dookhan prior to June 2011. Ms. Nassif would have been responsible for reporting any personnel concerns to her. Dr. Han had minimal direct contact with staff from the drug lab.

8. Dr. Han advised that she knew Chuck Salemi, from senior staff meetings, since 2004. Mr. Salemi never contacted Dr. Han directly. Mr. Salemi could have contacted her directly, at any time, as it was well-known that she had an open door policy. Dr. Han further added that even entry level staff memebers would come directly to her.

9. Dr. Han was asked about her knowledge of Annie Dookhan prior to June 2011. She replied that DPH was at one point thinking about closing down the Amherst Lab due to budget cuts. They looked at the number of staff assigned at Jamaica Plain and Amherst. They also looked at test volume and court volume. They were also looking at where the samples were coming from throughout the state and what number of samples could be absorbed by the Jamaica Plain Lab. During this process, Dr. Han questioned why other chemist's productivity was not as high as Annie Dookhans. Ms. Nassif then explained to her that all samples were different, some samples were complicated and some were simple. A chemist handling more complicated samples would do less numbers. Dr. Han stated that Ms. Nassif further explained that there were caveats interpreting data. Chemists often times had other duties besides testing cases, such as: court, quality control duties, training and writing SOP's.

10. Dr. Han stated that prior to June 2011 there were no concerns, reported to her, about any of Annie Dookhan's testing volume or quality of testing. Dr. Han advised that they looked back 2-3 years in the review of chemist's numbers. It never occurred to Dr. Han that Annie Dookhan was doing too many cases. Ms.

Nassif reported to Dr. Han that Annie Dookhan was a good employee who would typically return to the lab, after court, to do more testing.

11. Dr. Han stated that near the end of June 2011, Ms. Nassif reported to her that there was a problem with the evidence log for samples that Annie Dookhan had tested. Ms. Nassif advised Dr. Han that approximately 90 samples Annie Dookhan had tested were returned to the evidence room having not been signed out, in either the computer or the hand written ledger book. Furthermore, a few days later, the empty entry areas in the ledger book for those samples had been filled in. Furthermore, the evidence officer's initials (Gloria Phillips) had been forged.

12. Dr. Han advised that she thought about the impact of this breach of protocol. She asked Ms. Nassif about the quality and integrity of the analysis. Ms. Nassif advised her that there wasn't a problem with the quality and integrity of Annie Dookhan's testing. Dr. Han never spoke to Mr. Salemi or Elizabeth O'Brien about the issue. Ms. Nassif was the person who spoke with each of them.

13. According to Dr. Han, this breach of protocol by Annie Dookhan did not bring into question the quality of the evidence logs or testing. However, it was decided that Annie Dookhan was to be taken off of testing. At that time the SOP's needed to be updated. Annie Dookhan had the capability to re-write them, so she was given that task.

14. Dr. Han advised that Ms. Nassif questioned Annie Dookhan. Annie Dookhan neither admitted, nor denied anything in regards to the back filled entries or the forged initials in the evidence log book. According to Dr. Han, she believed that the initials of Gloria Philips were forged in the evidence log book by Annie Dookhan.

15. Dr. Han eventually notified the Labor Relations concerning this matter, as the lab was being transferred to the State Police. Dr. Han didn't know what should be done with Annie Dookhan. Dr. Han does not recall telling Deputy Commissioner Lupi that if Annie Dookhan came clean and showed remorse she would be allowed to test samples again.

16. Dr. Han advised that David Young from Labor Relations was notified of the Annie Dookhan situation. Dr. Han does not know the date, but it was just prior to notifying Commissioner Auerbach. Dr. Han advised that she thought this was a simple disciplinary issue. Mr. Young advised that it was not and it should go up the chain. The issue of Annie Dookhan was discussed with Commissioner Auerbach in December of 2011. Dr. Han met with Dr. Auerbach in her office for roughly 30-60 minutes. During this meeting Dr. Han briefed Dr. Auerbach about the situation. Dr. Auerbach felt it was something that needed to be addressed but he did not appear visibly upset. Dr. Han does not recall Dr. Auerbach advising her on what needed to be done about the matter at that meeting. According to Dr. Han, Steve Chilian, Deputy General Counsel for DPH, was assigned to investigate this matter.

17. Dr. Han advised that either Ms. Nassif or Elizabeth O'Brien suggested reviewing the other evidence logs, but they were unable to find anything out of the ordinary in the examination of the logs. At some point, which may have been prior to the investigation, Annie Dookhan was placed on administrative leave. Ms. Nassif also advised Dr. Han of a problem with Annie Dookhan's resume. Dr. Han stated that Ms.Nassif told her that Annie Dookhan said that she was working towards her master's degree or didn't get it. Dr. Han advised that Ms. Nassif told her that when she questioned Annie Dookhan about her resume indicating that she had a master's degree, Annie Dookhan informed Ms. Nassif that her resume was out of date and it was a mistake. Dr. Han advised Ms. Nassif that Labor Relations should be involved with the Dookhan matter. Dr. Han advised that it was at that time they thought about terminating Annie Dookhan. Dr. Han never saw a copy of the resume in question. Dr. Han advised that it is possible that the discovery of the resume issue was between February and March of 2012.

18. Dr. Han advised that Annie Dookhan's resignation was negotiated between Labor Relations and MOSES. A settlement was eventually reached and Annie Dookhan resigned with some stipulations. Dr. Han does not remember the stipulations. Dr. Han did not have the authority to approve the settlement. She does not know who approved it.

19. Dr. Han was not aware of the lab policy concerning assistant district attorneys or police officers contacting the drug lab.

20. In addition to the forging of Gloria Phillip's initials, Dr. Han heard that there was another instance of Annie Dookhan forging someone's initials on a document. She was made aware of this information from Ms. Nassif around June 2011.

21. Dr. Han advised she personally met with Annie Dookhan to advise her that she was to be placed on administrative leave. At that time Dr. Han delivered written notification to her, as well. Dr. Han advised Annie Dookhan not to come to the building while on administrative leave. Annie Dookhan was advised to be available if anyone needed to get a hold of her. Dr. Han and Annie Dookhan did not discuss anything outside of the letter. At that meeting Annie Dookhan said she was 'okay." She did not seem upset, angry, nor did she complain.

Respectfully submitted,

#1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
### Office of the Attorney General
### One Ashburton Place, Room 1910
### Boston, MA 02108

**To:**  Detective Lieutenant Robert Irwin #1230 *RWI*
Commanding Officer, MSP-AGO Detective Unit

**From:**  Trooper Carly E. Rose #3347
MSP-AGO Detective Unit

**Subject:**  Execution Report:  **MA State Police Drug Laboratory**
**305 South St, 3rd Floor**
**Jamaica Plain, MA 02130**

**Case:**  2012-034-2589-0052

1.  On Wednesday, November 7, 2012 at approximately 1050 hours, under Detective Captain Joseph Mason's command, members of the Massachusetts State Police and Attorney General's Office entered the MA State Police Drug Laboratory complex.

2.  The following personnel were present throughout the operation: MA State Police: Detective Captain Joseph Mason, Detective Lieutenant Robert Irwin, Trooper Patrick Johnson and this trooper. We were also accompanied by Assistant Attorney General Anne Kaczmarek, AGO Senior Investigator Mark Pulli and MSP Lab Director John Cronin.

3.  Secured were two (2) 4-drawer filing cabinets and multiple documents, including log books. All personnel secured at approximately 1130 hours. Evidence was secured and inventoried. The official evidence log is attached.

Respectfully submitted,

*Tpr Rose 3347*

Trooper Carly E. Rose #3347
Massachusetts State Police
Office of the Attorney General
Criminal Bureau




# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place Boston, MA 02108
## High Tech & Computer Crime Division
### *Evidence Seizure Log Form*

| MSP Case Number | Defendant/Subject | Location/Place |
|---|---|---|
| 2012-034-2589-0052 | DOOKHAN, Annie | Hinton State Lab, 305 South Street, JP |
| **Date** | **Time (in/out)** | **Evidence Officer** |
| 11/7/12 | 1050/1130 | Trooper Carly Rose #3347 |

| Item # | Qty | Item Description | Location/Officer Init. |
|---|---|---|---|
| 1 | 1 | metal file cabinet color red containing documents | hall outside RM 363 |
| 2 | 1 | metal file cabinet color green containing documents | hall outside RM 363 |
| 3 | 1 | cardboard box labeled "ASD RX 2006" containing documents | office between 358/359 |
| 4 | 1 | cardboard box labeled "ASD RX 12/04-3/06" containing documents | office between 358/359 |
| 5 | 1 | cardboard box labeled "ASD 06 analytical data" containing documents | office between 358/359 |
| 6 | 1 | cardboard box labeled "ASD powder 1/04-9/05" containing documents | office between 358/359 |
| 7 | 1 | cardboard box labeled "ASD MS/GC IR etc 1/04-2/05" containing documents | office between 358/359 |
| 8 | 1 | cardboard box labeled "ASD powder 1/05-9/05" containing documents | office between 358/359 |
| 9 | 1 | cardboard box labeled "ASD VM 1/04-5/07" containing documents | office between 358/359 |
| 10 | 1 | cardboard box labeled "ASD powder 2006" containing documents | office between 358/359 |
| 11 | 1 | cardboard box labeled "ASD quant" containing documents | office between 358/359 |
| 12 | 1 | cardboard box labeled "ASD quant" containing documents | office between 358/359 |
| 13 | 1 | cardboard box labeled "ASD analytical data 3/05" containing documents | office between 358/359 |
| 14 | 1 | white bankers box containing documents | hall outside RM 363 |
| 15 | 1 | white bankers box containing documents and logs | hall outside RM 363 |
| 16 | 1 | white bankers box containing documents | hall outside RM 363 |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |
| 29 | | | |
| 30 | | | |
| 31 | | | |
| 32 | | | |
| 33 | | | |
| 34 | | | |
| 35 | | | |

Evidence Seizure Log Form           Attorney General's Office           Page 1 of 1

Suffolk County District Attorney's Office
AGO - December 20, 2012 009



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews *FJM* . *10·31·12*
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  **Interview of: George Papachristos**
**Norfolk District Attorney's Office**
**Phone: 781-830-4800 x369**

**Interview conducted on October 3, 2012, at approximately 1645 hours. Interview conducted by Lieutenant Michael Cooney and Detective Lieutenant Robert Irwin.**

**Case #:**   **2012-034-2589-0052**

1. George Papachristos is currently an Assistant District Attorney employed at the Norfolk District Attorney's office. He started at the DA's office in 2004 as a student intern. He was hired full time in 2005. He has worked at Quincy, Stoughton, Dedham, and Brookline District Courts. He returned to Dedham for a second stint in approximately 2006. He began supervising at Dedham District Court and also started to prosecute motor vehicle homicide cases out of superior court. He was assigned to superior court full time in 2007. In superior court he was assigned to "general crimes" which he advised are major felonies such as A&B, A&B D/W, MV Homicide, Assault w/intent to murder, firearms and drug cases.

2. Papachristos stated that he dealt primarily with the DPH lab on drug related prosecutions as most of his cases were from local police departments. He did

8. When Papachristos needed a discovery package he would email the chemist on the "cert" directly. He recalls emailing Nicole Medina, Michael Lawler and Dookhan for discovery packets. He advised that there was not a lot of defense attorney's looking for discovery packets so he didn't have to do that very often. Papachristos advised that the first time he was made aware that he was to call the evidence office at the lab and not the individual chemist was approximately May or June of 2012. Michael Lawler from the lab had contacted him advising that any further requests should go through the evidence office.

9. Papachristos advised "Cert's" would normally come from the police. He is not sure if he ever asked the lab for a "cert".

10. Papachristos advised that he never had a case that he needed to call the lab to get an analyzation done on a rush. If someone at the office needed a "cert" for grand jury and needed a rush on it they would go to an ADA that was authorized to send such a request. A fax would be sent to Shirley at the lab with the request.

11. Papachristos never met Annie Dookhan outside of work. The only time he met her was at the lab the one time prepping for the Franjul case. He advised that he and Dookhan had gotten friendly in a work related sort of way. He felt she was a hard worker and a good person who was always looking to help on work related matters. There were times where the two of them would vent about work, she to him and him to her.

12. Papachristos felt that Dookhan was under a lot of pressure and she was looking to get something off her mind. Dookhan then started to share personal information with him. He is not sure if it was over the phone or email but Dookhan contacted him and advised that she was having problems with her husband.

13. Papachristos advised that around the time that Dookhan made the disclosure about her husband and her having problems he got a series of text messages on his work cell phone. Papachristos paraphrases the text's as: "This is Annie's husband do not believe her, she's a liar, she's always lying. She is looking for sympathy and attention." Papachristos's name was not mentioned in the texts and he believes they might have been sent to more than just one person. The texts did not say anything about fooling around with his wife or having an affair. Papachristos advised the texts were about Dookhan looking for sympathy or currying favor. Those texts are the only one's he received. He separated himself from contact with Dookhan after the text messages.

14. Dookhan had sent Papachristos a greeting card. It was a friendly card and it had a dog on it. It said something about keep your head up there are people who care about what you're doing. Keep up the good work. Papachristos did not think too much about the greeting card but then he had a phone conversation with Dookhan. He spoke to Dookhan over the phone for a discovery packet. After the call Papachristos received an email from Dookhan that said thanks for making me smile. Papachristos felt that it was getting a little weird.

15. Papachristos was asked about an email he sent to Dookhan on March 25, 2010. He advised that he sent the email to clarify to Dookhan personally that their relationship was a work friendly relationship but work only. Papachristos did not want any further personal disclosures from Dookhan or get in the middle of a marital problem that he had nothing to do with. He advised her that they were working professionals; Papachristos advised that he contacted Dookhan by email to establish a record.

16. Dookhan responded by email on the 26th of March 2010. Papachristos was not shown the email but he recalls Dookhan feeling terrible. Dookhan also left a voice mail on his work line saying how sorry she was. She said that she would talk to Papachritos's bosses to tell them that nothing happened and that Dookhan just felt that she could talk to him. She didn't mean to get him in the middle of anything.

17. On February 1, 2012 the DA's office was notified by letter from the DPH lab of something was wrong with a chemist. On February 21, 2012 the DA's office learned through DPH that Dookhan had breached protocol on samples. Dookhan never disclosed to Papachristos that she was in any kind of trouble. She did not advise him before the DA's office was notified or after the office was notified.

18. After the problems with Dookhan, Papachristos advised that he asked a colleague about having a relationship with a person that is an expert witness. That person did not work at the lab and she was a member of the state police. He did not have a case with her and he realized that if he did he would be conflicted out of the case. He advised that he would not be able to prosecute a case if he was having a relationship with a witness.

19. Papachristos was asked about drug weights and results. He advised that he never asked Dookhan to adjust drug weights or results on drug samples tested by her. He advised absolutely not.

20. Papachristos was asked if he had ever had a physical relationship with Dookhan and he advised no, never. He was asked if he ever had an emotional relationship with Dookhan and he advised no, never.

21. Papachristos did not know until Dookhan had emailed him that she used her personal email. He became aware after she answered some of his emails from her personal email address. He does not believe that he has ever emailed her first to her personal email; he believes that he would reply only.

22. Papachristos does not believe that Dookhan asked to see him outside of work and he knows that he did not ask to see her outside of work.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# The Commonwealth of Massachusetts Department of State Police

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

MARY ELIZABETH HEFFERNAN
SECRETARY

COLONEL TIMOTHY P. ALBEN
SUPERINTENDENT

## Division of Investigative Services
## Forensic and Technology Center
## 124 Acton Street
## Maynard, Massachusetts 01754

October 15, 2012

TO: Lieutenant Colonel Francis J. Matthews, Commander
Division of Investigative Services
Major James M. Connolly, Deputy Division Commander
Forensic Service Group
Dr. Guy Vallaro, Chief Science Officer/Laboratory Director
Forensic Services Group

FROM: Detective Captain Joseph V. Mason Jr., Executive Officer
Forensic Service Group

SUBJECT: Supplemental Report to File # 2012-034-2589-0052
Peter Piro Follow–up Interview

1. On October 9, 2012 at approximately 2:15 P.M. I re-interviewed Peter Piro at the MOSES' office located at 90 N. Washington Street, Boston. Also present at the interview was MOSES' Attorney Michelle Gates. Piro advised that he wanted to clarify that errors Annie Dookhan made in the area of quality control were administrative in nature and would not affect the outcome of the analysis.

2. Piro also stated that Dookhan was not in charge of quality assurance or quality control. He stated that everyone in the lab had a role in quality assurance and quality control. He went on to say that ultimately the lab director is in charge of quality assurance. Dookhan, however, did help out and had specific quality control duties. Some of those duties included:

collecting quality control documents, as well as review and sign off on quality control reports for balances.

Respectfully Submitted,

Detective Captain Joseph V. Mason Jr. #1451
Massachusetts State Police
Division of Investigative Services
Forensic Services Group
978-451-3303

2



The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Department of Public Health
250 Washington Street, Boston, MA 02108-4619
Office of General Counsel
(617) 624-5200.

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**JUDYANN BIGBY, MD**
SECRETARY

**JOHN AUERBACH**
COMMISSIONER

TO:             John Auerbach, Commissioner, MDPH

FROM:        Steven Chilian, Deputy General Counsel

RE:             Investigation - Lab Breach in Protocols

DATE:         February 29, 2012

## CONFIDENTIAL MEMORANDUM

On December 1, the Department of Public Health (MDPH) became aware of an alleged irregularity in the Lab's protocols for documenting the transfer of samples submitted for forensic analysis for criminal proceedings. The Department has conducted an investigation to determine the validity of this allegation.

## I.    INVESTIGATION PROCESS

A. Persons Interviewed: The following persons were interviewed by me as part of this investigation and the information provided by them is incorporated herein. Union protocols were observed for all interviews. Their statements or interview summaries are attached as exhibits to this report.

1.  Linda Han, Lab Director (Boston)
2.  Julianne Nassif, Program Manager (Boston)
3.  Charles Salemi, Lab Supervisor II (Boston)
4.  Shirley Sprague, Administrative Assistant II (Boston)
5.  Elizabeth O'Brien, Laboratory Supervisor I (Boston)
6.  Gloria Philips, Administrative Assistant I (Boston)

7. Annie Dookhan, Chemist II (Boston)

B. <u>Documents</u>: Documents reviewed during this investigation include, but are not limited to, the following:

1. Relevant Statutes (M.G.L. chapter 111, sections 12 and 13)
2. Policies and Procedures – Drug Analysis Laboratories – Updated 9/24/2004
3. Copy of the relevant log book pages
4. Time Logs for Lab employees for period of June 14 to June 25

## II.     ALLEGATION INVESTIGATED

Whether the transfer of a number of samples from the evidence office to the Lab for testing was properly assigned and recorded in accordance with Lab protocols.

## III.    FINDINGS:

A. The MDPH Drug Forensic Lab (Lab) is authorized pursuant to M.G.L. Chapter 111, sections 12 and 13 to provide chemical analysis to police authorities for the purpose of enforcement of law.

B. Annie Dookhan (AD) is a Chemist II whose duties at the Lab at the time of the alleged event were to analyze samples submitted to the Lab for forensic testing. AD has held this position for eight years. During her tenure as chemist she has had an exemplary record of performance and was highly regarded by her peers for her work ethic and professionalism. She has no record of any disciplinary actions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

C. The Lab's protocols for handling samples requires that all samples received by the Lab for testing be given a unique sample identifier called an evidence control number (control number). The Lab uses this number to track the case samples as they undergo the testing process. All transfers of samples to and from the evidence office are required to be entered into the Lab's computer tracking system by an evidence officer and manually recorded in the office log book (log book). The log book contains a list of all samples (by sample control number) received at the Lab for testing. The evidence officer is required to record his/her initials, the date of the transfer and the initials of the person accepting receipt of the sample(s). The person receiving the sample is required in the presence of the evidence officer to record his/her initials signifying his/her receipt.

D. The Lab became aware of a potential breach in its protocol on June 16, 2011 by evidence officer, Shirley Sprague (SS). The discovery was made by SS while entering information into

the Lab's computer from a number of evidence control cards. [1] When SS scanned the evidence envelope's bar code into the computer, the information displayed on the computer for that case did not show the sample(s) for that case as having been assigned to the chemist identified on the control card. SS had to manually input the chemist's name into the computer. This is not a necessary step when the samples are properly scanned out to the chemist by the evidence officer. SS repeated this process for a number of samples. SS also examined the log book. There were no entries to the right of the control numbers for these samples recording their transfer from the evidence office to the chemist for testing. SS contacted her supervisor, Elizabeth O'Brien (EO), by telephone to alert her of this irregularity. The primary chemist listed on the control cards as having custody of these samples was AD.

E. EO met with SS in the evidence office that same day, June 16th, and confirmed SS's findings, i.e., there was no record of the transfer of these samples to AD in either the Lab's computer tracking system or the log book.[2] On June 20th, EO met with Charles Salemi (CS), Supervising Chemist for the Analysis Section, and Julie Nassif (JN), the Lab's Director of the Division of Analytic Chemistry, to brief them about the discovery. EO brought the log book to the meeting to show both JN and CS. At the time of this meeting, there were no entries in the log book documenting the transfer of the samples from an evidence officer to AD.

F. When the log book was re-examined again on June 21, there were now entries recording their transfer from Gloria Philips (GP) to AD on June 14. A review of GP's time logs showed GP to be on leave from June 15 until June 27. Therefore, GP was unable to have made these entries.

G. GP maintains that she was on leave between June 15 and June 27 and therefore unable to have written the entries on the 21st. Her time sheets confirm her absence from work during this period. GP was also asked to review the log book, specifically the transfers purportedly

---

[1] All samples are transferred in evidence envelopes that are bar coded with each sample's unique identification (control) number and are accompanied with a control card that contains the test result, the date the sample was received by the lab, the date analyzed, test result and the initials of the chemists that performed the test(s). The primary chemist who is assigned the sample performs the preliminary test(s). A separate chemist performs the confirmation test(s). The evidence envelopes are kept in the custody of the primary chemist in the chemist's lab evidence locker (a locked cabinet) while waiting testing. The results of the analysis are provided to the requesting law enforcement agency in the form of a certificate of analysis that certifies what the samples contained and its net weight. The certificate is signed by both chemists.

[2] The samples in question totaled 90.

made by her to AD on June 14. GP stated that the initials purporting to be hers had been written by someone else.

H. The log book is kept in the evidence room. AD, as do all Lab staff, have access to the evidence room via a palm reader. The evidence room is normally staffed by two evidence officers. The number of evidence officers working on the 20th of June was one and the number working on June 21st was two, with one evidence officer working a half-day. The short staffing provided a greater opportunity to enter the evidence office without being observed.

I. AD verified her initials in the log book, but indicated that she may have initialed her receipt "after the fact". That is, although the log book shows that the date of her receipt was June 14, 2011, she likely initialed her receipt for them on a later date. She acknowledged that she had seen the entry by GP but denied that it was written by her. She had no explanation as to who may have made the entry.

J. AD was temporarily removed from her testing duties on or about June 21 and assigned other administrative duties. AD was placed on administrative leave on February 21, 2012.

K. AD has not testified in any cases involving the 90 samples. The certificate of analysis (certificate) routinely produced by the Lab for each of the tested samples and signed by AD certified what the sample was found to contain and its net weight.

L. The Commissioner's office first became aware of this incident on December 1, as a result of inquiries made by the Lab to Human Resources concerning the possible reassignment of AD in early December. The Lab's failure to report this incident to Central Office was based on the Lab's lack of appreciation for its potential legal significance and their opinion that the integrity of the test results had not been affected. There is no evidence to suggest that the integrity of the results were impacted by the documentation issue with the log book.

M. The Lab has taken a number of steps to minimize any reoccurrence of this nature. The Lab has revised its protocol for handling test samples, to include a protocol for reporting discrepancies and has instituted a new policy that limits access to the evidence office to evidence officers only with all transfers of samples to chemists for testing conducted through the evidence office service window. Finally the Lab is also looking at the cost feasibility of adding new security measures such as surveillance cameras.

## III   CONCLUSIONS

Based on a preponderance of the evidence collected during the course of this investigation through interviews and review of documentation, it can be concluded that AD failed to follow Lab protocols for the transfer and documentation of samples for testing, and subsequently created a false record of said transfers. The facts support that the log book was examined by three persons after June 16 and prior to June 21, each of whom stated that there were no written entries next to the sample control numbers for the identified samples that documented their transfer for testing to AD. When the log book was re-examined again on June 21, the previously blank pages for these samples were "filled in". The log book now showed them as having been transferred from GP to AD on June 14. GP could not have written these entries as she was on leave from June 15th through the 27th and, as noted in the findings section, was emphatic after having reviewed the log book that the entries were not in her hand writing. Finally, visual inspection of the log entries supports that the entries for GP and AD were likely written by the same person. While AD did not claim responsibility for writing GP's initials she did verify that the initials signifying her receipt of the samples was in her handwriting and acknowledged that their handwriting is similar. If you eliminate GP as authoring the log entries, the only person with both motive and opportunity to have completed them is AD. The most likely scenario as supported by the evidence is that AD retrieved the samples from the evidence office for testing without following Lab protocols and later compounded this error by creating false documentation of the transfer after the fact.



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Detective Lieutenant Robert Irwin #1230 *RMJ*
Commanding Officer, MSP-AGO Detective Unit

**From:** Trooper Carly E. Rose #3347
MSP-AGO Detective Unit

**Subject:** Execution Report:

**MA State Police Drug Laboratory**
**305 South St, 3rd Floor**
**Jamaica Plain, MA 02130**

**Case:** 2012-034-2589-0052

1.      On Wednesday, November 7, 2012 at approximately 1050 hours, under Detective Captain Joseph Mason's command, members of the Massachusetts State Police and Attorney General's Office entered the MA State Police Drug Laboratory complex.

2.      The following personnel were present throughout the operation: MA State Police: Detective Captain Joseph Mason, Detective Lieutenant Robert Irwin, Trooper Patrick Johnson and this trooper. We were also accompanied by Assistant Attorney General Anne Kaczmarek, AGO Senior Investigator Mark Pulli and MSP Lab Director John Cronin.

3.      Secured were two (2) 4-drawer filing cabinets and multiple documents, including log books. All personnel secured at approximately 1130 hours. Evidence was secured and inventoried. The official evidence log is attached.

Respectfully submitted,

*Tpr Rose 3347*

Trooper Carly E. Rose #3347
Massachusetts State Police
Office of the Attorney General
Criminal Bureau