


# Massachusetts State Police
## Office of the Attorney General
### One Ashburton Place Boston, MA 02108
### High Tech & Computer Crime Division
*Evidence Seizure Log Form*

| MSP Case Number | | Defendant/Subject | Location/Place |
|---|---|---|---|
| 2012-034-2589-0052 | | DOOKHAN, Annie | Hinton State Lab, 305 South Street, JP |
| Date | | Time (in/out) | Evidence Officer |
| 11/7/12 | | 1050/1130 | Trooper Carly Rose #3347 |

| Item # | Qty | Item Description | Location/Officer Init. |
|---|---|---|---|
| 1 | 1 | metal file cabinet color red containing documents | hall outside RM 363 |
| 2 | 1 | metal file cabinet color green containing documents | hall outside RM 363 |
| 3 | 1 | cardboard box labeled "ASD RX 2006" containing documents | office between 358/359 |
| 4 | 1 | cardboard box labeled "ASD RX 12/04-3/06"containing documents | office between 358/359 |
| 5 | 1 | cardboard box labeled "ASD 06 analytical data" containing documents | office between 358/359 |
| 6 | 1 | cardboard box labeled "ASD powder 1/04-9/05" containing documents | office between 358/359 |
| 7 | 1 | cardboard box labeled "ASD MS/GC IR etc 1/04-2/05" containing documents | office between 358/359 |
| 8 | 1 | cardboard box labeled "ASD powder 1/05-9/05" containing documents | office between 358/359 |
| 9 | 1 | cardboard box labeled "ASD VM 1/04-5/07" containing documents | office between 358/359 |
| 10 | 1 | cardboard box labeled "ASD powder 2006" containing documents | office between 358/359 |
| 11 | 1 | cardboard box labeled "ASD quant" containing documents | office between 358/359 |
| 12 | 1 | cardboard box labeled "ASD quant" containing documents | office between 358/359 |
| 13 | 1 | cardboard box labeled "ASD analytical data 3/05" containing documents | office between 358/359 |
| 14 | 1 | white bankers box containing documents | hall outside RM 363 |
| 15 | 1 | white bankers box containing documents and logs | hall outside RM 363 |
| 16 | 1 | white bankers box containing documents | hall outside RM 363 |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |
| 29 | | | |
| 30 | | | |
| 31 | | | |
| 32 | | | |
| 33 | | | |
| 34 | | | |
| 35 | | | |



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews _(signature)_ 10·31·12
Commanding, Division of Investigative Services

**From:**    Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of: George Papachristos**
**Norfolk District Attorney's Office**
**Phone: 781-830-4800 x369**

**Interview conducted on October 3, 2012, at approximately 1645 hours. Interview conducted by Lieutenant Michael Cooney and Detective Lieutenant Robert Irwin.**

**Case #:**    **2012-034-2589-0052**

1. George Papachristos is currently an Assistant District Attorney employed at the Norfolk District Attorney's office. He started at the DA's office in 2004 as a student intern. He was hired full time in 2005. He has worked at Quincy, Stoughton, Dedham, and Brookline District Courts. He returned to Dedham for a second stint in approximately 2006. He began supervising at Dedham District Court and also started to prosecute motor vehicle homicide cases out of superior court. He was assigned to superior court full time in 2007. In superior court he was assigned to "general crimes" which he advised are major felonies such as A&B, A&B D/W, MV Homicide, Assault w/intent to murder, firearms and drug cases.

2. Papachristos stated that he dealt primarily with the DPH lab on drug related prosecutions as most of his cases were from local police departments. He did

have some State Police cases but they were prior to Melendez Dias and all he needed at that time were drug certificates or "certs". One of the first people he met from the DPH lab was Annie Dookhan and that was around 2007-2008. Papachristos believes that it was pre Melendez Dias and he met her at the lab, during working hours. They met on a drug case that Papachristos was prosecuting out of Quincy; the name of the defendant was Franjul. It was a cocaine trafficking case and Papachristos met with Dookhan who was the chemist on the case.

3. The analysis on the cocaine was a representative sample analysis. Papachristos was new to that type of analysis so he met with the chemist, Dookhan, to get an understanding of what that was. He did not have a clear understanding at the time as to what a representative analysis was or the math involved. They met so Papachristos could prep Chemist, Dookhan in his case for possible testimony. Dookhan also sent Papachristos a couple of sample cases where representative sampling was done and the admissibility of same. Dookhan did not testify at the trial as the case ultimately plead out.

4. After the completion of the case, Papachristos sent a letter commending Dookhan's work to Charles Salemi and Linda Han at the lab. Prior to sending the letter, Papachristos asked Dookhan who he should send the letter to. Dookhan advised him that her boss is Charles Salemi but that he wouldn't care so he should send the letter to Linda Han. Papachristos would send letters of recognition/appreciation on a regular basis thanking people for their hard work and dedication on cases that he prosecuted; this included witnesses and police officers.

5. When Papachristos was a supervising attorney in Dedham District Court around 2006-2007, he had an office issued data phone. Due to budget cut's everyone except top management turned in their office issued data phone, this was approximately 2007. Papachristos then used his personal data phone, an old Blackberry, as a way to receive emails for work. He tried several times to get his office email put on the phone but was told that it could not be done. His personal email account was through Hotmail. He would use his Hotmail account when he wasn't at his computer on nights and weekends. Papachristos advised that he is a very hard worker and that he would work numerous nights and weekends with no compensation.

6. Papachristos would use the Hotmail account to contact defense attorneys, police officers and people at the lab including Annie Dookhan. Papachristos told a lot of people that if they had to get a hold of him to shoot him an email on the Hot Mail account because he always had his Blackberry on. Papachristos stated that he received an office issued data phone towards the end of 2011. There were still a few people that still had his Hotmail account saved and used that to contact him. But he had transitioned over to the state email system and was using his office phone.

7. Papachristos advised that other than the one meeting on the Fangula case he never had occasion to meet with any other chemist including Annie Dookhan. He has never had to subpoena any chemist, including Dookhan, for a drug case.

8. When Papachristos needed a discovery package he would email the chemist on the "cert" directly. He recalls emailing Nicole Medina, Michael Lawler and Dookhan for discovery packets. He advised that there was not a lot of defense attorney's looking for discovery packets so he didn't have to do that very often. Papachristos advised that the first time he was made aware that he was to call the evidence office at the lab and not the individual chemist was approximately May or June of 2012. Michael Lawler from the lab had contacted him advising that any further requests should go through the evidence office.

9. Papachristos advised "Cert's" would normally come from the police. He is not sure if he ever asked the lab for a "cert".

10. Papachristos advised that he never had a case that he needed to call the lab to get an analyzation done on a rush. If someone at the office needed a "cert" for grand jury and needed a rush on it they would go to an ADA that was authorized to send such a request. A fax would be sent to Shirley at the lab with the request.

11. Papachristos never met Annie Dookhan outside of work. The only time he met her was at the lab the one time prepping for the Franjul case. He advised that he and Dookhan had gotten friendly in a work related sort of way. He felt she was a hard worker and a good person who was always looking to help on work related matters. There were times where the two of them would vent about work, she to him and him to her.

12. Papachristos felt that Dookhan was under a lot of pressure and she was looking to get something off her mind. Dookhan then started to share personal information with him. He is not sure if it was over the phone or email but Dookhan contacted him and advised that she was having problems with her husband.

13. Papachristos advised that around the time that Dookhan made the disclosure about her husband and her having problems he got a series of text messages on his work cell phone. Papachristos paraphrases the text's as: "This is Annie's husband do not believe her, she's a liar, she's always lying. She is looking for sympathy and attention." Papachristos's name was not mentioned in the texts and he believes they might have been sent to more than just one person. The texts did not say anything about fooling around with his wife or having an affair. Papachristos advised the texts were about Dookhan looking for sympathy or currying favor. Those texts are the only one's he received. He separated himself from contact with Dookhan after the text messages.

14. Dookhan had sent Papachristos a greeting card. It was a friendly card and it had a dog on it. It said something about keep your head up there are people who care about what you're doing. Keep up the good work. Papachristos did not think too much about the greeting card but then he had a phone conversation with Dookhan. He spoke to Dookhan over the phone for a discovery packet. After the call Papachristos received an email from Dookhan that said thanks for making me smile. Papachristos felt that it was getting a little weird.

15. Papachristos was asked about an email he sent to Dookhan on March 25, 2010. He advised that he sent the email to clarify to Dookhan personally that their relationship was a work friendly relationship but work only. Papachristos did not want any further personal disclosures from Dookhan or get in the middle of a marital problem that he had nothing to do with. He advised her that they were working professionals; Papachristos advised that he contacted Dookhan by email to establish a record.

16. Dookhan responded by email on the 26th of March 2010. Papachristos was not shown the email but he recalls Dookhan feeling terrible. Dookhan also left a voice mail on his work line saying how sorry she was. She said that she would talk to Papachritos's bosses to tell them that nothing happened and that Dookhan just felt that she could talk to him. She didn't mean to get him in the middle of anything.

17. On February 1, 2012 the DA's office was notified by letter from the DPH lab of something was wrong with a chemist. On February 21, 2012 the DA's office learned through DPH that Dookhan had breached protocol on samples. Dookhan never disclosed to Papachristos that she was in any kind of trouble. She did not advise him before the DA's office was notified or after the office was notified.

18. After the problems with Dookhan, Papachristos advised that he asked a colleague about having a relationship with a person that is an expert witness. That person did not work at the lab and she was a member of the state police. He did not have a case with her and he realized that if he did he would be conflicted out of the case. He advised that he would not be able to prosecute a case if he was having a relationship with a witness.

19. Papachristos was asked about drug weights and results. He advised that he never asked Dookhan to adjust drug weights or results on drug samples tested by her. He advised absolutely not.

20. Papachristos was asked if he had ever had a physical relationship with Dookhan and he advised no, never. He was asked if he ever had an emotional relationship with Dookhan and he advised no, never.

21. Papachristos did not know until Dookhan had emailed him that she used her personal email. He became aware after she answered some of his emails from her personal email address. He does not believe that he has ever emailed her first to her personal email; he believes that he would reply only.

22. Papachristos does not believe that Dookhan asked to see him outside of work and he knows that he did not ask to see her outside of work.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# The Commonwealth of Massachusetts Department of State Police

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

MARY ELIZABETH HEFFERNAN
SECRETARY

COLONEL TIMOTHY P. ALBEN
SUPERINTENDENT

## Division of Investigative Services
## Forensic and Technology Center
## 124 Acton Street
## Maynard, Massachusetts 01754

October 15, 2012

TO: Lieutenant Colonel Francis J. Matthews, Commander
Division of Investigative Services
Major James M. Connolly, Deputy Division Commander
Forensic Service Group
Dr. Guy Vallaro, Chief Science Officer/Laboratory Director
Forensic Services Group

FROM: Detective Captain Joseph V. Mason Jr., Executive Officer
Forensic Service Group

SUBJECT: Supplemental Report to File # 2012-034-2589-0052
Peter Piro Follow–up Interview

1.      On October 9, 2012 at approximately 2:15 P.M. I re-interviewed Peter Piro at the MOSES' office located at 90 N.Washington Street, Boston. Also present at the interview was MOSES' Attorney Michelle Gates. Piro advised that he wanted to clarify that errors Annie Dookhan made in the area of quality control were administrative in nature and would not affect the outcome of the analysis.

2.      Piro also stated that Dookhan was not in charge of quality assurance or quality control. He stated that everyone in the lab had a role in quality assurance and quality control. He went on to say that ultimately the lab director is in charge of quality assurance. Dookhan, however, did help out and had specific quality control duties. Some of those duties included:

collecting quality control documents, as well as review and sign off on quality control reports for balances.

Respectfully Submitted,

Detective Captain Joseph V. Mason Jr. #1451
Massachusetts State Police
Division of Investigative Services
Forensic Services Group
978-451-3303

2



# THE COMMONWEALTH OF MASSACHUSETTS
# OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

September 17, 2012

District Attorney C. Samuel Sutter
Bristol County District Attorney's Office
PO Box 973
888 Purchase Street
New Bedford, MA 02741

*Re: William A. Hinton State Laboratory*

Dear District Attorney Sutter:

As you know, this Office is currently conducting a criminal investigation into potential misconduct of a chemist at the William A. Hinton State Laboratory in Jamaica Plain. During the investigation, Massachusetts State Police Detectives interviewed witnesses and prepared a series of police reports based upon these interviews.

The Massachusetts State Police reports may contain potentially exculpatory information, as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Hinton laboratory. Please find the attached index and investigative reports pertaining to this Office's ongoing criminal investigation.

As our investigation proceeds, we may be in contact about further disclosures of potentially exculpatory information.

Please do not hesitate to contact me at (617) 963-2489 with any questions or concerns.

Sincerely,

John Verner
Chief-Criminal Bureau
Assistant Attorney General

# INDEX

1.    5 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Daniel Renczowski" dated 08/21/12

2.    1 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Mai Tran" dated 8/22/12

3.    2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Della Saunders" dated 08/22/12

4.    5 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Charles Salemi" dated 08/22/12

5.    3 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Michael Lawler" dated 08/07/12

6.    4 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Peter Piro" dated 08/27/12

7.    2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Shirley Sprague" dated 08/07/12

8.    4 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Elizabeth O'Brien" dated 08/07/12

9.    3 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Hevis Lleshi" dated 08/22/12

10.    2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Lisa Glazer" dated 08/21/12

11.    3 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Gloria Phillips" dated 08/22/12

12.    2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Nicole Medina" dated 08/28/12

13.    2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Kate Corbett" dated 08/28/12

14.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Daniella Frasca" dated 08/28/12

15.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Kevin McCarthy" dated 09/07/12

16.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Sandra L. Lipchus" dated 09/07/12

17.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Stacy Desjardins" dated 09/07/12

18.     1 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Chuck Ifezue" dated 09/09/12

19.     1 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of John Donovan" dated 09/12/12

20.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Sosha Haynes" dated 09/12/12

21.     2 page Massachusetts State Police Report by Sergeant Joseph Ballou re: "Interview of James L. Hanchett at the Amherst Drug Lab" dated 09/12/12

22.     2 page Massachusetts State Police Report by Sergeant Joseph Ballou re: "Interview of Sonja Farak at the Amherst Drug Lab" dated 09/12/12

23.     2 page Massachusetts State Police Report by Sergeant Joseph Ballou re: "Interview of Rebecca M. Pontes at the Amherst Drug Lab" dated 09/12/12

24.     2 page Massachusetts State Police Report by Sergeant Joseph Ballou re: "Interview of Sharon A. Salem at the Amherst Drug Lab" dated 09/12/12

25.     2 page Massachusetts State Police Report by Trooper Randy Thomas re: "Interview of Gerald Giguere-State Drug Lab Case" dated 09/10/12

26.     2 page Massachusetts State Police Report by Trooper Randy Thomas re: "Interview of Paul Jaszek-State Drug Laboratory Case" dated 09/10/12

27.     2 page Massachusetts State Police Report by Trooper Randy Thomas re: "Interview of Donna Lacroix-State Drug Laboratory Case" dated 09/10/12

28.     2 page Massachusetts State Police Report by Trooper Randy Thomas re: "Interview of Allan Stevenson-State Drug Laboratory Case" dated 09/10/12

29.     4 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Annie Dookhan" dated 08/28/12 **(previously provided)**

30.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Circumstances surrounding the interview of Annie Dookhan" dated 08/28/12 **(previously provided)**

31.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Signed statement of Annie Dookhan" dated 08/28/12 **(previously provided)**

32.     3 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Circumstances and conversation from phone calls both received and made to Annie Dookhan" dated 08/30/12 **(previously provided)**

33.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Xiu Ying Gao dated 9/14/12

34.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Zhi Y Tan" dated 9/14/12

35.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Sidney Fuller-Jones" dated 9/13/12

36.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: "Interview of Stephen Ridley" dated 9/12/12

37.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: " Interview of Janice Zanolli" dated 8/28/12

38.     2 page Massachusetts State Police Report by Detective Lieutenant Robert Irwin re: " Interview of Paul Servizio" dated 9/13/12

39.     8 page (including attachments) Massachusetts State Police Report by Massachusetts State Police Trooper Dennis Keeler re: "Execution of Search at MA State police Drug Laboratory" dated 9/11/12



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews  *FJM* 9-15-12
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Interview of:  **Daniel Renczowski**
**August 21, 2012 at 0945 hours**



Interview conducted on August 21, 2012, at approximately 0945 hours. Interview conducted by Detective Captain Joseph Mason, Detective Lieutenant Robert Irwin and MOSES Attorney Paul Donahue.

**Case #:**  2012-034-2589-0052

1. Dan Renczowski advised he has been with the lab since October 2005. He is a Chemist II and he has his paperwork in to be a Chemist III. Renczowski's responsibilities are analysis, backup to the mass/spec supervisor Peter Piro, mentoring chemists, and he's the backup safety officer. He also is responsible for the ordering of lab inventory.

2. Renczowski advised that he has worked with Annie Dookhan for almost seven years. He took over on quality control work and Dookhan trained him. Dan believed that Dookhan was a good trainer. However, sometime in April or May of 2011, Dan advised that Dookhan improperly put Renczowski's initials on a document called a control sheet. The initials indicated that Renczowski had taken custody of the vials that went to the mass/spec department and Renczowski's initials would have meant that everything on the control sheet was correct.

Renczowski advised that his initials at that point would have been an administrative review and what Annie Dookhan had written down was correct. Renczowski had not seen the document and did not initial it. He stated it was falsified and forged by Dookhan.

3. Dan advised Dookhan had brought vials into the mass/spec and put them on the machine and set them up to run overnight. She would then ask Peter Piro to analyze them the next day. Dan advised that at the time it was okay to do that, but it was changed later. Dan advised that Dookhan was the primary chemist on the run. Peter Piro, the mass/spec supervisor, noticed a mistake on a form and he saw Renczowski's initials on it and called Renczowski in. He states that they looked at the form and realized it wasn't Renczowski's handwriting. Piro was surprised that Renczowski would let the mistake get by him. At that point they realized Renczowski had not initialed the form. Dan states that Piro then called Dookhan in as she was the primary chemist. Dookhan came in and it was Peter Piro, Renczowski, and Annie Dookhan. Piro confronted Dookhan with what Renczowski said about the initials and Renczowski added that the handwriting was Dookhan's, and that she had written Renczowski's initials. Dookhan said she made a mistake and she took the form back. Dan advised that Peter Piro also gave her the vials back.

4. Dan advised that Dookhan did a new sheet and had Renczowski sign the samples in to the mass/spec the proper way. The samples were analyzed at a later date. Renczowski does not recall which samples they were. Renczowski advised Peter Piro that he was upset that Dookhan had signed his initials. Piro said to take it to Chuck Salemi, which Renczowski did. Dan states that Chuck Salemi said he would take care of it. Dan has no documentation of the event that he is aware of. Shortly after this, Dan advised that Piro sent a memo out about samples being put on the mass/spec machine by primary chemists. The samples were to be put on by the secondary chemist.

5. Dan states that there were several instances where Dookhan would bring in a sample to the mass/spec as one narcotic and the sample would read out as a different narcotic on the mass/spec instrument. Renczowski did a discovery package on a case that Dookhan believed to be marijuana. Dan advised that Dookhan had sent the vials into the mass/spec and said that both samples were Delta 9 THC which would confirm as marijuana. Delta 9 THC is the active chemical in marijuana. Renczowski did the analysis on the mass/spec, assuming they were THC. The first vial wasn't straight THC. It was co-alluding with morphine and also codeine present. The second vial was negative or there was a very trace amount of THC in the second vial but nothing he could confirm. Dan advises this would be unusual and was happening at an increasing frequency with Annie Dookhan's case.

6. Renczowski advised that he sent the samples back to Dookhan. Dookhan sent the samples in to the mass/spec again and Renczowski advises that they came back as an almost perfect standard for THC. Dan states the procedure in place then was that the samples were returned to the primary chemist for them to figure it out. The chemist was supposed reanalyze the samples. Renczowski spoke with

Dookhan and advised her how the samples originally came out. Renczowski was not sure what Dookhan wanted to do with them. Dookhan advised Dan that she would take care of it. Dan states that at some point Dookhan resubmitted the vials with the same lab number. Dan states that the specter did not look anything like the first two vials run with the same lab number. The new vials looked like typical marijuana samples. No morphine or codeine. Renczowski did not realize the samples were from the same lab number. Dookhan had given a new control sheet and it did not have Renczowski's handwritten notes on it, but on the back of the control card Renczowski had written on the back of the card the original run and the results with the morphine and codeine.

7. Renczowski brought the issue to Peter Piro's attention and he is not sure what Piro did. Renczowski advises that he will get us the discovery package on that case. Renczowski advises that after the marijuana control sheet incident nothing else happened with Dookhan because Salemi told him to bring it to him.

8. Dan advises that there have been inconsistencies in the past with Dookhan's cocaine and heroin samples submitted to the mass/spec. Dookhan would submit a cocaine sample and it would come back heroin or vice versa. Dan believes the time in which the cocaine and heroin samples were not coming out right was around 2010 or so. Renczowski thought it was an honest mistake. He feels it happened about five times that Dookhan got cocaine and heroin wrong. He advises that she also got prescription drugs wrong once or twice. Renczowski advises there are no similar occurrences with other chemists.

9. Renczowski recalls that before the control sheet issue Dookhan had submitted cocaine that came back as nothing at all, after the vials went through the mass/spec. Renczowski ran it twice and it came back nothing. The samples were then returned to Dookhan and Renczowski is not sure what happened with the case. Renczowski explained that the chemists assign a 6-digit number to the samples that go into mass/spec. Those are kept in the data file of the machine and it also has the date. The run number has the date and instrument name. In an effort to see if investigators could find the case Renczowski refers to earlier in this paragraph, Renczowski advised that we could go through the control sheets or control cards to try and find the sample numbers.

10. Dan advised that there are no reports or statistics that he is aware of on chemists that submit samples as being one drug and then coming back as another.

11. Renczowski would check Dookhan's vials into the mass/spec. Renczowski would point out mistakes that Dookhan would change right on the spot. Renczowski would ask Dookhan how she would know that's the right lab number and Dookhan would say, I know and she would not check any paperwork.

12. According to Dan, Dookhan had some questionable lab habits. Dookhan would have many mass/spec vials open to the air and uncapped. The vials were next to each other on the rack. There is a potential for cross contamination. Also the

room was dry and there was a lot of static electricity which could affect the sample.

13. Dan states that the QC Mix was done to make sure the mass/spec machine is running properly. Renczowski went back after the June 2011 incident and checked QC Mixes of Dookhan and some appeared blank. Renczowski makes a QC Mix in a large flask he puts it in vials and they run before the samples to make sure the machine is running correct. When Dookhan ran the QC Mix there was no peak, but Dookhan filled out the form saying that the numbers on the QC run were correct. Dan advised there was actually no data showing the the data that Dookhan claimed. Dan states a chemist is supposed to run two blanks, then a CQ Mix prior to any run. Piro kept a file on Dookhan in regards to a QC Mix which he found after the June 2011 incident. Dan states that Piro was going back and doing an investigation on Dookhan's QC Mix. According to Dan Dookhan was approved to run the mass/spec instrument.

14. Renczowski recalls an incident involving another forgery by Annie Dookhan. Nicole Medina was given a copy of a tune sheet by Renczowski, which contained the alleged forgery. The original tune sheet just had Dookhan's initials. The second one had both Annie Dookhan and Nicole Medina's initials. According to dan the two copies are supposed to be the same and there is supposed to be a copy left at the machine and another copy left in records. Dan advised that other chemists made paperwork mistakes. They inverted numbers but none to the extent of Dookhan and none stating that a sample was one thing and it was actually another or nothing at all.

15. Dan states that prior to June 2011, all the chemists had access to the evidence office using the palm reader. If no one was in the evidence office a chemist could use the palm reader unless the door was dead bolted or alarmed. There were times that Dan was in the evidence office to ask a question and realize no one was there and he would walk out. Renczowski did not think it was appropriate to be in the evidence room without anybody in there. He does not remember the evidence locker safe being opened with no Evidence Officer there. He did not know the code to the evidence safe. Dan states that Betsy, Shirley and Gloria are the only ones that Renczowski has seen open the safe door. Renczowski has never tried opening the door to the evidence room with his key. Renczowski has been in the evidence room or side room, Room # 355 and when an Evidence Officer advised that they were going to the bathroom and leaving Renczowski alone. However, when this occurred the safe door would be closed. Dan states that when an Evidence Officer is in the evidence room the safe door was open on a routine basis. Someone acted as the Evidence Officer if the regular evidence officer could be there. Dan states that if there was no back up then the evidence room would be closed.

16. Renczowski never discussed the evidence log book or anything to do with it with Dookhan. Resubmittals used to run through Julie Nassif, who would approve or not approve whether there is a retest. Then the retest would go to Betsy O'Brien for assignment.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews *FJM* 9-15-12
Commanding, Division of Investigative Services

**From:**    Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of: Mai Tran
August 22, 2012 at 1610 hours**



**Interview conducted on August 22, 2012, at approximately 1610 hours. Interview conducted by Detective Captain Joseph Mason, Detective Lieutenant Robert Irwin and MOSES Attorney Gates.**

**Case #:**    **2012-034-2589-0052**

1. Mai Tran has been in the Jamaica Plain Lab since 1986 and worked for DPH since 1982 and she is currently a Chemist II. Tran advised she did not work with Annie Dookhan. She would say hi to Annie and ask her about her son. Tran has worked part-time for the last ten years and has been back to working full-time since July 2012. According to Tran she could access the evidence room with her palm print but was unable to go into the safe. She has never gone in the evidence room without evidence officers being present. She has been in the evidence room with the safe door open before, but there was an evidence officer there. Tran does not know the code to the evidence safe or have a key to the safe. Tran had a key for the lab, but nobody took it or tested her key that she is aware of.

Respectfully submitted,

*Robt M Irwin* #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews *YRM 9-15-12*
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant R.M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Interview of Della Saunders
August 22, 2012, 1635 hours



**Case #:**  2012-034-2589-0052

1. On August 22, 2012 at approximately 1635 hours, this writer, Commanding Officer Robert Irwin, alongside Detective Captain Mason and MOSES Attorney Michelle Gates, conducted an interview with Della Saunders. The following is a summary of that conversation.

2. Della Saunders advised she has been with the lab for twenty-seven years. She is a Chemist III and she is an authorized Evidence Officer. Della Saunders is able to assign samples, testify in court, do administrative duty and do technical reviews. Della Saunders supervises two chemists, Kate Corbett and Lisa Glazer. She has worked with Annie Dookhan. Saunders advised the system they use at the lab is a two-chemist system. There is a custodial chemist who the primary samples stay with and there is also a confirmatory chemist. The confirmatory chemist prepares the mass/spec and puts the samples in the run to be analyzed, except for marijuana. If the sample came back from mass/spec and was identified to be different than what the custodial chemist thought it was, the sample would go back to the custodial chemist to do more work on it.

3. Della Saunders states that she never saw anyone dry labbing. She never saw anything out of the ordinary. Everything checked out when she confirmed Annie Dookhan's

work but Della was not in the same room working with Annie. She never discussed Annie's situation after the June 2011 incident, and they always had a cordial working relationship.

4. Della states that she was allowed in the safe to take in samples. She doesn't remember being in the evidence room alone and the safe being left open. She states it was possible that while the evidence officers were in the evidence room that the safe door would be left open. Della states that she knew the code to the evidence safe. She adds that the key that opened the lab door also opened the safe door. She has used her key on the safe door. Della states that she did not tell anyone that their key worked in the safe nor the code to the safe was. Della believes that most people didn't know that their key worked on the safe door. Della stated that she believed that Elizabeth O'Brien, Shirley Sprague, Gloria Phillips, Janice Zanolli and Chuck Salemi also knew the code. Della has no idea if Annie Dookhan knew the code or whether or not her key worked on the safe door.

5. Della states that she is not aware if Annie Dookhan was trained as a backup for the evidence room. Della did advise that Dookhan would sometimes sit and enter cards in the evidence room. Della states that Dookhan would volunteer to help and that she was good at typing.

6. Della states she was not aware of any issues involving Dookhan until the fall of 2011. Peter Piro had told Della that Dookhan was doing something that wasn't right. Della is not sure what that was and told us that we should ask Peter Piro.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**       Lieutenant Colonel Francis J. Matthews  *JHM  9-15-12*
              Commanding, Division of Investigative Services

**From:**     Detective Lieutenant Robert M. Irwin
              Commanding, MSP-AGO Detective Unit

**Subject:**  **Interview of:  Charles Salemi**
              **August 22, 2012 at 1030 hours**



**Interview conducted on August 22, 2012, at approximately 1030
hours. Interview conducted by Detective Captain Joseph Mason,
Detective Lieutenant Robert Irwin and MOSES Attorney Michelle
Gates.**

**Case #:**   **2012-034-2589-0052**

1. Charles Salemi has been with the lab since 1974. He was in Food and Drug until
   1980. In 1980 he transferred to the Jamaica Plain forensic drug analysis lab (JP Lab).
   He is a Lab Supervisor II. Salemi oversees operations of the JP Lab. At one point, he
   oversaw the whole operation from approximately 2003 until 2006 or 2007. Around
   2006 or 2007, Julie Nassif was made the Director of Analytical Chemistry of the lab.
   Salemi then oversaw the chemistry portion of the lab. He also spends much of his
   time dealing with defense attorney requests for re-weigh's and discovery packages.
   Charles Salemi also did casework.

2. Salemi stated there are four separate rooms where people/chemists work. Charles
   Salemi oversaw all rooms and all chemists. Prior to 2009, there were supervisors in
   every room. The supervisors were all Chemist III's. In 2009, Elizabeth (Betsy)
   O'Brien was promoted to Lab Supervisor I and she went into the evidence room as its
   supervisor.

3. Charles Salemi advises that he and Julie Nassif did not get along because of a
   grievance over Peter Piro's attempt to be reclassified as a Supervisor I. It went to a

grievance, and just before it was to be heard DPH settled and made Peter a Supervisor
I.

4. The Chemist III's and Supervisors of the lab were Peter Piro, Michael Lawler, and
Della Saunders.

5. Prior to the June 2011 incident with Dookhan, Salemi had several occasions where he
and others were concerned about Dookhan's high productivity. As a result of this,
Salemi stated there was an audit conducted of Annie's work around 2010. They
picked a random month and went over all her powder sheets, which are reporting
sheets, and looked at everything she was supposed to be doing. They wanted to make
sure that she was following lab procedures. Salemi did the audit with Betsy O'Brien.
The audit consisted of reviewing the paperwork on every tenth sample from the
month. There were no actual re-tests performed. Salemi believes there was a record
of the audit that they did on Dookhan and he would try and find it for us. Salemi
stated that at the conclusion of the audit they found nothing wrong with Dookhan's
case work.

6. Salemi stated the lab also performed routine monthly quality control audits that did
include re-testing. Salemi believes Annie had at least one sample every month
re-checked. Salemi advised there should be paperwork on these quality control
audits. He stated that he would try and find these audits for investigators. He advised
the re-tests are done on a sample that is in the safe that has already been analyzed. He
advised that they do that to five or six random samples a month, but that the re-tests
were eventually stopped, and it is now just a technical review.

7. According to Salemi, Betsy O'Brien alerted Salemi that Dookhan's sample numbers
were very high in the month of March 2011. Salemi believes Betsy told him this in
the month of May 2011. Salemi advised that he sent an email to Julie Nassif that
they, Betsy O'Brien and Chuck Salemi, wanted to talk to Nassif about Dookhan's
high numbers. As a result of that conversation, Julie Nassif decided she would give
Dookhan a special project to try and slow her down.

8. Salemi stated that on Friday June 17th 2011 he received an email from Betsy O'Brien
about a problem with some samples that had not been properly signed out of the
evidence room. Shirley Sprague had notified Betsy, and Betsy then notified Salemi.
O'Brien told Salemi that there were discrepancies with the evidence log book.
Salemi states that Sprague advised O'Brien that when Sprague was entering the
returned cards from Dookhan in the computer the samples were not coming up as
having been properly signed out of the evidence room. Salemi advised he
immediately emailed Julie Nassif and apprised her of the discrepancies. Salemi
spoke to Julie Nassif on Monday June 20, 2011. Salemi stated that as a result, Julie
Nassif, Betsy O'Brien and Salemi met that day. At that time they all observed the log
book and they all noticed there were no initials or information next to the sample
numbers in question.

On June 21st 2011, Salemi, Julie Nassif, and Betsy O'Brien met with Annie
Dookhan. According to Salemi, Julie Nassif led the discussion of this meeting. She
asked Dookhan what happened with the samples in question. Annie didn't really

respond and stated that she didn't know what happened. Annie was asked directly about the evidence log book and if she had made the entries that were now in the evidence log book and she said she didn't know what happened. Salemi stated that Dookhan denied signing or filling in the evidence log book after the samples were tested. Salemi advised that after Dookhan left the meeting, Julie Nassif said she would deal with the situation. Julie Nassif said she would get in touch with Linda Han. Salemi told Nassif that Dookhan couldn't do samples anymore and should be taken off the bench. Julie, Chuck, and Betsy all spoke about notifications and they felt the incident didn't affect Dookhan's casework. In hindsight, Salemi stated he realizes that was the wrong decision. They should have notified Quincy PD and the Norfolk DA's office right away. Salemi feels that Annie Dookhan had a mental breakdown.

9. Salemi advised that around the time of the June 2011 incident, possibly in May, Dan Renczkowski contacted Salemi and said that he believed that Annie Dookhan had put Dan's initials on samples that were put into the mass/spec. Salemi stated that Dan had sent an email to Salemi and they later talked about Dan's initials being placed by Dookhan on the samples put into the mass/spec. The initials were on a sheet that goes with the samples into the mass/spec. A couple of days later, Nicole Medina advised Salemi that Annie Dookhan had forged Medina's initials on samples to the mass/spec. Salemi believes he reported the forged initials to Julie Nassif verbally in May 2011 and that there were two accusations of Dookhan forging other chemist's initials and also about Dookhans high numbers. As a result of this, Julie Nassif told Salemi that she would put Annie Dookhan on a project.

10. Salemi stated that Annie Dookhan was working a lot of extra hours and not putting in for overtime. It concerned the other chemists as they felt their numbers would not get them a promotion. Other than the special project that was mentioned by Nassif, Salemi believes nothing else was done in regards to the initials being forged to the mass/spec.

11. Investigators asked Salemi if he had any knowledge of Dan Renczkowski sending back mass/spec samples from Dookhan that were wrong. According to Salemi, Dan Renczkowski did not report to Salemi about samples submitted by Dookhan to the mass/spec coming back different than what Dookhan initially reported the drug as being. Salemi wanted to get Mike Lawler to supervise Dookhan but Nassif and Han said no.

12. Salemi was asked by investigators if he had conversation with Lawler in regards to Dookhan's work. Salemi does not remember Lawler saying to Salemi that anything was wrong with Dookhan's work, or that anything "fishy" was going on. Salemi told lab personnel that if they had a formal complaint about Dookhan they should put it in writing. Salemi states that no one provided him with a written complaint. As far as Salemi was concerned all the talk about Annie Dookhan was just talk around the lab.

13. According to Salemi, he did not work very often with Annie Dookhan over the last couple of years. Salemi added that Julie Nassif had taken over the personnel decisions back in 2009 and that Salemi was no longer making them.

14. Salemi stated as far as lab security, up until approximately 2001 or 2002, he was not sure if there was only one master key. Around 2001 or 2002, Kevin McCarthy, the lab Supervisor II, had a palm reader installed but a chemist could still use a key as well. Salemi stated that he believes that card passes were used to get into the outside hallway doors of the lab and have been used for at least the past five or six years.

15. Charles Salemi stated that he set policy for the evidence room. He had a problem with how it was run in 2009 and Salemi removed himself from the evidence room chain of command. He told Betsy O'Brien to report directly to Julie Nassif in regards to the evidence room. Salemi stated he was still in control of the keys to the lab, evidence room and evidence safe. Salemi decided who could go into the evidence room. Chemists were allowed in the room to check receipts and enter samples in the evidence log book. This was in effect until the June 2011 incident. Now chemists are not allowed in the evidence room. Chemists are not allowed in the safe unless accompanied by an evidence officer. Salemi believes there were times when the evidence room had no evidence officer there. An example of this is if the evidence officer had to go to the bathroom. Salemi never observed the evidence safe door open and no evidence officer in the evidence room. Salemi stated that he has a written policy that nobody is allowed in the evidence room without an evidence officer.

16. Salemi advised that back when Kevin McCarthy was in charge, the evidence officer would have the code to the safe. Salemi took over for Kevin McCarthy and did not keep a written list of who had the code and or a key to the safe. Salemi knew the list of who had a key and the code and access to the safe in his head. Salemi stated that he had the list in his head and that no one other than himself, Shirley and Gloria had the code and the key. Salemi stated that when Gloria went out on medical leave Della Saunders filled in, Salemi is not sure if Della had the code to the evidence safe. The code was not changed until just recently. When Salemi assumed security responsibilities from McCarthy he (Salemi) did not change the evidence safe codes.

17. Salemi stated that he and Shirley had a master key. He added that Betsy O'Brien received one around 2009 or 2010. The master key opened up all of the offices and the evidence office door. The master key also opened the evidence safe. Gloria told Salemi that her key didn't work on the safe and that Gloria had to use the code. Salemi stated that after the June 2011 incident, Julie Nassif and Grace Connolly decided on their own to check the keys. Charles Salemi was never told to check other people's keys. Julie Nassif took Annie's key and gave it to Grace Connolly. Salemi stated that at some point, the safe door lock mechanism was removed and changed. Salemi stated on December 5th 2011 he gave the lock mechanism which had been removed from the evidence safe door to Grace Connolly. According to Salemi, Julie Nassif and Grace Connolly then checked Annie Dookhan's key on the original safe door lock. Dookhan's key worked on the safe door lock mechanism that had come from the safe door.

18. Salemi advised that after the June 2011 incident, Salemi asked Peter Piro for his key and Salemi checked to see if it worked on the safe lock. Salemi can't remember whether the key worked or didn't work. In the key records that Salemi maintained, there is a receipt that Annie Dookhan got a key from Salemi. After learning Annie Dookhan's key worked on the evidence safe door, Salemi did not believe there was

any conversation in the lab about checking everybody's key and Salemi does not believe they were checked. Salemi states it was out of curiosity that Salemi checked Peter Piro's key. There is no record of whose key worked on the safe door.

19. According to Salemi, the hand/palm reader is supposed to keep records of who accesses the evidence office. Salemi does not know if the records are kept anymore. Salemi advises that Shirley Sprague has computer access to the palm reader data. Salemi advised investigators that we would have to ask Shirley about records from the reader as Salemi does not maintain them.

20. Salemi advises that now the lock and code on the safe have both been changed. Salemi has a key to open the safe but does not know the code to the safe. According to Salemi, there are three keys to the safe (per a record he now maintains) dated December 2, 2011. Salemi states that this record reflects that he, Betsy, and Shirley have a key to the evidence safe.

21. Salami advised that after the incident in June of 2011, Salemi did not have any conversation with Dookhan about samples. Salemi was not involved in the discipline of Annie Dookhan.

22. According to Salemi, there is a mass/spec tune test report done before every mass/spec run. The tune report is supposed to be signed off by the chemists. Salemi has no knowledge of problems with Annie Dookhan on tune tests in the mass/spec. Salemi advises that Peter Piro runs the mass/spec.

23. Salemi does not know if a check of the other evidence log books were done for any other forgeries of samples being signed out of the evidence room/safe.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews *FJM* 9-15-12
           Commanding, Division of Investigative Services

**From:**    Detective Lieutenant Robert M. Irwin
           Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of: Michael Lawler**
                     **August 7, 2012 at 1625 hours**

                     Date of Birth:
                     Telephone:

               **Interview conducted on August 7, 2012, at approximately 1625 hours.**
               **Interview conducted by Detective Captain Joseph Mason, Detective**
               **Lieutenant Robert Irwin and Attorney Kleine.**

**Case #:**    **2012-034-2589-0052**

1. Michael Lawler advised that he has been with the lab from 1983 to the present. For eight or nine years he was working in newborn screening at the DPH Lab. In 1994 he transferred to the JP Drug Lab and has conducted drug analysis since. Lawler is currently a Chemist III. He spends approximately 75 percent of his time conducting drug analysis, preparing court documents, and that type of work. He is in workroom #358 approximately 75 percent of his time. He is in the mass/spec office 15 percent of his time, and he's doing administrative work in the chemist office approximately 10 percent of his time. In Room #358, Lawler works with Chuck Salemi and Hevis Lleshi. Zhi Tan was Lawler's former lab partner until Tan retired.

2. Lawler advised that previously, he had access to the evidence office and could go over issues with the Evidence Officers. Chemists had access to the small office off of the evidence room and were able to sign off in the inventory/evidence log books there. Lawler states that chemists were prohibited from entering the safe. On one or two occasions, Lawler when escorted by an Evidence Officer, went in the safe to check on large volumes of samples that would be assigned to him. Lawler can't

recall going into the evidence office, when no Evidence Officer was present. The evidence office is generally staffed. When Lawler has been in with the Evidence Officers, he has never observed the door to the safe open unless there was a lot of activity around. For the most part, samples were given to Lawler in a box or plastic bin by the Evidence Officers.

3. Lawler was asked if any chemist had acted inappropriately or conducted bad science. Lawler advised that all chemists have discretion into what can be tested. Lawler has no direct knowledge of "dry labbing." He describes "dry labbing" as no effort to analyze the sample, and that a chemist looks at it, and if it looks like cocaine, they say it is cocaine.

4. Lawler advised that Annie Dookhan's production numbers were inconsistent with the amount of samples she could test properly. There are monthly reports used as a management tool to check on things. There was a lot of overtime being worked and that meant more samples and more paperwork during the week for the chemist. Lawler stated that an average chemist could do 50 to 150 samples a month. About a year and a half ago, he saw the monthly report and he was staggered by Annie Dookhan's numbers, they were over 500. Lawler advised that he could do 25 samples on a solid Saturday without any distractions.

5. Lawler's states that Dookhan's numbers caused him concern. He started watching the number of slides in her discard pile. He would do a discrete peek over a couple of weeks and it did not look like there were enough slides in her discard pile, but Lawler did not count them. Lawler states that the slides were for the cocaine micro-crystal test, used when testing for cocaine. Lawler was not sure if Dookhan could have emptied her dump bucket when he was not in the room. Lawler rethought the micro-crystal slides issue and had doubts about what he had felt. There was no absolute proof that micro-crystal tests were not being performed by Dookhan on every case. Lawler does not know of any inconsistencies in Dookhan's resubmittals.

6. In December 2010 Lawler was concerned about Dookhan. He reported his concerns about Dookhan's unusually high output to Chuck Salemi and Betsy O'Brien, Salemi advised that they had been aware of things and that Salemi was uncomfortable with Dookhan, and he had concerns in regards to her production. Lawler states that Salemi advised that he brought those concerns to Julie Nassif. Lawler stated that Chuck that Chuck Salemi told him his concerns were minimized because Dookhan was taking home paperwork, she had high energy, and she was skipping lunches and breaks. Salemi advised Lawler to take his concerns to Julie Nassif if he felt that he had more concerns.

7. Lawler states he contacted a MOSES attorney about reporting Dookhan, and he spoke to an Attorney in the spring of 2011. Lawler was advised about hearsay and he didn't want to make accusations about a young woman's career. Lawler advises that everybody had discomfort with Annie Dookhan's monthly numbers. People were worried on a personal level that their supervisor didn't value them because they were not producing numbers as high as Dookhan. Lawler also questioned and was concerned whether the "lab was being compromised." After the safe breach in

June of 2011 Lawler called the MOSES Attorney in regards to what to say if asked on the stand questions about Dookhan by a defense attorney. He was wondering what he should say about an investigation, criminal investigation, or any other action at the lab. Lawler did not reveal anything to the younger chemists, other than being uncomfortable with Dookhan's numbers.

8. Lawler has no direct knowledge over his entire career at the lab of anyone falsifying, stealing, or performing bad science, or "dry labbing."

9. Lawler believed Chuck Salemi had taken Lawler's key to see if it opened the safe door. Lawler believes the keys were tested, but he is not sure. Lawler's key did not work on the evidence room and he's not sure if Salemi gave him back the same key.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# *Massachusetts State Police*
## *Office of the Attorney General*
## *One Ashburton Place, Room 1910*
## *Boston, MA 02108*

**To:**    Lieutenant Colonel Francis J. Matthews   *9-15-12*
                 Commanding, Division of Investigative Services

**From:**    Detective Lieutenant Robert M. Irwin
                  Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of: Peter Piro**
                    **August 27, 2012 at 10:30a**



                    **DOB:**
                    **Phone:**

              **Interview conducted on August 27, 2012, at approximately 10:30a.**
              **Interview conducted by Detective Captain Joseph Mason, Detective**
              **Lieutenant Robert Irwin and MOSES Attorney Kleine.**

**Case #:**    **2012-034-2589-0052**

1. Peter Piro advised that he has been at the JP Drug Lab since December 1991 and that his current title is Lab Supervisor I. He supervises the GC/MS Lab. He also conducts training, quality control, and outside purchases. Piro advised that initially he thought Annie Dookhan was a hard worker and diligent. But there came a time that Piro noticed some red flags. Piro advised that he noticed Dookhan's sample numbers were unusually high. Piro noticed that around 2007 or 2008 is when he started noticing Dookhan's numbers were high. Peter Piro spoke with Elizabeth O'Brien, who was Annie Dookhan's immediate supervisor at that time (2008-2009). In 2009, Chuck Salemi became Dookhan's immediate supervisor. Peter Piro didn't get the feedback that he expected from Elizabeth O'Brien so he went to his superior, Chuck Salemi. Piro spoke with Chuck Salemi about his concerns of Dookhan's numbers being so high. His concerns were that she might not be doing all the tests she should be performing. According to Piro when performing a cocaine test you're supposed to perform a micro-crystal test. According to Piro he never saw Dookhan in front of a microscope. This made him suspicious, but was not proof of any improprieties.

2. Piro advised that Dookhan would bring in racks and racks of vials to the mass/spec day after day. Piro doesn't believe Dookhan could do those numbers correctly. He also noticed that Dookhan was not always at her bench. Piro states that Dookhan also had other responsibilities at the lab such as making up standards. He states that she didn't do those in a timely fashion, so that duty was taken away from her. Dookhan was supposed to review documents for quality control and when they got to Piro the documents would have mistakes.

3. Peter Piro reported all of these concerns to Chuck Salemi. As a result, Chuck did an audit of Dookhan's paperwork only. Salemi told Piro that he had also e-mailed Julie Nassif about Dookhan. Chuck Salemi told him that it wasn't his (Salemi's) place to discipline Dookhan and that it was up to Julie Nassif. Piro advised that disaster struck in the spring of 2011. He stated that it was almost like Dookhan wanted to get caught.

4. Piro advised that prior to the June 2011 incident, Dan Renczowski reported to Peter Piro that Dookhan had forged his (Dan's) initials on a control sheet. Dookhan was the primary chemist and was only supposed to fill out her portion of the sheet. However Piro advised that she filled in Renckowski's portion and signed his initials. Piro confronted Dookhan with the control sheet. She did not respond, but took it back and resubmitted it correctly.

5. Another impropriety Piro discovered involving Dookhan concerned the falsification of a quality assurance test. The test is known as a Quality Control Daily Injector Test on the GC/MS. Piro advised the test is done prior to a run of samples on the GC/MS to insure the instrument is working properly. Piro discovered that prior to a particular run Dookhan failed to properly inject a QC mixture, therefore the results came out as a blank. Piro states that Dookhan then made up test numbers that were within the acceptable range. Peter Piro has a copy of that GC/MS daily injector column check sheet. Piro spoke with Dookhan about it. He advised that she didn't say anything when Piro showed her the made-up numbers. This caused Piro to pull the raw data and he saw the numbers were blank on the run that Dookhan had done. Piro went to Chuck Salemi about the made-up numbers and the forging of the initials. Piro felt that it was over the top what Dookhan was doing.

6. After the incident in the evidence office in June 2011, Julie Nassif told Peter Piro that it didn't really matter about the forgeries and made up data because Annie Dookhan was in enough trouble for what she did in the evidence office in regards to the evidence log book. Peter Piro advised that he didn't agree and felt it should be looked at in its entirety. Peter Piro is worried about being asked questions by a Defense Attorney and didn't want to perjure himself. Julie Nassif advised him, "Don't perjure yourself." Piro advised that there were no admissions made by Annie Dookhan to Peter Piro about the testing of the samples. Peter Piro was surprised that Elizabeth O'Brien

gave Annie Dookhan access to the database. Peter Piro was not sure if it was a read-only privilege.

7. Piro states that Dookhan started to have trouble with her cocaine and heroin samples being wrong when they went through the mass/spec. A few ended up being both a cocaine and heroin mix called a speedball. Piro advised that a chemist is supposed to run a cocaine and heroin bracketing standard on that type of sample. Peter Piro thought that Annie Dookhan had higher than average samples that were bracketed as such. Piro thought that this allowed Dookhan to cover both instead of doing the presumptive tests.

8. Piro thought that Dookhan had a higher than average amount of samples that she said were cocaine that turned out to be heroin. He states that if a chemist is "dry labbing" and just looking at samples and not doing the color test, that is where they get the samples wrong. Peter Piro does not have any firsthand knowledge that Dookhan was "dry-labbing" just his suspicions.

9. Piro advised that on one occasion he came in on a Saturday on overtime. Annie Dookhan was also working that day. Piro observed Dookhan arrive at work and commence to measuring samples without doing a balance check on her scale. Piro stated that he had enough of Dookhan. He went over and put the weights a chemist uses for balancing their scale in front of her. They stared at each other and Piro felt that Dookhan got the message that she needed to make sure her scale was correct.

10. Piro related an incident when Dan Renczkowski performed a GC/MS test on a sample that Dookhan had sent in as THC (marijuana). Renczkowski gave the samples back to Annie Dookhan because it did not come back correctly in the mass/spec. When it came back to the mass/spec again, it came back as THC (marijuana).

11. Piro advised that Dookhan had a few too many cocaines that turned out to be heroin for Peter Piro's satisfaction. He states she would say it was cocaine and the mass/spec would determine it to be heroin. Piro reported these instances verbally to Chuck Salemi shortly after each occurred.

12. Piro states that it took six months for the DPH lawyers to do their investigation after the incident in June of 2011. The chemists were all wondering why Annie Dookhan was able to stay in the lab. Though she was not doing samples, she was still in the lab.

13. Piro states that Dookhan occasionally assisted in the evidence room. Piro never saw the safe door open when there wasn't an Evidence Officer in the room. Piro did not know the code to the evidence safe. Piro heard later, after the June 2011 incident that his key opened the safe door, but it wasn't supposed to work on the safe door. He never saw Dookhan use a code or key to open the safe door.

14. Piro advised that Dookhan had relationships with ADA's so she would pull sample numbers for them. Piro states that Shirley Sprague finally said, "No, no taking samples out of order." Piro recalls that ADA's were calling Dookhan direct and not the evidence office as was the proper procedure.

15. Piro alluded to a gender discrimination complaint by some of the female employees at the lab and Michael Lawler. It was a discrimination complaint brought by females in the chem lab who felt they weren't being treated fairly by the lab and Salemi. Piro feels that after that discrimination complaint, Salemi felt that he could not discipline the people that worked for him.

16. Piro advised that the mass/spec results not agreeing with the custodial chemist's initial finding happened very infrequently. Usually it was due to an administrative error. If that was the case, the sample would be given back to the chemist to correct. Piro advised that when heroin was switched to the plastic bags from the glassine bags (glassine bags are the waxed paper type packaging) there was a higher instance of Dookhan getting cocaine samples back from the mass/spec that were actually heroin. The suspicion Piro had is that Dookhan would "dry lab." According to Piro, Dookhan would look at the sample and think it is cocaine and not heroin due to the packaging.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**      Lieutenant Colonel Francis J. Matthews *FJM 9-15-12*
Commanding, Division of Investigative Services

**From:**      Detective Lieutenant R.M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of Shirley Sprague**
████████████████████ MA
**August 7, 2012, 1600 hours**
**Date of birth:** █████████
**Phone:** █████████████

**Case #:**    **2012-034-2589-0052**

1. On August 7, 2012 at approximately 1600 hours, Detective Captain Mason and this writer, Commanding Officer Robert Irwin, interviewed Shirley Sprague. The following is a summary of that conversation.

2. Shirley Sprague advised that she has been with the lab since 1978. She has been assigned to the evidence office since around 1991 or 1992. In June of 2011 she was responsible for generating results and "cert's" in the computers. She advised that in June of 2011 she was entering results from the cards into the evidence office data base. Shirley states that she observed that the samples being entered did not have an originating chemist assigned to them. Sprague advised that the chemist who had brought the cards back showing the analysis results, was Annie Dookhan. Shirley Sprague advised that she felt there was something wrong, that the samples were not signed out according to the computer data base. Sprague told Elizabeth O'Brien and Elizabeth then told Shirley that she would look into it. Later that day, Elizabeth O'Brien and Shirley looked at the evidence logbook and none of the samples coming back from Dookhan had been signed out. Shirley didn't hear anything about this discrepancy for a while.

3. According to Shirley it appears that Annie Dookhan just took the whole bin of samples and didn't sign it out. Annie Dookhan did not talk to Shirley about the evidence. Shirley advised that Annie Dookhan tried to return the evidence which had not been signed out to the evidence room. Dookhan wanted the samples to be

scanned in by Shirley. This was approximately two to three weeks after it was discovered that the evidence logbook did not have the samples properly logged out. Shirley advised that the samples wouldn't scan in and that Elizabeth O'Brien took over for her and scanned them in. Shirley states that Annie Dookhan stood there and said nothing.

4. Shirley states that employees of the lab need to use the palm scanner to get in the evidence room. All the chemists had access to the evidence room prior to the recent change. Shirley added that all the chemists could access the small office, room 355, through the evidence office. Shirley states that all the chemists know that no one is allowed in the evidence safe. Shirley found out a few months after the June 2011 incident that all the chemist's keys worked on the evidence safe door. She was told this information from Chuck Salemi. Shirley advised that the evidence officers never knew all the chemists' keys worked on the drug safe door. Shirley states that Chuck Salemi started checking keys and they worked. Shirley was not sure if Chuck checked Annie Dookhan's keys.

5. Shirley advised that prior to the June 2011 incident there were three evidence officers as well as Chuck Salemi who knew the code. Also, Della Saunders who fills in for evidence officers knew the code. Shirley would be surprised if anyone else knew the code. Shirley never told the code to anyone. She never gave the code to Dookhan. Shirley states that evidence officers used to leave the safe door open when it was busy in the evidence room, now it is always shut. Shirley has never seen the door open when there was no evidence officer in evidence room.

6. Shirley states she has now been told to keep the safe door closed all the time by Julie Nassif.

7. Shirley is not aware of Dookhan taking any other samples out of the evidence room without signing them out prior to the June 2011 incident. Shirley states that she is aware that chemists are not allowed in the safe and Shirley has never observed a chemist in safe.

Respectfully submitted,    #/230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews ~~JM 9-15-12~~
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Interview of: **Elizabeth O'Brien**
**August 7, 2012 at 1430 hours**

███████████ **MA**
DOB: ███████
Phone ███████

Interview conducted at the JP Lab on August 7, 2012, at
approximately 1430 hours. Interview conducted by Detective Captain
Joseph Mason, Detective Lieutenant Robert Irwin and MOSES
Attorney Kevin Klein.

**Case #:**  **2012-034-2589-0052**

1. Elizabeth O'Brien has been employed for twenty-one years in the lab as a chemist
and a supervisor. She was a Chemist II until approximately 2000. She left for
approximately fourteen months. When she returned, late in 2001- early 2002, she
became a Chemist III. In approximately 2009 she became a Lab Supervisor I. Since
2009 she has worked primarily in the evidence room as a supervisor. Elizabeth
O'Brien believed her supervisor to be Chuck Salemi, but also Julie Nassif was a
supervisor. From 2009 through the present, she is a supervisor and evidence
technician/officer. When Elizabeth O'Brien was a working chemist, the chemist's
asked the evidence technician/officer for samples either by card or verbally.
Evidence technicians/officers would notify her that the samples were ready and she
would go and sign them out.

2. She would bring the evidence into a little room off the evidence room, room 355. She
would check the samples to make sure they were the right samples, then she would
fill out the evidence log book. The samples were then brought to the chemists work
area where they were stored. She was never told as a chemist to go retrieve her own
samples from the evidence safe. She never saw another chemist retrieve their own

samples from the safe. She has never heard talk of any chemist going into the safe and getting samples out. There have been times when there is no evidence technician/officer in the office during working hours. In that case you would put the card in the slot. An example of when the evidence room would be unattended was during lunchtime. If the evidence technician/officer were out, Chuck Salemi would act as backup. Whenever the evidence room was left unattended the safe door was closed and secured.

3. Elizabeth was asked about the operation and control of the evidence safe door and according to Elizabeth the safe door has a number code and key. The number code or key will open the safe door. Elizabeth doesn't believe the key or code had been changed since 2003 or 2004. She stated Chuck Salemi has the "key book." The book has a running record of who has what keys. As a chemist she did not have a key to the safe. Around 2008 she received a master key. She was a Chemist II and got the key because she was helping out quite frequently as a backup evidence person, she used the key on the safe. Elizabeth does not believe the code to the safe was well known. She stated that she believed that Shirley, Gloria, Chuck, and Della Saunders had a key to the safe and knew the code. Elizabeth added that Chuck Salemi may not know the code.

4. Elizabeth O'Brien believes Annie Dookhan didn't have the code to the safe and she is not sure if she had a key. Chuck Salemi would know how many people had a key to the safe when Dookhan was employed at the lab. Elizabeth O'Brien's stated that her master key worked on the door to the lab and the door to the safe. Elizabeth O'Brien believed DPH was going to check Dookhan's key to see if it worked on the safe. Grace Connelly, Julie Nasiff, Chuck Salemi and Elizabeth O'Brien discussed taking Dookhan's keys and trying them on the safe. Elizabeth O'Brien never heard anything further on Dookhan's key.

5. According to Elizabeth O'Brien, Annie Dookhan was a good worker and friendly. Dookhan did a lot of work. The day the samples were taken by Dookhan and not properly logged out, Elizabeth O'Brien was not in. Elizabeth O'Brien never gave the code or the key to the safe to Dookhan.

6. Elizabeth O'Brien stated that there are times the safe door is propped open when evidence technicians/officers are in the room working. She added that the safe door should be closed when evidence officers are out of the evidence room. Elizabeth O'Brien has observed the safe door open with no evidence officer present. That was only a handful of times going back to 2009. She said it was only because of human error, and she would then close the safe door. The safe door being open and unattended was not documented.

7. Previously, all the chemists could get into the evidence room. They would use a palm print and they would gain access. This was in place, up until April 1, 2012, when it was changed. Elizabeth O'Brien believes the samples from Annie Dookhan's violation of protocol were taken, on June 14, 2011. Gloria Phillips was the evidence officer that day. Gloria had been on extended illness leave and was in work very rarely. Gloria was working by herself that day. Elizabeth believes that Dookhan took advantage of Gloria being busy and by herself.

8. As a chemist, Elizabeth O'Brien stated she worked with Annie Dookhan in the same room. That was up until 2008 or 2009, but Elizabeth did not do a lot of samples in 2009. Elizabeth added that she believed Dookhan was a hard worker, focused, efficient, reliable, and technologically strong. The kind of person, if you owned your own business, you would want to hire her. O'Brien believed that Dookhan was a top notch chemist. She worked side by side with Annie for four years, 2004 to 2008. O'Brien never saw any short cuts by Annie.

9. Investigators asked Elizabeth about "dry labbing" and she described 'dry labbing' as looking at the sample, not testing it, and then saying what it is. She never saw Dookhan dry lab. She never saw anything wrong with Dookhan's testing and her not using proper procedures. According to Elizabeth O'Brien's observations, she saw the proper number of slides for the number of bags, but of course she was not looking over Dookhans shoulders.

10. Since Dookhan's departure from the lab, Elizabeth O'Brien said she has had no conversation with Annie Dookhan, and she received no explanation from Dookhan in regards to the samples and the log book. Elizabeth O'Brien brought the issue to Chuck Salemi. Elizabeth O'Brien was asked why Annie Dookhan would take samples without properly logging them out. She advised, "Annie was going through personal problems, then court, and Melendez Diaz was tough at first on her. In 2009 she had a miscarriage and other personal problems. Perhaps she was trying to be important, by being the "go-to person."

11. O'Brien stated that she believes that on June 14, 2011 Dookhan wanted the Quincy PD box of samples to analyze. She got along good with the Norfolk DAs and police officers. The Quincy box was not next in the sequence. Dookhan had asked about the Quincy box of samples. Since Melendez-Diaz and in cases of rush requests, there were times that samples were pulled out of order. When samples from the June 2011 incident were returned by Dookhan, she had the box that the samples were stored in when they were in the safe. This was unusual as evidence officers don't usually give the box with the samples. The box was seen when Dookhan returned the samples to Elizabeth O'Brien.

12. In June of 2011, O'Brien's knowledge of Dookhan forging or taking out her own cases was not documented in writing. There were two other sets of lab numbers that were not initialed; they led back to Annie as well. They brought them to Julie Nassif around the same time in June of 2011.

13. O'Brien advised that Dookhan had no training in operating computer systems that assigned cases, logs, etc.

14. At one time Peter Piro advised Elizabeth O'Brien, that Annie Dookhan had put her initials where she shouldn't have. O' Brien does not recall what document Piro was referring to.

15. O'Brien looked at Dookhans curriculum vitae. She checked her claim on her education when she first went to work. Dookhan's early curriculum vitae claimed

Masters in progress, and then in 2011-2012, her curriculum vitae had a Masters designation. O'Brien believes around June of 2010 she confronted Dookhan about the Masters on her curriculum vitae. According to O'Brien Dookhan subsequently took the Masters Degree off, but at times sent her curriculum vitae out with a Masters Degree on it.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General

Hevis was on the powder sheet. Annie Dookhan did not make the changes to the powder sheet that would of properly reflected the roles and responsibilities of the chemist in training and the certified chemist. Hevis stated that she is unsure of how many samples that were that were done like that during the period she was in training from April 1 to June 16, 2011. Hevis was in training when she did Annie Dookhan's cases and she had not taken the exam yet.

4. According to Hevis, Annie Dookhan was always trying to please people: ADAs, cops, bosses, directors. Hevis was certified as a chemist in June of 2011. Hevis tried to work at Annie Dookhans pace, but Chuck (Salemi) and Peter (Piro) told her to "slow down, you can't work like her, it is against protocol." Hevis and Annie Dookhan were close socially. They sometimes went out for drinks after work. When Annie Dookhan was taken off of samples she told Hevis that she was writing protocols. Then Annie was placed on administrative leave. Hevis stated that Annie texted her and told her to erase all of Annie's texts, emails and for her not to call. Annie told Hevis she didn't want to get her in trouble. Hevis stated that she believes Annie lived in ▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮ and she has a son named ▮▮▮▮▮ In her opinion Annie was always rushing.

5. Hevis stated that she recalls that in the lab, Annie put up a piece of brown lab paper so that Daniela Frasca couldn't see her. Annie hung the lab paper between her bench and Daniela's bench. Hevis recalls asking Annie to take the paper down when renovations were occurring at the office. According to Hevis, Annie said that Daniela and Annie should be separate and not see what each other were doing.

6. Hevis stated that when it came to cocaine crystal slides the way Annie Dookhan did the crystals, Hevis was unable to replicate Annies results. Hevis stated that Annie Dookhan got crystals really quickly. Hevis did not get them as quickly as Dookhan and she wasn't 100 percent sure why. Hevis stated that when Annie would get the crystals quickly Dookhan would not let Hevis look at the crystals under the microscope. Although, on the occasions when Dookhan would let Hevis look at the crystals under the microscope, it would take Dookhan a much longer time to develop the crystals. According to Hevis these were the only crystal slides she was allowed to look at. Hevis further recalled that when Annie did the crystals herself she would look at them for one second and then throw the slide away.

7. Annie told Hevis that she had access to the safe. She said, "Betsy, Chuck and I have access to the safe." She also told Hevis that "Betsy, Chuck and I can close the lab." According to Hevis, a senior chemist was supposed to open and close the lab. Either a Chem I or a Chem II was not supposed to close the lab. Hevis stated that Annie was able to open and close the lab as a Chem II.

8. According to Hevis, Annie had a lot of privileges. Hevis thought it was because she was so productive. She recalled that Peter Piro was against Annie having her run of the place. Hevis believes that Annie knew the code to the evidence safe. Annie told Hevis that she had the code to the safe but she did not tell her who gave her the code. Annie was allowed to look up lab numbers and to Hevis's knowledge, only evidence officers were allowed to look up lab numbers. Annie told Hevis that she was trained to receive evidence but it was Hevis's understanding that Annie was only a chemist

and should not have been allowed to receive evidence. Annie told Hevis that Annie
did training and had access to grants that other people in the lab didn't have access to.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews *[signature]* 9-15-12
Commanding, Division of Investigative Services

**From:**    Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of: Lisa Glazer**
                          **August 21, 2012 at 11:15a**
                          ████████ **Street**
                          ████ **MA**
                          **DOB:** ████████
                          **Phone:** ████████

**Interview conducted on August 21, 2012, at approximately 11:15a.
Interview conducted by Detective Captain Joseph Mason, Detective
Lieutenant Robert Irwin and MOSES Attorney Paul Donahue.**

**Case #:**    **2012-034-2589-0052**

1. Lisa Glazer advised that she is a Chemist II and has been with the lab for five years. Her role as a Chemist II is to test samples. Lisa Glazer advised that she has worked with Annie Dookhan from the time she started, to when Annie Dookhan left. Lisa and Dookhan worked in separate rooms, and that has always been the case. Glazer never really watched Dookhan do her preliminary work on the samples. Dookhan set up her own runs in the mass/spec, although set up different than Lisa's, Lisa said there was nothing wrong in the way Annie set hers up.

2. According to Lisa, the computer system that assigns the lab numbers was on Betsy's computer in the lab. Dookhan would go into Betsy's computer to get data. The computer was not locked. Annie would get such things as dates of analysis. After Dookhan was taken off the bench, Lisa found out that Dookhan wasn't supposed to do that, she wasn't supposed to go into Betsy's computer. Lisa believes Dookhan couldn't change anything when she went into Betsy's computer, but that she could just look up the case numbers.

3. Lisa states she has not had any conversations with Annie about what happened at the lab in June 2011. She stated she did have conversations with Annie about Annie's curriculum vitae.

4. Lisa advised when she came back from maternity leave in October 2011, Dookhan had been sending out a discovery and had copied Lisa on the email. Lisa states she opened up the discovery email and she observed that Dookhan had added classes to her curriculum vitae. Lisa states she asked Dookhan about the classes, as she was interested in them, and as to why her supervisor didn't offer them to everyone. Annie said she had got a grant from the Department of Justice for the classes. Dookhan wouldn't give Lisa any more information on the grant or the classes. Lisa states she asked Annie about the classes and felt Annie might have lied about the courses and who paid for them. Lisa has no direct knowledge of whether Annie Dookhan actually took the courses.

5. Lisa stated that up until February of this year she had access to the evidence room. The palm scanner still works, but Lisa was told not to go in, so she doesn't go into the evidence room anymore. Lisa has seen the evidence safe door open when in the evidence office. She had gone in the evidence room once, with nobody in there and she observed the safe door open. Lisa states the evidence officers were pretty good about locking the door, but it was left open occasionally. Lisa was told when she first started at the lab that she needed special permission to go into the evidence safe and that only five or six people had that permission. Lisa stayed out of the safe and never saw Dookhan go into the safe.

6. Lisa advised that after Dookhan was taken off the bench in June 2011, Dookhan was not supposed to go into the evidence room or the lab, but she still did. Dookhan was writing procedures to get the lab accredited and that is why she said she was off the bench. Lisa advised that is what she was told.

7. Lisa states that after Melendez Diaz, she found it tough to keep her numbers up. Prior to Melendez Diaz, Lisa advised she would do approximately 100 samples a week on average, and a max of about 400 samples in a month, but that would be with no other responsibilities. After Melendez Diaz, which she believes was June 26, 2009, Lisa's samples lowered to 200 a month at the most. Lisa had heard a rumor that Annie Dookhan was doing 800 samples a month.

---

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# *Massachusetts State Police*
## *Office of the Attorney General*
## *One Ashburton Place, Room 1910*
## *Boston, MA 02108*

**To:**     Lieutenant Colonel Francis J. Matthews ~~HM~~ 9-15-12
Commanding, Division of Investigative Services

**From:**   Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**   **Interview of: Gloria Phillips**
**August 22, 2012 at 1400 hours**

 **, MA**
**DOB:** ███████
**Phone:** ████████

**Interview conducted on August 22, 2012, at approximately 1400
hours. Interview conducted by Detective Captain Joseph Mason and
Detective Lieutenant Robert Irwin**

**Case #:**   **2012-034-2589-0052**

1.  Gloria advised she has been with the Jamaica Plain Lab for approximately
    twenty years. Prior to being assigned to the JP Lab, she worked at 150 Tremont
    and 250 Washington Street with DPH. Gloria is currently an Evidence Officer
    and Administrative Assistant. She has held that job for 15 years. She works in
    the evidence room. She is the liaison between the chemists and the police
    departments. She does intakes, enters samples into the system, and then puts
    them in the safe with a card from that date. Gloria advised that when the chemists
    need work, they will come and ask for samples. Gloria gets samples, scans them
    out of the safe, and then the chemist takes possession of the samples. Prior to the
    chemist taking custody of the samples, the samples have to be logged into the
    evidence log book. The evidence officer initials the evidence log and makes sure
    it is in the book before the chemist can initial the evidence log. Gloria stated she
    would never give samples to a chemist without scanning them out and filling out
    the evidence log.

2.  Gloria advised the chemist does the analysis and the card then comes back to the
    evidence officer. The data from the card is entered into the computer by the
    evidence officer and then the certificate of analysis goes back to the chemist. The

chemist then brings the sample back, and it is scanned back into the safe by the evidence officer. The police are then notified and eventually arrive to pick up their sample, and the sample is scanned out of the safe and to the police department.

3. Gloria states that in June 2011, Gloria was taking time off because she has a terminally ill son. Gloria was at work on the day the samples in question are shown to have been given out. Gloria recalls giving Annie Dookhan samples that afternoon on June 14, 2011. Gloria advised that Annie would ask for specific samples from specific towns. Annie Dookhan always wanted Norfolk County. Gloria states that Annie Dookhan asked for specific numbers and Gloria gave them to her because she figured Elizabeth O'Brien said it was okay.

4. Gloria states that in regards to the 90 samples that were not properly signed out, she feels Annie Dookhan got the samples when Gloria went to lunch. Gloria always closes the safe when she goes to lunch unless someone else, another evidence officer, is in the evidence room. She does not know how Annie Dookhan got into the safe.

5. Gloria advised that the 90 samples from June 14, 2011 incident came to light when the card came back from Dookhan for entry into the computer by Shirley on June 16, 2011. Gloria was not in that day. She advised that she got a call from Elizabeth O'Brien who asked her to come in on Monday and look at the handwriting on the evidence log.

6. Gloria states she came in on the Monday and Elizabeth asked her if she forgot to scan the 90 samples. Gloria told Elizabeth O'Brien that it was impossible. The next week or so, Gloria looked at the handwriting in the log and confirmed it was not hers. She told Elizabeth O'Brien that the handwriting was not hers.

7. Gloria states that Annie Dookhan did not try to talk to her after June 14, 2011 incident. Gloria wanted to ask Dookhan about what happened but Julie Nassif told Gloria she couldn't discuss it with Annie Dookhan. Gloria was mad that she couldn't ask Dookhan why she forged her initials, but she didn't discuss it with Annie Dookhan.

8. Gloria advised that she had her key tested by Elizabeth O'Brien, but is unaware of the results. Gloria had heard that everybody had the same key. At the end of the day evidence officers would deadbolt the door on the evidence room. Gloria advised she did not know that the chemists had the same key as her. Gloria believes that the key works on the safe but Gloria used the keypad to get into the safe.

9. Gloria advised that chemists could come into the evidence room but they were not supposed to be in the evidence room unless the evidence officer was in the room. She states that there was maybe one time she came back and a chemist was in there alone. Gloria gave that chemist a dirty look and said you're not supposed to be in here alone. She did not recall who that chemist was.

10. Gloria states that she has also had samples dropped off by a chemist in the evidence room when she was gone. She believed that if she dead bolted the door that no one could get in. She never saw a chemist in the safe. She has no clue on when the 90 samples were taken by Dookhan. It could have been before or after the June 14, 2011 date.

11. Gloria advised the safe door used to stay open prior to the June 2011 incident, but after they found out everybody's keys worked, the evidence safe door is shut all the time. Gloria advised that nobody is able to get by her.

12. Gloria advised that a couple months before the state police took over the lab, they found out the keys worked on the evidence safe door. Gloria said Elizabeth O'Brien checked her key. Gloria has heard that all the keys worked. Gloria is not sure if Annie Dookhan knew the code to the safe. Gloria believed that Dookhan had a lot of leniency because she was a top producer. Gloria advised Dookhan was allowed to do cards that an evidence officer would do when Shirley was out.

13. Gloria believes that she, Della, Chuck, Shirley, and Elizabeth knew the code prior to June 2011. The code was not written and Gloria would never tell Dookhan or anyone else the code to the safe.

Respectfully submitted,

Robert M. Irwin #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**   Lieutenant Colonel Francis J. Matthews *FJM 9-15-12*
Commanding, Division of Investigative Services

**From:**   Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**   Interview of: **Nicole Medina**
**August 28, 2012 at 1230 hours**

▮▮▮▮▮▮ **Massachusetts**
Phone: ▮▮▮▮▮
Date of Birth: ▮▮▮▮▮

Interview conducted on August 28, 2012, at approximately 1230 hours. Interview conducted by Detective Captain Joseph Mason, Detective Lieutenant Robert Irwin and MOSES Attorney Paul Donahue.

**Case #:**   2012-034-2589-0052

1. Nicole Medina advised she is a Chemist II and has been with the lab since November 2004, she analyzes drugs. Nicole advised that she has worked with Annie Dookhan and that they were co-workers. Annie Dookhan worked in a different area than Nicole. They did not do work together but there might have been one or two occasions when they prepared a re-agent together. Nicole would joke with Annie about her being the "super woman" of the lab.

2. According to Nicole, the chemists were allowed to go in the evidence room until a few months ago. Nicole Medina never wanted to and never went into the evidence safe. Nicole did not know the combination for the safe and never tried her key on the safe. Nicole advises the safe door has been open when she has been in the evidence room in the past, but that there was always an evidence officer present. Nicole states that there might have been a few times the evidence officer left Nicole alone in the evidence room when the evidence office would go to the bathroom, but that the evidence officer would always lock the safe. Nicole states she has never talked to any chemists who got their own samples out of the safe. Nicole does not know of anyone who tested her key on the evidence safe door.

3. Nicole stated that the mass/spec tune test, which makes sure the instrument is running properly is supposed to be signed off by two chemists. Nicole advised that Annie Dookhan would set the machine up and then they were both supposed to initial the tune test sheet. Nicole stated that she learned Annie Dookhan signed her (Nicole's) initials on the sheet without her knowledge. Nicole's initials were put down on the sheet as doing the review. Nicole advises that she did not initial the form. Nicole believes this happened sometime around the end or middle of June 2011. Nicole states that when two chemists' initials are on the original, a copy is made and one copy goes into the file/records room and the other copy goes in a file next to the instrument. Nicole found one copy of a tune test dated June 10, 2011 in the binder next to the mass/spec instrument and it had the initials ASD (Annie S Dookhan) and the date. It also had the initials NEM (Nicole E Medina) and the date. Nicole advises that it is not her handwriting and she did not initial the sheet. Nicole went and found the copy filed in the records room and that copy only had ASD and the date. Nicole states that she has no idea why the two copies are different or why her initials were used. She just happened to find the document. She had heard of similar issues with Dookhan and the forging of initials so she might have been on a heightened state of alert to see if Dookhan had forged her initials. Nicole provided us with a copy of this tune test.

4. Nicole advised that she went on maternity leave between November 21, 2010 and she was back to work on May 25, 2011. Nicole was just getting back up to speed from maternity leave in June of 2011. That is when Peter Piro was at DEA School and not at the lab. Nicole advised that Annie Dookhan tried to pressure Nicole to analyze her mass/spec submissions. Nicole would not do it because Peter wanted to recertify Nicole when he got back from the DEA school.

5. Nicole recalls that on an unknown date, after Dookhan was removed from lab after the June 2011 incident, she observed Dookhan in the mass/spec lab. Nicole advised that even though Dookhan was supposed to be prohibited from entering the mass/spec lab she still would go in. Nicole believes that around the early fall of 2011, Nicole found Dookhan in the mass/spec room, at the computer, with the door shut and the lights off. Nicole asked Dookhan what she was doing and Dookhan said the bright lights bothered her and she didn't want them on. Nicole reported this to Peter Piro. Nicole also adds that Annie Dookhan sometimes got requests direct from ADAs to do discovery.

Respectfully submitted,

*[signature]* #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews *[initials]* 9-15-12
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** Interview of: **Daniella Frasca**
August 28, 2012 at 1300 hours

~~[redacted]~~ Massachusetts
Date of Birth: ~~[redacted]~~
Telephone: ~~[redacted]~~

Interview conducted on August 28, 2012, at approximately 1300 hours. Interview conducted by Detective Captain Joseph Mason, Detective Lieutenant Robert Irwin and Attorney Donahue.

**Case #:** 2012-034-2589-0052

1. Daniela Frasca advised she is a Chemist II, and she has been employed at the state lab since January 8, 2001. Daniela Frasca conducts chemical analysis. She advised she had worked with Annie Dookhan for about eight years. She worked with her since Dookhan started. Daniela Frasca advised that she and Annie Dookhan shared a lab room for the eight years that Dookhan was at the lab. They worked together until Dookhan went and worked for Julie Nassif.

2. When Dookhan was at her bench and Frasca was at her bench they would talk and joke around. They talked about testing, color tests, what crystals look like; general scientific things. Frasca advised that Dookhan took care of her own work and Frasca took care of her own work. Frasca advised that there was a brown piece of paper that divided Frasca and Dookhan's work area, and it was put up by a previous chemist, Sandra Lipchus. It was left up after Lipchus left. Frasca never thought the paper was put up to hide anything. Frasca felt Dookhan was a good worker. Frasca never observed anything out of the ordinary or wrong with Dookhan. Even when the brown paper came down, she did not notice anything unusual. Frasca states she occasionally saw Dookhan using her microscope.

Frasca added she was busy doing her own work and did not constantly observe Dookhan. Frasca saw Dookhan doing microcrystal tests however she could not say if Dookhan did one every time. Frasca said Dookhan was very fast. Dookhan would show up with bins of stuff and say Betsy gave it to her.

3. Frasca advised that chemists were allowed in the evidence office before the June of 2011 incident, but never alone. When chemists were in the evidence office there would be an evidence officer in the room. Frasca advised that if the safe door was open it was never left open without the presence of an evidence officer. She states that once an Evidence Officer would leave, they would lock the safe. Frasca did not know the code to the safe and she did not try her own key on the safe. She states she did not have access to any computers in the evidence office. She believes that Dookhan had access to the code to get into the lab, as well as the code to get in the computer in the evidence office. Frasca does not know who gave Dookhan the code. According to Frasca she believed that Dookhan had access to the lab database. Additionally she believed that Dookhan helped in the evidence office and helped do certificates.

4. Frasca advised that Dookhan could open the lab in the mornings. She states that Dookhan knew the code to the alarm. Frasca does not know who gave Dookhan the code. Frasca does not know if Dookhan had access to the evidence safe. Frasca never had her key taken and tested. She has had no conversations about any mistakes that Dookhan made with cocaine or heroin. Frasca states that she does not remember observing Dookhan balance her scale. Frasca balances her scale every day and keeps a log book. Frasca advised that Dookhan was away from her bench at times but Frasca is not sure how much. Frasca added that when Dookhan was taken off the bench as a result of the June 2011 incident, Dookhan told Frasca she was doing SOPs for Julie Nassif. Frasca has not talked or had any communication with Dookhan since she left the office.

5. In conclusion Frasca added that Dookhan would get calls on her cellphone from certain ADA's about court. This unusual because other chemists don't get those types of calls.

Respectfully submitted,

#1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews  *JM*  9-15-12
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Interview of:  **Kevin McCarthy**
September 7, 2012 at 12:20p

███████ MA
DOB: ████████
Phone: ████████

Telephone interview conducted on September 7, 2012, at approximately 12:20p. Interview was conducted by Detective Lieutenant Robert Irwin.

**Case #:**  2012-034-2589-0052

1. Kevin McCarthy advised that he started at the DPH Lab in 1966, at the State House. He then moved to 600 Washington Street, Boston, Massachusetts. In 1978, Kevin McCarthy went to work at the lab in Jamaica Plain. He was in Jamaica Plain from 1978 to 2003. He retired in 2003 as a Supervisor II.

2. In 2004 he was asked to come in and help with the backlog of samples. McCarthy agreed and worked about nine or ten weeks a year on average. He worked from 2004 to 2008 testing samples. In the fall of 2008, he was told that DPH no longer had the money for him to work and do the samples, so he didn't work anymore. He did not do any supervision and he advises that things have changed in forensic science since 1966.

3. McCarthy was made a supervisor approximately in the early 1990s and he was a supervisor until 2003. He believes Annie Dookhan was hired right after he left. McCarthy did not supervise Annie Dookhan. In 2004, when McCarthy came back, he did not work with Annie Dookhan. She worked at the other end of the lab. She might have done some of his mass/spec work on his samples.

4. McCarthy knew Dookhan from seeing her at the lab. Her son was born around the same time as McCarthy's grandson. McCarthy and Dookhan would have small talk about the kids and he stated that she seemed like a nice woman to him. McCarthy never saw anything out of the ordinary done by Annie Dookhan. McCarthy could not recall seeing Dookhan working, but he stated he must have seen her at working at some point, but he could not recall anything specific. He did not see Annie Dookhan doing anything wrong. McCarthy did not talk to anyone at the lab that said Dookhan had done anything wrong.

5. McCarthy recalled a problem at the lab back in the early 1980s. There was a guy stealing drugs, Peter Gandolfo, and it was reported and investigated by the State Police.

6. Between 2004 and 2008 McCarthy would go into the evidence room to get his samples, but could not recall if he went in the safe. If he did, it would have been with someone from the evidence room. McCarthy advises that you need a palm hand print registered on the reader to get in the evidence room. McCarthy did not have the combination for the safe or the key to the safe. When McCarthy would get his samples he would go in the small room off the evidence room with his box and then sign the samples into the evidence log book. He did his own thing and never really saw anybody else doing their samples at the same time.

7. He was asked if he saw anybody at the lab, during his tenure, doing anything wrong against policy and procedures or anything criminal and he responded, "Absolutely not."

8. McCarthy heard that Chuck Salemi was suspended. He wanted to add to the interview that Chuck Salemi was honest as the day is long, and that he gives him his complete support. McCarthy has confidence in Salemi and is sure he didn't do anything intentionally wrong.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews *(initials)* 9-15-12
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  **Interview of: Kate Corbett**
**August 28, 2012 at 11:27a**

██████████████ **Massachusetts**
**DOB:** ██████
**Phone:** ██████████

**Interview conducted on August 28, 2012, at approximately 11:27a.**
**Interview conducted by Detective Captain Joseph Mason, Detective**
**Lieutenant Robert Irwin and MOSES Attorney Paul Donahue.**

**Case #:**  **2012-034-2589-0052**

1. Kate Corbett advised that she is a Chemist II and has been with the JP Lab since 2005. She advises that she analyzes unknown substances for the presence of narcotics. She has worked with Annie Dookhan and they have worked in mass/spec together. Kate Corbett, Annie Dookhan, Dan Renczowski, Peter Piro, and Della Saunders all worked with the mass/spec instrument. Previously, Kate advised there had been a two chemist system and they would rotate and would confirm everyone else's samples. The two chemist system changed around March or April of 2012.

2. Kate Corbett noticed that Annie Dookhan did a lot of samples. Kate Corbett talked to Annie about how she could do so many samples. Dookhan replied that she wouldn't take lunch or breaks. Dookhan would do things that Kate Corbett wouldn't do. An example of that is what happened a couple months prior to Kate Corbett going on maternity leave, in March of 2011. Kate advised at that time in the two chemist system the first chemist was required to compile a batch sheet on the mass/spec instrument. Then the batch sheet was to be initialed by the second chemist. On a number of occasions Annie Dookhan put Kate Corbett's initials on the sheet as the second chemist. Nobody else would put Kate's initials on a batch sheet. Kate feels that Annie did this because she knew Kate was going on maternity leave in a couple of months. Kate advises that Annie put Kate's initials down many times on the batch sheet.

3. Kate Corbett would not see the samples and did not set them up for the mass/spec runs done by Annie. Kate would see the data when Annie put it on her desk to look at. Kate advises it was alright for Annie to put her (Annie's) own run on the mass/spec but she should not have put Kate's initials down. It should have been Annie Dookhan's initials only.

4. Kate advised that Annie Dookhan made it appear that she had permission to do more stuff in the lab than anybody else at the lab. She was able to look in Betsy's O'Brien's computer to see the database and would look up information on Betsy's database.

5. Kate never noticed any bad science or 'dry labbing' by Annie. She was not in the room when Dookhan would do her work. Kate Corbett was on maternity leave from March 2011 to September 2011. When Kate came back Annie was not talking to anyone. Kate advised that she was told Annie was not allowed in the lab, in the mass/spec area, or be allowed to pull data for discovery. On the contrary, Kate stated she would see Dookhan doing all of those things. When this happened Kate would tell Peter Piro and Peter Piro would tell Chuck Salemi.

6. Corbett advised that prior to her maternity leave a chemist could go in the evidence office, get samples, and go in the little room off of the evidence room where they would match the samples to the receipt and sign the evidence log book. This changed around April 2012 and chemists could no longer go into the evidence office. Kate advised that she was sometimes in the evidence office alone, when one of the evidence officers had to go to the bathroom they would shut the safe door. Kate advises sometimes the safe door was open when Kate was in the evidence office and the evidence officers were in the evidence office with her. Kate never went in the evidence safe and never took her own samples. She advised that she didn't even like standing in the doorway of the safe. Kate never talked to Annie Dookhan about getting her own samples out and she never talked to Annie about the code to the safe or a key to the safe. Kate states she did not know the code to the safe. Kate advises that Della Saunders might have known the safe code because Della could take in evidence. Kate never used her key on the evidence safe door but now the talk amongst the chemists was that all their keys worked on the evidence safe door. Kate does not know of any other chemists who have taken evidence out without it being logged into the evidence log book.

Respectfully submitted,

#1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**       Lieutenant Colonel Francis J. Matthews   *FJM 9-15-12*
·         Commanding, Division of Investigative Services

**From:**     Detective Lieutenant Robert M. Irwin
              Commanding, MSP-AGO Detective Unit

**Subject:**   Interview of: **Sandra L. Lipchus**
                           **September 7, 2012 at 12:35p**
                           ███████████ **MA** ████
              **DOB:** ████████
              **Phone:** ███████████

              **Telephonic interview conducted on September 7, 2012, at
              approximately 12:35p. Interview was conducted by Detective
              Lieutenant Robert Irwin.**

**Case #:**    **2012-034-2589-0052**

1. Sandra advised that she started with DPH in approximately 1985. She was always
   at the Jamaica Plain lab. She retired on October 1, 2003, as a Chemist III. At the
   lab Sandra was responsible for analyzing illegal drugs. Sandra was asked if she
   ever observed any unethical or criminal behavior, or anyone not following proper
   policies and procedures at the lab in Jamaica Plain while she was working there
   she advised that she had not.

2. Sandra was then asked if she had ever reported any wrongdoing or any of the
   above behaviors that were not looked into by the supervising staff at the Jamaica
   Plain lab, and she said no. Sandra did not work with Annie Dookhan and believes
   that Annie was hired several months after Sandra retired.

3. Sandra wanted to add to her statement that she has heard nothing but good things about Chuck Salemi and Sandra has nothing but good things to say about him. She further stated that Chuck is very conscientious and played by the rules.

Respectfully submitted,

*Robert M. Irwin* (signature)

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews *9-15-12*
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** Interview of: **Stacy Desjardins**
**September 7, 2012 at 0920 hours**

▆▆▆▆▆▆▆ **North Carolina**
Date of Birth: ▆▆▆▆▆▆
Telephone: ▆▆▆▆▆▆▆

**Telephone interview conducted on September 7, 2012, at approximately 0920 hours. Interview conducted by Detective Lieutenant Robert Irwin.**

**Case #:** **2012-034-2589-0052**

1. Stacy Desjardins advised that she is currently employed as a floor supervisor for Tommy Bahama. Desjardins had worked at the Jamaica Plain lab from March 2009 to February 2011. She was a Chemist I. She did preliminary examinations, spot tests, crystal tests and she was a primary chemist. During the last two months she was employed there, she was being trained as a confirmatory chemist. She and her husband wanted to move to an area that was more affordable. Working at the lab had nothing to do with her leaving. In fact, she was sad to leave the lab.

2. Desjardins advised that when she was new at the lab she was trained by Della Saunders. She trained for approximately six weeks under Della Saunder's supervision. Saunders stayed with Desjardins and did all that was required to train her. Desjardins first had a written test and then Chuck Salemi created three different mock cases where Desjardins was given samples to test in which Stacy passed and became certified. Desjardins then started testing on her own.

3. Stacy Desjardins did not work directly with Annie Dookhan. She states that Dookhan was her confirmatory chemist on a lot of cases. Stacy Desjardins did not witness anything out of protocol or wrong with Dookhan's performance.

Desjardins did not notice anything out of the ordinary by any chemist at the Jamaica Plain lab. She was with Della Saunders, Lisa Glazer, and Kate Corbett and Dookhan was in a different room.

4. Desjardins advises that she does not recall ever having a sample returned back to her from the mass/spec because it was different then the preliminary analysis. Likewise, she never had her samples returned. Desjardins advised that she never had cocaine come back as heroin. She would do a spot test for cocaine, if she couldn't get crystals she would send it to the mass/spec and if they got cocaine, she would go back and work up the crystals and get them. She advised that she never heard of a chemist adding a known positive drug to a negative sample.

5. Desjardins advised that Peter Piro was training her to be a confirmatory chemist. She states that Dookhan never asked Desjardins to write her initials and Desjardins doesn't believe Dookhan forged Desjardins's initials. Desjardins reports she saw Dookhan go into the evidence office safe alone more than once. Dookhan was the only chemist that she saw who went in the safe alone. However, there was an Evidence Officer in the office when Dookhan went in the evidence safe. Desjardins does not know who that Evidence Officer was. Desjardins knew that the chemists weren't supposed to go in the safe alone. She just figured Dookhan had permission.

6. On one occasion Desjardins was given samples she requested from the Evidence Office by Dookhan. She believes that the paperwork would still be at the lab. Desjardins states that she believes that Dookhan would have had to sign the evidence logbook. Desjardins is very organized and the paperwork should still be at the lab.

7. Desjardins had no key or code to the safe. She does not know if Dookhan had a key or a code to the safe. She has never seen the safe door open and no Evidence Officer in the evidence room. Desjardins was able to ask Elizabeth O'Brien for certain types of drugs. If she wanted to work on marijuana all week, she could ask for that. The Evidence Officers would try and assign samples by where a chemist lived, Desjardins lived in Quincy.

8. Desjardins advised that there were a few chemists who wondered how Dookhan could do so many samples. Desjardins busted her ass to get samples done and always wondered how Dookhan was beating her. Desjardins believes Dookhan had the code to lock up the lab as well and only supervisors were supposed to have that code.

Respectfully submitted,

#1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews *FJM 9-15-12*
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** Interview of: Sosha Haynes
September 12, 2012 at 1545 hours

████████ Michigan
Date of Birth: ████████
Telephone ████████

Telephone interview conducted on September 12, 2012, at
approximately 1545 hours. Interview conducted by Detective
Lieutenant Robert Irwin.

**Case #:** 2012-034-2589-0052

1. Sosha Haynes advised that she has a Masters Degree in Forensic Science and
   is currently a high school teacher in Ferndale Michigan. She worked at the
   lab in Jamaica Plain for a little over a year around 2004. She was a Chemist I.
   She was trained by Chuck Salemi who was the head of the lab, Della Saunders
   and Betsy O'Brien also assisted in her training.

2. Haynes was asked if she observed any unethical behavior, criminal behavior
   or violations of lab policy or procedures by any of the people employed at the
   lab during her tenure. She advised that she had not and that she had a forensic
   background where most of the people at the lab had a chemistry background.
   She advised that with her forensic background she thought the lab was run a
   little too lax and that it relied a little too much on individuals and that there
   were not enough checks and balances.

3.  Haynes stated that she never observed any "dry labbing" and she does not know of any complaints about lab behavior brought by any other lab employee.

4.  Haynes knew Annie Dookhan back then her name was Annie Khan. Annie was a co-worker and Sosha never saw anything out of the ordinary when it came to Annie.

Respectfully submitted,

#1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**   Lieutenant Colonel Francis J. Matthews  *FJM*  9-15-12
Commanding, Division of Investigative Services

**From:**   Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**   **Interview of: John Donovan**
**September 12, 2012 at 1505 hours**

██████████ Massachusetts
Date of Birth: ██████████
Telephone: ██████████

**Telephone interview conducted on September 12, 2012, at
approximately 1505 hours. Interview conducted by Detective
Lieutenant Robert Irwin.**

**Case #:**   **2012-034-2589-0052**

1. John Donovan advised that he worked at the state lab from 1963 to 2003. He
left the lab and retired in June of 2003. When he retired his title was Lab
Supervisor I. He stated he never knew Annie Dookhan and that she came
after he left, he has never met her. Donovan was asked if he knew of anyone
at the lab that engaged in bad science, violations of policy and procedures or
anything criminal. He advised that he never did. He also was asked if knew
of any reports of such behavior made by anyone else that did not get
investigated or looked into. He advised no, he did not. He states that he
trusted the people he worked with at the lab with his life and that they were
very honorable people.

Respectfully submitted,

*[signature]*  ≈ #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**   Lieutenant Colonel Francis J. Matthews  *FJM  9-15-12*
Commanding, Division of Investigative Services

**From:**   Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**   **Interview of: Chuck Ifezue**
**September 9, 2012 at 1005 hours**

██████ **Massachusetts**
**Date of Birth:** ████████
**Telephone:** ████████

**Telephone interview conducted on September 9, 2012, at approximately 1005 hours. Interview conducted by Detective Lieutenant Robert Irwin.**

**Case #:**   **2012-034-2589-0052**

1.  Chuck Ifezue advised that he is currently a Pharmacist in the Care Systems and he works with critical care patients. He advised that he worked at the state lab in Jamaica Plain from 2004 to 2005. He was a Chemist I. He worked with Peter Piro, Nicole Medina, and Charles Salemi was his supervisor. Ifezue advised that Annie Dookhan was in the next room over from him. He did not work with her and he did not see Annie Dookhan do anything wrong. Chuck Ifezue advised that he would stay at his bench and do his work. He did not see anyone else at the lab at any time do anything wrong. He also advised that he did not see anyone do anything that he thought was against lab policies and procedures.

Respectfully submitted,

*Robert M. Irwin*
Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



**The Commonwealth of Massachusetts**
**Massachusetts State Police**
**Office of the Attorney General – West**
**1350 Main Street, Fourth Floor**
**Springfield, Massachusetts 01103**

September 12, 2012

**To:**      Detective Lieutenant Robert M. Irwin
SPDU AG, Commanding

**From:**    Sergeant Joseph F. Ballou #2302
SPDU AG West

**Subject:**  Interview of James L. HANCHETT at the Amherst Drug Lab
Case # 12-034-2589-0052

1.        On Tuesday, September 11, 2012, Trooper Randy L. Thomas #2935 and I travelled to the Amherst Drug Lab to interview employees of the lab. The Amherst Drug Lab was formerly operated by the Department of Public Health and was a satellite of the Hinton Lab in Jamaica Plain. Laboratory records showed that James HANCHETT was currently employed as the supervisor at the drug laboratory in Amherst.

2.        At approximately 11:45 AM, Trooper Thomas and I interviewed James HANCHETT at the lab. Also present was Attorney Michelle S. Gates from the Massachusetts Organization of State Engineers and Scientists (MOSES). I asked Mr. HANCHETT for his cooperation in our investigation and he agreed to speak with us. When asked to describe his position and duties at the lab, Mr. HANCHETT told us he was the lab supervisor and supervised three chemists. He added that he had worked at the lab from 1977 to the present. He told us he worked his way up from a junior chemist, to assistant supervisor, then to lab supervisor. He said he held his current position at the Amherst Lab for about eight to nine years, and that he has been in charge of whole office for four to five. When asked if he had ever worked at the lab in Jamaica Plain, he replied that he worked in Boston in the early 1980's for about six months, but not recently.

3.        Mr. HANCHETT said he met Annie DOOKHAN a couple times. He explained that he went to the Boston office ten to twelve times per year and sometimes saw her there. He stated that he had never seen her outside of work. He added that she asked for a copy of their Standard Operating Procedure (SOP) about eight to nine months ago. He said he had Rebecca PONTES email it to Ms. DOOKHAN.

4.         When asked if he ever observed or had knowledge of anyone at the lab falsifying or forging documents or if he ever observed or had knowledge of anyone in the lab not performing analytical procedures properly, including quality control or testing requirements, Mr. HANCHETT said he did not. Mr. HANCHETT also said he had never reported any wrongdoing at the lab and that none of his employees had reported any unethical behavior to him.

5.         Mr. HANCHETT later offered us a tour of the lab and brought us inside. The laboratory consisted of two rooms open to each other. He showed us that most of the preliminary testing was conducted in the first room, while the confirmatory testing on the Mass Spec machines was done in the second room. Mr. HANCHETT took pride in his record keeping and showed me that he maintained records of his cases from the beginning of his career. He told me that the allegations at the lab in Jamaica Plain were troubling because integrity is everything in their line of work.

<u>INDEX BY NAME</u>

<u>DOOKHAN</u>, Annie S., IF, 10/24/1977, ██████████████MA
████████

<u>HANCHETT</u>, James L., WM, ████████, ███████████████, MA

<u>PONTES</u>, Rebecca M., WF, ████████████████████, MA

Respectfully submitted,

*Joseph F. Ballou*

Joseph F. Ballou #2302
Sergeant, Massachusetts State Police
Office of the Attorney General



September 12, 2012

**To:**  Detective Lieutenant Robert M. Irwin *(initials)*
SPDU AG, Commanding

**From:**  Sergeant Joseph F. Ballou #2302
SPDU AG West

**Subject:**  Interview of Sonja FARAK at the Amherst Drug Lab
Case # 12-034-2589-0052

1.  On Tuesday, September 11, 2012, Trooper Randy L. Thomas #2935 and I travelled to the Amherst Drug Lab to interview employees of the lab. The Amherst Drug Lab was formerly operated by the Department of Public Health and was a satellite of the Hinton Lab in Jamaica Plain. Laboratory records showed that Sonja FARAK was currently employed at the drug laboratory in Amherst.

2.  At approximately 12.15 PM, Trooper Thomas and I interviewed Sonja FARAK at the lab. Also present was Attorney Michelle S. Gates from the Massachusetts Organization of State Engineers and Scientists (MOSES). I asked Ms. FARAK for her cooperation in our investigation and she agreed to speak with us. When asked to describe her position and duties at the lab, Ms. FARAK told us she was employed as a Chemist 2. She said her duties included analyzing narcotics and conducting machinery maintenance, including maintenance on the Mass Spec machine. She said she had worked in Amherst since 2004 and worked at the lab in Jamaica Plain for part of 2003.

3.  Ms. FARAK told us she knew Annie DOOKHAN from when she worked in Jamaica Plain, but that she knew her by her maiden name, Khan. She said that, although Ms. DOOKHAN started after she did and worked in a different lab room, they worked on some cases together. She explained that Ms. DOOKHAM may have done the preliminary analysis while she did the Mass Spec work, or vice versa. She found Ms. DOOKHAN to be friendly and did not notice her doing anything improper.

4.        When asked if she ever observed or had knowledge of Annie DOOKHAN, or anyone at the lab falsifying or forging documents or if she ever observed or had knowledge of anyone in the lab not performing analytical procedures properly, including quality control or testing requirements, Ms. FARAK said she did not. Ms. FARAK also said she had never reported any wrongdoing at the lab during her career.

INDEX BY NAME

DOOKHAN, Annie S., AKA KHAN, IF, 10/24/1977, ███████████ MA
    ██████████

FARAK, Sonja, WM, ████████████████████ MA

                    Respectfully submitted,

                    *Joseph J. Ballou*

                    Joseph F. Ballou #2302
                    Sergeant, Massachusetts State Police
                    Office of the Attorney General



September 12, 2012

**To:**         Detective Lieutenant Robert M. Irwin
              SPDU AG, Commanding        9-14-12

**From:**      Sergeant Joseph F. Ballou #2302
              SPDU AG West

**Subject:**   Interview of Rebecca M. PONTES at the Amherst Drug Lab
              Case # 12-034-2589-0052

1.          On Tuesday, September 11, 2012, Trooper Randy L. Thomas #2935 and I travelled to the Amherst Drug Lab to interview employees of the lab. The Amherst Drug Lab was formerly operated by the Department of Public Health and was a satellite of the Hinton Lab in Jamaica Plain. Laboratory records showed that Rebecca PONTES was currently employed at the drug laboratory in Amherst.

2.          At approximately 12.00 PM, Trooper Thomas and I interviewed Rebecca PONTES at the lab. Also present was Attorney Michelle S. Gates from the Massachusetts Organization of State Engineers and Scientists (MOSES). I asked Ms. PONTES for her cooperation in our investigation and she agreed to speak with us. When asked to describe her position and duties at the lab, Ms. PONTES told us she was employed as a Chemist 2, and conducted narcotic analysis. She said she worked in Amherst just over 8 years, since 2004, and did not work at any other labs.

3.          Ms. PONTES said she did not know Annie DOOKHAN, but that, about a year ago, Ms. DOOKHAN had sent an email to the Amherst Lab requesting a copy of their Standard Operating Procedure (SOP) on all methods. She remembered her supervisor, James HANCHETTE, had asked her to follow up on it and she did.

4.          When asked if she ever observed or had knowledge of anyone at the lab falsifying or forging documents or if she ever observed or had knowledge of anyone in the lab not performing analytical procedures properly, including quality control or testing requirements, Ms. PONTES said she did not. Ms. PONTES also said she had never reported any wrongdoing at the lab during her career.

INDEX BY NAME

DOOKHAN, Annie S., IF, 10/24/1977, ███████████, MA
   ████████

HANCHETT, James L., WM, ██████, ███████████████ MA

PONTES, Rebecca M., WF, ████████████████████ MA

Respectfully submitted,

*Joseph 2 Ballou*

Joseph F. Ballou #2302
Sergeant, Massachusetts State Police
Office of the Attorney General



**The Commonwealth of Massachusetts**
**Massachusetts State Police**
**Office of the Attorney General - West**
**1350 Main Street, Fourth Floor**
**Springfield, Massachusetts 01103**

September 10, 2012

**To:**   Detective Lieutenant Robert M. Irwin
SPDU AG, Commanding

**From:**   Trooper Randy Thomas #2935
SPDU AG West

**Subject:**   Interview of Gerald GIGUERE – State Drug Lab Case
Case # 12-034-2589-0052

1.        Laboratory records indicated that Gerald GIGUERE was a former employee of the drug laboratory in Amherst. On 09-10-12 Sgt. Joseph Ballou and I interviewed Gerald GIGUERE at his home. GIGUERE confirmed that he was a former employee of the Amherst drug laboratory. GIGUERE told us the Amherst laboratory was a satellite office of the laboratory in Jamaica Plain, and that the laboratories were under the Department of Public Health until recently. GIGUERE retired from the lab as a Senior Chemist and worked at the Amherst lab from May 1972 until October 2003. He was assigned in Amherst and never worked in the Jamaica Plain laboratory. He explained that as a senior chemist he completed drug analysis. He was also responsible for method development, which he explained included his reprogramming the Mass Spec computer system. This system was used to identify compounds. The reprogramming was necessary when a new compound was discovered. He also fixed instruments and computers in the lab as needed.

2.        GIGUERE said he did not know Annie DOOKHAN.

3.        We asked GIGUERE if he ever observed or had any knowledge of anyone working at the laboratory falsifying or forging documents or if he had any direct knowledge of anyone in the laboratory not performing analytical procedures properly, including quality control or testing requirements. GIGUERE said he knew of nothing improper at the laboratory. We asked GIGUERE if he ever reported any wrongdoing at the laboratory during his career, and he said no. He told us he believed he worked with ethical people.

4.        GIGUERE explained that chemists at the Amherst laboratory completed all testing on a substance from beginning to end, including using the Mass Spec system. By contrast, the chemists in the Jamaica Plain laboratory were typically more specialized. He told us that the Amherst laboratory sometimes handled some of the cases from the Jamaica Plain Laboratory due to the volume of case in Jamaica Plain.

5.        We asked GIGUERE if chemists had any incentives to complete analysis on more samples as opposed to fewer. GIGUERE said chemists were required to fill out progress report sheets on a monthly basis. These sheets only indicated the number of samples a chemist analyzed, and did not include other responsibilities a chemist might be required to tend to. He told us there were no incentives officially written down, but said that all things being equal, a chemist who completed analysis on more samples would likely be considered for promotion over a chemist with fewer samples. Promotions in the laboratory include pay increases.

<u>INDEX BY NAME</u>

<u>DOOKHAN</u>, Annie S., IF, 10/24/77, ████████████ MA
████████

<u>GIGUERE</u>, Gerald H., WM, ████ ████████████ MA
████████

                    Respectfully submitted,

                    *Tr. ☒ #2935*
                    Randy Thomas
                    Trooper, Massachusetts State Police
                    Office of the Attorney General

2



**The Commonwealth of Massachusetts**
**Massachusetts State Police**
**Office of the Attorney General – West**
**1350 Main Street, Fourth Floor**
**Springfield, Massachusetts 01103**

September 12, 2012

To:      Detective Lieutenant Robert M. Irwin
           SPDU AG, Commanding

From:     Sergeant Joseph F. Ballou #2302
           SPDU AG West

Subject:   Interview of Sharon A. SALEM at the Amherst Drug Lab
           Case # 12-034-2589-0052

1.        On Tuesday, September 11, 2012, Trooper Randy L. Thomas #2935 and I travelled to the Amherst Drug Lab to interview the employees of the lab. The Amherst Drug Lab was formerly operated by the Department of Public Health and was a satellite of the Hinton Lab in Jamaica Plain. Laboratory records showed that Sharon SALEM was currently employed at the drug laboratory in Amherst.

2.        At approximately 11:55 AM, Trooper Thomas and I interviewed Sharon SALEM at the lab. Also present was Attorney Michelle S. Gates from the Massachusetts Organization of State Engineers and Scientists (MOSES). I asked Ms. SALEM for her cooperation in our investigation and she agreed to speak with us. When asked to describe her duties at the lab, Ms. SALEM told us she was employed as a Chemist 3. She explained that she worked as the evidence officer, doing paperwork and working on the database. She also conducted technical reviews. She added that she had not conducted an analysis in about five to seven years. She told us she worked in Amherst since 1987 and did not work anywhere else.

3.        Ms. SALEM said she did not know Annie DOOKHAN and did not remember having any interaction with her.

**Subject:**   Interview of Sharon A. SALEM at the Amherst Drug Lab
Case # 12-034-2589-0052

4.        When asked if she ever observed or had knowledge of anyone at the lab falsifying or forging documents or if she ever observed or had knowledge of anyone in the lab not performing analytical procedures properly, including quality control or testing requirements, Ms. SALEM said she did not. Ms. SALEM also said she had never reported any wrongdoing at the lab during her career.

INDEX BY NAME

DOOKHAN, Annie S., IF, 10/24/1977, ██████████ MA
    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

SALEM, Sharon A., WF, ██████, ██████████████ MA

Respectfully submitted,

Joseph F. Ballou #2302
Sergeant, Massachusetts State Police
Office of the Attorney General

2



September 10, 2012

**To:**      Detective Lieutenant Robert M. Irwin
             SPDU AG, Commanding

**From:**    Trooper Randy Thomas #2935
             SPDU AG West

**Subject:** Interview of Paul JASZEK – State Drug Laboratory Case
             Case # 12-034-2589-0052


1.        Laboratory records indicated that Paul JASZEK was a former employee of
the drug laboratory in Amherst. On 09-10-12 Sgt. Joseph Ballou and I interviewed
JASZEK at his home. JASZEK told us he was retired from the Amherst laboratory
where he worked from 1968 to March 15, 2002. He said he never worked at the Jamaica
Plain laboratory.

2.        JASZEK told us his duties included analyzing drug samples brought to the
laboratory for analysis by local police departments. JASZEK told us he was a food
chemist for over 20 years. He became a drug chemist in approximately his last ten to
twelve years at the laboratory. He became a drug chemist because the food side of the
laboratory closed, which left only the options of leaving the laboratory or becoming a
drug chemist. He had received some training and experience in testing marijuana prior to
the closing of the food side of the laboratory, so he transitioned to a drug chemist.

3.        . JASZEK did not know Annie Dookhan.

4.        We asked JASZEK if he ever observed or had any knowledge of anyone at
the laboratory forging or falsifying documents or had directly observed or had any
knowledge of anyone in the laboratory not performing analytical procedures properly
including quality control or testing requirements. He said he never saw any of that, and
had no knowledge of anything unusual at the laboratory. We asked JASZEK if he ever
reported any wrongdoing on the part of any employees at the laboratory. He said no. He
told us he worked with good people and thought everyone was honest.

**Interview of Paul JASZEK – State Drug Laboratory Case**
**Case # 12-034-2589-0052**

INDEX BY NAME

DOOKHAN, Annie S., IF, 10/24/77, ███████████ MA
███████

JASZEK, Paul J., WM, 07/15/41, ███████████, MA
███████

Respectfully submitted,

*Tpr ———— #2935*

Randy Thomas
Trooper, Massachusetts State Police
Office of the Attorney General

2



September 10, 2012

**To:**     Detective Lieutenant Robert M. Irwin *RMJ*
            SPDU AG, Commanding          *9-14-12*

**From:**   Trooper Randy Thomas #2935
            SPDU AG West

**Subject:** Interview of Donna LACROIX – State Drug Laboratory Case
            Case # 12-034-2589-0052

1.          Laboratory records indicated that Donna LACROIX was a former
employee of the drug laboratory in Amherst. On 09-10-12 Sgt. Joseph Ballou and I
interviewed LACROIX by telephone. LACROIX confirmed she was retired from the
Amherst laboratory. She said she was officially listed as an Administrative Assistant, but
told us her actual responsibilities included acting as the Evidence Officer for the
laboratory. She worked at the Amherst laboratory from September, 1972 until
September 2003. She told us she originally worked on both the food side of the
laboratory as well as the drug side. At some point they closed the food side of the
laboratory and she continued on as Evidence Officer on the drug side. She explained that
as the Evidence Officer, she accepted drug evidence submitted by police officers for
analysis. She weighed the evidence on a scale and did so with it in the packaging. She
referred to that as the "Gross Weight." After weighing the evidence she entered it into
the computer system, and locked it in the evidence room. LACROIX was also
responsible for assigning cases to the chemists, which could include signing out
approximately 20 samples for analysis at a time to them. She explained the procedure:
She signed the samples out to the chemist, and then signed them back in when the
chemist returned them. The chemist would return the samples with the results of the
analysis. At that point, she entered the samples with the results into the computer system.
She printed a certificate with that information, the chemist signed the certificate, and she
(who was a Notary Public) notarized it.

2.        LACROIX said she was assigned to the Amherst laboratory and never worked in the Jamaica Plain laboratory.

3.        LACROIX did not know Annie Dookhan.

4.        We asked LACROIX if she ever observed or had any knowledge of anyone in the laboratory falsifying or forging documents or had any knowledge of anyone in the laboratory not performing analytical procedures properly including quality control or testing requirements. She told us that in approximately 30 years of working at the laboratory she could only recall one instance where a chemist did not do enough testing on an item. She reported that incident and the item was returned to the chemist for further testing. It was just a matter of the chemist rushing. She said this instance did not include any wrong-doing and was a long time ago. She said she did not see any forgery or falsifying of documents at the laboratory.

5.        LACROIX said she believed she worked with people of integrity.

INDEX BY NAME

DOOKHAN, Annie S., IF, 10/24/77, ████████████ MA

LACROIX, Donna E., WF, ████████████████████, MA

Respectfully submitted,

*[signature]* #2935

Randy Thomas
Trooper, Massachusetts State Police
Office of the Attorney General



### The Commonwealth of Massachusetts
### Massachusetts State Police
### Office of the Attorney General - West
### 1350 Main Street, Fourth Floor
### Springfield, Massachusetts 01103

September 10, 2012

**To:**     Detective Lieutenant Robert M. Irwin,  *emg-14-12*
SPDU AG, Commanding

**From:**   Trooper Randy Thomas #2935
SPDU AG West

**Subject:**  Interview of Allan STEVENSON – State Drug Laboratory Case
Case # 12-034-2589-0052

1.          Laboratory records indicated that Allan STEVENSON was a former
employee of the drug laboratory in Amherst. On 09-10-12 Sgt. Joseph Ballou and I
interviewed STEVENSON by telephone.

2.          STEVENSON confirmed that he was retired from the Amherst drug
laboratory, and had worked there from June 15, 1970 to June 31, 2008, with the
exception of approximately a three year period when he was in charge of the Jamaica
Plain laboratory. He was not sure of the exact timeframe, but estimated that it was either
from 1999-2002 or 2000-2003. During his time at the Amherst laboratory he reported to
the Jamaica Plain laboratory on a weekly basis, in order to report to his supervisor and to
work on a database design. His supervisor at one point was Dr. Harvey George. While
working in Amherst, he was a Chemist working on food analysis including bacteriology
and pesticide analysis. He later became a supervisor.

3.          STEVENSON knew Annie DOOKHAN. He was not involved with hiring
her, and was fairly sure she was hired after the period when he was a supervisor in
Jamaica Plain. STEVENSON had conversations with her and said she was personable
and a nice person, but that he was not involved with her work. He never had any
interaction with her outside of the workplace.

4.          We asked STEVENSON if he ever observed or had any knowledge of
anyone at the laboratory forging or falsifying documents or had directly observed or had
any knowledge of anyone in the laboratory not performing analytical procedures properly
including quality control or testing requirements. He said no.

5.          We asked STEVENSON if he ever reported any wrongdoing on the part of any employees at the laboratory. He said no.

INDEX BY NAME

DOOKHAN, Annie S., IF, 10/24/77, ████████████ MA
        ████████

STEVENSON, Allan C., WM, ████████ ███████████████████ , MA
        ████████

                    Respectfully submitted,

                    _Randy Thomas_ #2935
                    Randy Thomas
                    Trooper, Massachusetts State Police
                    Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews *FJM. 9-12-12*
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** Interview of: Annie Dookhan

███████, MA
DOB: 10/24/77
Cell: █████████

Interview conducted at her residence in ███████ MA on August 28,
2012, at approximately 1700 hours. Interview conducted by Detective
Captain Joseph Mason and Detective Lieutenant Robert Irwin.

**Case #:** 2012-034-2589-0052

1. Annie Dookhan resides with her husband ███████ and their young son, ███████. She
has a Bachelor of Science degree in Biochemistry from UMass Boston, graduating in
2001. From December 2001-November 2003 she was employed as a chemist at the
UMass Biological Lab in Jamaica Plain. From November 2003 through March 2012
she worked for DPH Jamaica Plain Drug Lab as a Chemist. She was first hired as a
Chemist and did routine drug testing and Quality Control. She was upgraded to
Chemist II on or around September 2004.

2. Dookhan resigned from the DPH lab in March of 2012, "pending an investigation."
Dookhan admits she was at fault and responsible for the 90 samples that she removed
from the Evidence Room in June 2011. She admits that the samples were not
properly assigned to her, not entered into the computer by an Evidence Officer, and
not entered into the Evidence Log Book.

3. Although Dookhan claims not to recall removing the bin of samples from the safe, she admits she must have done so, as it is the only logical explanation – she just does not remember. She denied having the code or key to the evidence safe. Dookhan admitted that after being questioned about the mishandling of the samples by Julie Nassif, the Director of Chemistry, Dookhan falsely filled in the blank entries in the Evidence Log Book and forged Gloria Phillip's initials on the 90 plus Log Book Entries. She stated that this was the only time she ever took samples improperly from the Evidence Office or falsified the Evidence Log Book. Dookhan was shown a copy of the Evidence Log Book for the date in question and she identified the entries that she had forged/postdated. Dookhan initialed the entries on the sheet that she had falsified.

4. Dookhan was then asked about her Tune Reports. A Tune Report shows that the mass spec is functioning correctly. Dookhan was asked if she had ever forged Chemist Nicole Medina's initials on any of those reports. Initially, she denied falsifying any Tune Reports and/or signing Nicole Medina's initials on them. Dookhan was then shown a falsified/forged Tune Report from June 10, 2011 at 15:53:50. She then stated, "I screwed up, it's my fault, I was not paying attention." When asked to explain, Dookhan then admitted to forging the initials deliberately. When asked why she did this, Dookhan stated, "There was no one available – no one has the time – I wanted to get the work done." Dookhan initialed the sheet we showed her to memorialize that she had forged Nicole Medina's initials on the June 10, 2011 Tune Report.

5. Dookhan was also asked about falsifying a Quality Control GC/MS Daily Injector Report. This procedure is to analyze a known amount and types of drugs to determine if the GC/MS is in proper working conditions. A report is generated with the results, and evaluated and signed off by the chemist as accepting the results. Initially, Dookhan stated that she would not do that because there was data to back up those reports. When she was shown a report from May 12, 2011 she stated that, "I got the work done, but not properly. I didn't follow the procedures and that was wrong." Dookhan admitted that the data she recorded on the report on May 12, 2011 was false and did not coincide with the data recorded from the instrument.

6. Dookhan stated that at some point Elizabeth O'Brien asked her to help out in the Evidence Office. Dookhan was then given access to the evidence data base. She routinely looked up data for Assistant District Attorneys who would call her directly, bypassing the proper protocol of going through the Evidence Office. She stated that this was her fault and she should have directed the ADAs to the office. When Dookhan was removed from lab duties following the June 2011 incident with the samples, she started directing the ADAs to follow the proper procedure by sending a form to the Evidence Office. Dookhan advised that no ADA, Police Officer, or anyone else asked her to do anything improper in her analysis or findings. She said they just wanted to get their case analyzed or get the information from the analysis. Dookhan advised that after being removed from the lab, she disobeyed orders and, on occasion, still looked up data. She stated her doing that was "wrong."

7. Initially, Dookhan denied doing anything improper in regards to her analyzing drug samples. Initially, she claimed that she performed a cocaine crystal test on every cocaine sample. Dookhan stated that she, "would never falsify because it's someone's life on the line." She was asked about "dry labbing" and if she had ever done that. Dookhan asked us what we thought "dry labbing" was – we advised that it was when a chemist looks at a sample and identifies it by sight instead of doing the proper testing; the chemist then states they did all the work they were required to do, but really they "dry labbed". Dookhan then said she didn't *think* she had "dry labbed." She was then confronted with the results of the recent BPD re-test. This was a re-test on a positive analysis for cocaine, which Dookhan was the chemist on, that had come back as negative on a recent re-test. We also explained to her that we had received information that there were other anomalies reported during the investigation which indicated she was not doing everything properly. Also, her number of samples analyzed were so high that she couldn't have performed all the required tests. She became sad and a slight tear came to her eye and she stated, "I screwed up big time. I messed up. I messed up bad, it's my fault. I don't want the lab to get in trouble." Dookhan then admitted to "dry labbing."

8. Dookhan then explained that she would routinely secure a large number of samples from evidence. She would then group them on her bench by the same suspected drug. Dookhan would lay out a number of samples from various cases. She would separate suspected cocaine in one area, suspected heroin in another area, and so on. She would also set aside unknowns. Dookhan would identify the drug by the type of suspected drug that was checked off on the control card. She then went on to explain that she would lay out about twenty-five samples of what she felt were the same type of drug. Dookhan would then actually test approximately five samples properly at her bench. She would then prepare all her cocaines, heroins, and other vials for mass/spec, for all of the samples. The samples that she did not properly test she would label as the drug she suspected it of being.

9. Dookhan stated that she properly tested all of the unknowns, because she had no idea what they were. She would then submit all the samples to mass/spec for confirmatory analysis. On occasion the samples would be returned from mass/spec because the drug was different from what she had said it was. She would initially try to "clean the sample up" by making a more concentrated sample or using more of the sample. If that did not work, she would intentionally "contaminate" the sample by preparing a vial using a known drug from a completed test stored at her bench. She stated that she "only contaminated samples a few times." Dookhan did not want samples sent back from mass/spec to remain improperly typed, as it would show that she had not completed the required preliminary tests on all the samples she sent to mass/spec. Dookhan explained that she did what she did in order to get more work done.

10. Prior to Dookhan being removed from the testing lab in June of 2011, she "dry labbed" for two to three years. She has no knowledge of anyone else in the lab using improper testing methods. She advises that she was not tipped by anyone in the lab in regards to the June 2011 samples being improperly obtained, not entered, and the forgery of the log book. Dookhan also advised that no one at the lab knew of her "dry labbing" or her intentional contamination of samples. She never confided in

anyone about what she was doing. She also stated that she has no knowledge of anyone else in the lab not performing proper analysis.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
### Office of the Attorney General
### One Ashburton Place, Room 1910
### Boston, MA 02108


**To:**     Lieutenant Colonel Francis J. Matthews  *FJM . 9-12-12*
Commanding, Division of Investigative Services

**From:**   Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**   Circumstances surrounding the interview of Annie Dookhan▮
▮▮▮▮▮▮▮▮ MA DOB: 10/24/77.Interview conducted on August
28, 2012 at approximately 1700 hours. Interview conducted by
Detective Captain Joseph Mason and Detective Lieutenant Robert
Irwin.

**Case #:**   2012-034-2589-0052


1.     On August 28, 2012 at approximately 1700 Detective Captain Mason and
this officer traveled in our unmarked state police vehicles to the residence of
Annie Dookhan. Detective Captain Mason and I approached the front door and
knocked but did not receive a response. We were standing in the driveway when a
silver SUV drove up. Annie Dookhan stopped the car and exited her vehicle.
Both Captain Mason and I identified ourselves, showed her our badges, and
advised her where we were stationed. We told her we were hoping to talk to her
regarding an investigation at the lab. She said sure but that she had her son with
her. She said she would go through the garage and open the front door for us.

2.   Once in the house Dookhan led us to her dining room table where she offered us a
seat. We all took a seat at the table and Detective Captain Mason and I explained
that we were doing an investigation. We advised her that as part of that
investigation we wished to speak to her but that she didn't have to speak to us if

she didn't want. She said ok and then agreed to be interviewed. The interview was in a conversational tone throughout. Dookhan at times during the interview was smiling and at times had a tear or two. She, at all times, appeared alert and sober.

3. Approximately fifteen minutes into the interview Annie Dookhan's husband, ███ came home. Again, Detective Captain Mason and this officer introduced ourselves and shook his hand. He asked if everything was all right. We advised yes it was and that we only wanted to speak to his wife in regards to an investigation we were conducting. ███ Dookhan looked at his wife and she nodded to him and said everything is fine. ███ then offered us something to drink which we did not accept. ███ left the room at that time.

4. ███ Dookhan and his young son left approximately ten minutes later and did not return for approximately twenty minutes. The interview continued in a conversational tone. Upon ███'s return he asked to speak to his wife in private. We advised him that they could do whatever they wished and to take all the time they needed. ███ and Annie left the room and went to another room out of our sight and hearing. Annie Dookhan returned to the table after a few minutes and again the interview continued.

5. A short time later, ███ Dookhan left the house again with his son. The interview was completed and as Annie Dookhan walked us to the door she related what she had spoken to her husband about in private. She said her husband asked her if she needed a lawyer. She told him no, that she was ok, and that she would speak to us. This officer left a printed piece of paper with our names and my cell number should she have any questions or concerns. Both Detective Captain Mason and I left without incident. As I drove out of the driveway I observed Annie Dookhan to be walking the family dog.

Respectfully submitted,

Robert M. Irwin — #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews *FJM. 9-12-12.*
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Signed Statement of Annie Dookhan

**Case #:**  2012-034-2589-0052

1. On August 28, 2012 at the conclusion of the interview with Annie Dookhan, I wrote out a brief summary of portions of the interview between Annie Dookhan, detective Captain Mason and me. I had Annie Dookhan read the statement and asked if it was accurate. After she agreed that the statement was accurate I had her acknowledge such by signing at the bottom. Below is the complete content of the written statement. The original is currently secured with the case file kept by this officer.

2. I, Annie Dookhan, had taken out samples of safe and tested them without them being signed out as proper procedure. I also went in the Evidence Log book and postdated and filled the log book in. I signed my initials and an Evidence Officer's initials in the book. That was my mistake and I can't deny that. I also batched, put similar samples together, and tested some and not others; I "dry labbed." I have been doing it for about two to three years. At times, a few, I had to add to a sample that came back from Mass Spec to make it what I said it was. I would get the sample from a known sample. I would try to clean it, the original, up first but if it didn't I would need to take something, drugs, from another case. I intentionally turned a negative sample into a positive a few times.

3. Annie S. Dookhan 6:45p.m. 8-28-2012
I voluntarily signed this document, and it is true.
DLT RM Irwin 8/28/12 1845
DCPT JV Mason 8/28/12 1845 hrs

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews ~~FJM~~, 9-12-12
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** **Circumstances and conversation from phone calls both received and made to Annie Dookhan of** ▓▓▓▓▓▓▓▓ **MA DOB: 10/24/77. All calls were conducted on August 30, 2012.**

**Case #:** **2012-034-2589-0052**

1.      On Thursday August 30, 2012 this officer placed a call at approximately 0900 to the cell phone of Annie Dookhan ▓▓▓▓▓▓. The purpose of this call was a well-being check and as a notification that there could possibly be a press conference involving this investigation. This officer also wanted to advise Dookhan that she had some criminal exposure and that she should get an attorney. Dookhan did not answer the phone so I left a message identifying myself and requesting her to call my cell phone. I also knew through other interviews that Dookhan utilized text messaging so I also left a text message asking her to call my cell.

2.   At approximately 1100 hours, I sent Lt. Michael Cooney and Trooper Tom Mahon to Dookhan's Franklin address to conduct a well-being check. I was advised at approximately 1200 that there was no answer at the door. I subsequently called Dookhan on her cell phone and she answered. I identified myself and Dookhan said hello. She that she had seen my text and planned to call me back but was out with her son. I asked her how she was doing and she said

alright. I advised her that the lab had been shut down and she said she knew something like that would happen. I then advised her that there was going to be a press conference later that afternoon and that she and her family should be aware of it.

3. I advised Dookhan that we have not and would not give her name out to the press but she should be prepared as reporters have a way of learning that information. She then told me that the agreement she had with DPH when she resigned was that her name would not be given out. I told her that we would not give her name and neither would DPH, but she should be aware that reporters might come around her house.

4. I advised Dookhan that she should get an attorney and then consult with that attorney. She said she didn't know any attorneys and that she didn't have any money. I advised her that some attorneys will meet with her for a free initial consultation. She said she understood and would get back to me. I told her that if she got a lawyer, to give the lawyer my number and I would talk to the attorney. I told her to talk to her husband and he might be able to help with money for a lawyer. She told me they were in the process of a long divorce. She said that she didn't want to involve her family. She said she had told her husband about the samples not being logged but had not told him anything else about what had happened.

5. At approximately 1528 I received a call from Annie Dookhan's cell phone. I missed the call and at 1530 I called the phone back. Dookhan answered and I was advised that she was not at her home but that she had been told there was news media at her house. She asked why the news media were digging so hard. I told her that the lab had been closed and there had been a press conference. It was a news story. I then told her that there was some information that the media did not yet know about her including the contamination of samples and her turning a negative sample into a positive. I told her the media does not know the details and that will encourage them to try and get them. I told her we, the investigators, don't even know what cases this happened to. Dookhan replied that she knows this is a problem. She said she had told us that she would not be able to tell what cases that happened to and that it was a long time ago. She said that maybe if she saw the lab numbers and her notes, she might be able to tell. She also thanked me for my honesty and being upfront with her about the press and that she trusts me. I told her that she did not have to talk to the press and, if she has a problem at her house, to call the Franklin PD. I asked her about a lawyer and she asked me what kind of lawyer she needed. I told her that she should talk to a criminal lawyer. She told me that is what her husband had told her today.

6. At approximately 1645 Annie Dookhan called my cell phone. I answered and Dookhan was crying, not hard, more of a whimper. She was despondent and looking for advice. She said she managed to get home when the press left the front of the house but that they were back again. She said she talked to a lawyer and he would not handle her case if she hasn't been charged. She asked me if she was being charged criminally. I told her that I didn't know and that decision was not mine to make. I did tell her that based on the investigation to this point she had some criminal exposure. She asked me what she would be charged with if she was charged. Again, I told her those decisions were not mine and that I could not give her an answer. I again told her that she should get a lawyer.

7. Dookhan began crying and sounded despondent. She said she never meant to hurt anybody. I told her I knew that and that she had made a mistake, but that didn't make her a bad person. I asked her if she had family in the area that she could be with. She said she was an only child, her parents were in ▮▮▮▮ and the only family was a brother- and sister-in-law in ▮▮▮▮▮▮ I told her she should be with family.

8. Dookhan continued to cry. I asked her if she was alright and if she ever thought bad thoughts. She said that the harm she was causing people would go through her mind every now and then. When she said this she was crying and I wasn't sure if she said harm herself. I asked her to repeat it and she again mentioned the harm done to other people. I then asked her if she had thought of harming herself. She said no. I asked if she was sure and she said yes.

9. I then provided Dookhan with the telephone number for CPCS in Dedham. I advised her that she should call that number right away and they could assist her in finding council. Dookhan advised that she had written the number down and that she would call it. I advised Dookhan that my phone is always on and she could call me at any time. She said she didn't want to be a pest, I told her it was ok. She said she was a worry wart. I asked her if she had anyone coming home to be with her and she said her husband was on his way home.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews *JFM* 9-15-12
Commanding, Division of Investigative Services

**From:**    Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of: Xiu Ying Gao**
**September 14, 2012 at 1115 hours**

                █████ Georgia
                Date of Birth: ████████
                Telephone: ████████

**Telephone interview conducted on September 14, 2012, at approximately 1115 hours. Interview conducted by Detective Lieutenant Robert Irwin.**

**Case #:**    2012-034-2589-0052

1. Xiu Gao advised she was at the lab from approximately 1997 through 2008. She trained in Amherst then transferred to the Boston drug lab. She left the lab in 2008 as a Chemist II. Her supervisor was Chuck Salemi and then Chemist III Della Saunders. She worked in the same room as Kate Corbett and Lisa Glazer.

2. Xiu knew Annie Dookhan and advised that she was a nice lady. She did not see or hear of Dookhan doing anything wrong.

3. Xiu advised that she had no way of getting in the evidence safe and she was never in it.

4. She did not see anyone do anything wrong at the lab.

Respectfully submitted,

*[signature]* #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews *FJM 9-15-12*
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Interview of: Zhi Y Tan
September 14, 2012 at 1105 hours
████████████
██████ Georgia
Date of Birth: ████████
Telephone: ████████████

Telephone interview conducted on September 14, 2012, at
approximately 1105 hours. Interview conducted by Detective
Lieutenant Robert Irwin.

**Case #:**  2012-034-2589-0052

1. Zhi Tan advised that he was at the lab from approximately 1995 through his
   retirement in 2011. He worked at the Amherst lab until 1997 then transferred to
   the Boston drug lab. He retired in October 2011 as a Chemist II. He advised that
   his supervisor was Chuck salami and then Michael Lawler. Tan worked in the
   same room as Mike Lawler prior to Lawler it was Kevin McCarthy.

2. Zhi advised that he knows Annie Dookhan and advised that she was in his opinion
   a nice lady and she was happy. He did not see or hear of Dookahn doing anything
   wrong.

3. Zhi advised that he had no way of getting in the evidence safe and he was never in
   it. He did not have his key tested by anyone to see if it worked on the safe.

4. He advised that he was never told that Annie Dookhan was not allowed in the lab
   area.

5. Zhi advised that he did not see anyone do anything wrong at the lab. Zhi stayed at his bench and worked.

Respectfully submitted,

Robert M. Irwin    #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews *FJM* 9-15-12
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** Interview of: **Sidney Fuller-Jones**
**September 13 2012 at 1145 hours**
▮▮▮▮▮▮▮▮▮ **MA**
**DOB:** ▮▮▮▮▮▮
**Phone:** ▮▮▮▮▮▮▮▮

Interview conducted on September 13, 2012, at approximately 1145 hours. Interview conducted by Detective Lieutenant Robert Irwin and Trooper Carly Rose.

**Case #:** 2012-034-2589-0052

1. Sidney Fuller-Jones advised that she is currently an Administrative Assistant I, and she works for Julie Nassif. Nassif is the director of the Analytical Chemistry Division. Sidney Fuller-Jones has been in her current position for approximately a year and a half. Prior to that, she worked in purchasing on the second floor for eight to nine years. She started with DPH approximately 15 years ago.

2. Sidney Fuller-Jones states that she knows Annie Dookhan, but she didn't know her very well. She knew Dookham was a chemist over in the drug lab, and she never heard anyone say an ill word about her. Julie Nassif never told Sidney Fuller-Jones that there was a problem with Annie Dookhan. She never heard Annie Dookhan and Julie Nassif talking. Julie Nassif never had Sidney prepare any documents in regards to the discipline of Annie Dookhan. Sidney never heard anything and has no knowledge of Annie Dookhan doing anything wrong up until Dookhan left.

3. Sydney Fuller-Jones stated that around early July, late June 2011, is when Sidney Fuller-Jones was out for a few days and Dookhan moved in to her office to work on SOPs. Dookhan would go in the lab during that time because she still had

access. Julie Nassif told Sidney that Dookhan was in the office to work on SOPs.
Julie Nassif never said that Dookhan shouldn't be in the lab. Dookhan was at her
desk in the office which was next to Sidney's. Dookhan was at her desk a lot.
Sydney advised that Dookhan was at her desk more than she was in the lab, but
she was in the lab quite a bit.

4. Sidney Fuller-Jones had general conversations with Dookhan about life, but never
about work. Sidney was never told why Dookhan left. Sidney was on vacation
when the lab was closed. She has had no conversation with Julie Nassif regarding
Annie Dookhan. She went on vacation August 17, and came back September 6.
She has not heard from Nassif since she left in August. Sydney Fuller-Jones
stated that Julie Nassif did all her reports by herself and that she was very self-
sufficient. Sidney would transcribe meeting minutes and that was about it.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:** Lieutenant Colonel Francis J. Matthews ~~FJM~~ 9-15-12
Commanding, Division of Investigative Services

**From:** Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:** **Interview of: Stephen Ridley**
**September 12, 2012**

████████████████
███████Nevada
Date of Birth:████████████
Telephone:██████████████

**Interview conducted on September 12, 2012 at approximately 1215 hours. Interview conducted telephonically by Detective Lieutenant Robert Irwin.**

**Case #:** **2012-034-2589-0052**

1. Stephen Ridley advised that he worked for DPH for thirty-two years. He worked at the lab up until approximately ten years ago and he was assigned to Director Ralph Campury. He also worked in the drug lab in Jamaica Plain as a supervisor from approximately 1995-2001. Ridley went back to the lab and worked in the evidence office of the drug lab for a year or two, around 2008-2009. Shirley Sprague and Gloria Philips worked with him in the evidence office.

2. Stephen Ridley advised that he had a key and code to the safe but did not give anybody the key or code to the safe. He states that he did not know the code to the alarm system for the whole lab. Chemists were not allowed in the safe by themselves and he was not aware of any chemists having the code to the safe. Chemists were not allowed to sign out their own samples. Evidence Officers assigned the samples and chemists signed for them.

3. Ridley advised that he knows Annie Dookhan, he would assign samples to her and then sign them back in when she finished with them. He never saw Annie

Dookhan do anything wrong and never saw Annie Dookhan violate rules and regulations. Ridley never saw Annie Dookhan take her own samples or go in the safe. Ridley was never told by anybody that Annie Dookhan did anything wrong. He states that she was thought to be a good Chemist, trusted completely. Ridley never saw anyone do anything wrong at the lab and they were careful to do things the way they were supposed to be done.

4. Ridlley states that Chuck Salemi was his supervisor and Julie Nassif was the Director at the lab. There were no problems between Salemi and Nassif that Ridley observed.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
### One Ashburton Place, Room 1910
### Boston, MA 02108

**To:**  Lieutenant Colonel Francis J. Matthews *[signature] 9-15-12*
Commanding, Division of Investigative Services

**From:**  Detective Lieutenant Robert M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**  Interview of: Janice Zanolli
August 28, 2012 at 1425 hours
▮▮▮▮▮▮▮ MA
DOB: ▮▮▮▮▮
Phone: ▮▮▮▮▮▮

Interview conducted on August 28, 2012, at approximately 1425 hours. Interview conducted by Detective Captain Joseph Mason, and Detective Lieutenant Robert Irwin.

**Case #:**  2012-034-2589-0052

1. Janice Zanolli is an Administrative Assistant I. She has been in the lab for two years and has been working for the state for fourteen years. She works in the evidence office at Jamaica Plain. She pulls all the receipts for court. She keeps track of court time. She has a database. She answers phones. She does the filing system. She works on spreadsheets and she puts together discovery. The database is a FoxPro system. It has the defendant's last name, the court date, and the chemist's initials, so the date then can be looked up. It has the defendant's results, the dates, and the weights. Janice Zanolli has access to the database. Everybody in the evidence room has access to the database.

2. Janice Zanolli has seen Annie Dookhan with access to the database at least one time. Zanolli has no idea who gave Dookhan access but it was before Janice Zanolli started at the lab. Not long after Zanolli started and was in training Betsy O'Brien and Shirley Sprague were out. Gloria Phillips and Della Saunders were there and they were really busy. Dookhan came over and helped typing the cards. That was the only time Zanolli saw Dookhan working at the computer in the evidence room. Zanolli has no idea what Dookhan used for a password to get in the computer.

3. Janice Zanolli said during working hours there's always someone in the evidence office and when there was someone in the evidence office and an Evidence Officer, sometimes left the safe door open. Zanolli did not have a key to the safe. Zanolli didn't think that Dookhan had a key to the safe or the safe code. Zanolli never saw Dookhan get her own samples from the safe. Zanolli had no conversation with anyone from the evidence room about Dookhan having access to the database. Zanolli was new and didn't ask questions. Zanolli's key was never tested to see if it worked on the evidence safe. Zanolli is not sure about a read-only feature on the database. Zanolli does not know of one, she believes you can edit if you can have access.

Respectfully submitted,

*[signature]* #1230

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# Massachusetts State Police
## Office of the Attorney General
## One Ashburton Place, Room 1910
## Boston, MA 02108

**To:**    Lieutenant Colonel Francis J. Matthews  *FJM 9-15-12*
Commanding, Division of Investigative Services

**From:**    Detective Lieutenant R.M. Irwin
Commanding, MSP-AGO Detective Unit

**Subject:**    **Interview of Paul Servizio**
████████████████ **MA**
**September 9, 2012 1120 hours**
**Date of birth:**█████
**Phone:**█████████

**Case #:**    2012-034-2589-0052

1. On September 13, 2012 at approximately 1120 hours, Trooper Carly Rose and this writer, Commanding Officer Robert Irwin, interviewed Paul Servizio; also present was Attorney Eric Klein of MOSES. The following is a summary of that conversation.

2. Servizio is currently a Lab Supervisor in the Chemical Threat Lab at the DPH lab in Jamaica Plain. He has been at the Chemical Threat lab since 2002 or 2003. He started with DPH approximately 1977 or 1978. He worked at the drug lab from approximately 1981 or 1982 and stayed there until approximately 1985 or 1986.

3. Servizio was asked if he had observed any incorrect scientific procedures, violations of policies, or anything criminal happening at the drug lab during his tenure. He advised that he had not, other than Gandolfo which was reported and investigated in the 1980's.

4. Servizio knows Annie Dookhan from the drug lab. He has spoken to her about going to court after Melendez Diaz. He also talked to her about setting up a coffee pot in

between the two labs on the third floor. They also spoke about the different mass/spec instruments LC vs. GC. Servizio advises that Dookhan did not make any admissions or statements about her actions at the lab.

Respectfully submitted,

Robert M. Irwin
Detective Lieutenant, #1230
Massachusetts State Police
Office of the Attorney General



# *Massachusetts State Police*
## *Office of the Attorney General*
## *One Ashburton Place, Room 1910*
## *Boston, MA 02108*

**To:**      Detective Lieutenant Robert Irwin, #1230   *RMI 9/14/12*
              Commanding Officer, MSP-AGO Detective Unit

**From:**    Trooper Dennis D. Keeler, #3132
              MSP-AGO Detective Unit

**Subject:**   Execution Report:        **MA State Police Drug Laboratory**
                                    **305 South St, 3rd Floor**
                                    **Jamaica Plain, MA 02130**

**Case:**      2012-034-2589-0052

1.        On Tuesday, September 11, 2012 at approximately 1000 hours, under Detective Captain Joseph Mason's command, members of the Massachusetts State Police, Attorney General's Office, MA Environmental Health & Safety and Lan-Tel Communications entered the MA State Police Drug Laboratory complex.

2.        The following MA State Troopers were on-scene at the above location throughout the operation:

           i.      Detective Captain Joseph Mason
           ii.     Lieutenant Michael Cooney
          iii.    Trooper Dennis Keeler
          iv.    Trooper Carly Rose

3.        The following Assistant Attorney General's were on scene at the above location throughout the operation:

           i.      AAG Eileen O'Brien
           ii.     AAG Anne Kaczmarek
          iii.    AAG Christopher Kelly

4.      The following AGO Computer Forensic Examiner's were on scene at the above location throughout the operation:

    i.      Unit Director David Papargiris
    ii.     Division Director Paul Melaragni
    iii.    Analyst/Technician David Swan
    iv.     Analyst/Technician Mark Scichilone
    v.      Analyst/Technician Ken McCarthy

5.      The following MA State Police civilian personnel were on scene at the above location throughout the operation:

    i.      MSP Lab Director John Cronin
    ii.     MSP Forensics Technician Diane Howery
    iii.    MSP Forensics Technician Jeremy Miller
    iv.     MSP Crime Lab Technician Ed King
    v.      MSP Chemist Della Saunders
    vi.     MSP Programmer/Technician William Dole
    vii.    MSP Technician Luis Bauer

6.      The following MA Department of Health & Safety (EHS) employees were on scene at the above location throughout the operation:

    i.      Michael Normand
    ii.     Dana Marchand

7.      The following Lan-Tel Communications employees were on scene at the above location throughout the operation:

    i.      Mark Machesky
    ii.     Erik Nisbitt
    iii.    Dina Caloggero

8.      A list of laboratory employees and their assigned computers was retained (see Attachment #1). Also, an approximate diagram of the 3rd floor drug laboratory layout is included in this report (see Attachment #2). Video and photos were captured prior to the operation's commencement.

9.      At approximately 11:50 am, AAG Kaczmarek authorized MSP civilian personnel including Diane Howery, Jeremy Miller and Della Saunders to access and remove files. These files included receipts of evidence which were contained in file cabinets in room 354. The MSP Evidence personnel above stated the files were being

transported directly to the MSP laboratory in Sudbury, MA. They also removed evidence control cards from room 355 and backup documents for the receipts of evidence for the time period of January 4, 2010 to August 29, 2012. All this was overseen by MSP sworn personnel.

10.         At approximately 12:30 pm, Trooper Rose and I conducted a brief interview with Lan-Tel technician Erik Nisbitt in room 354 regarding the access control system. Nisbitt explained that the information that was being downloaded to Detective Captain Mason's work-issued computer showed "who accessed what door [to the lab] and when". Nisbitt explained that he actually installed this access system in 2001, eleven years ago to the day while he was working for another company. Initially, Nisbitt was going to download all the information to a nearby computer that looked to be assigned to Shirley Sprague. MSP Technician Luis Bauer signed on to Sprague's computer to commence the download but it was decided this was not in anyone's best interest. Nisbitt elaborated Sprague's computer did not capture any pertinent information with regards to this investigation. He stated she might have had additional configurations and readers installed but no information was ultimately downloaded. Nisbitt explained that three of the four access control readers were downloaded to Captain Mason's computer at the time and the fourth was underway. Nisbitt explained that the system "hasn't been online for approximately 5 – 6 months" though it's receiving archived data for that time period.

11.         The official evidence log is to follow.

Respectfully submitted,

Trooper Dennis D. Keeler, #3132
Massachusetts State Police
Office of the Attorney General
Criminal Bureau

ATTACHMENT

#1



# The Commonwealth of Massachusetts
## Executive Office of Public Safety & Security
One Ashburton Place, Room 2133
Boston, Massachusetts 02108
Tel: (617) 727-7775
TTY Tel: (617) 727-6618
Fax: (617) 727-4764
www.mass.gov/eops

Deval L. Patrick
Governor

Timothy P. Murray
Lieutenant Governor

Mary Elizabeth Heffernan
Secretary

September 10, 2012

Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Re:  Digital Evidence at Drug Laboratory, 305 South Street, Jamaica Plain

Detective Lieutenant Robert Irwin:

I, Curtis Wood, Undersecretary of Forensic Science and Technology at the Executive Office of Public Safety and Security, hereby authorize members of the Massachusetts State Police assigned to the Attorney General's Office and digital evidence analysts from the Attorney General's Computer Forensics Laboratory working with the aforementioned officers to take custody of, copy, and analyze the items listed below for evidence. I understand that copies of the contents of the items, including all files and data, may be created and retained for analysis. I also understand that the analysis of the copies of the media may continue even after the items designated for analysis are returned.

This consent specifically refers to the following computers which were assigned to the following laboratory employees:

Charles SALEMI
Michael LAWLER
Mai TRAN
Daniela FRASCA
Della SAUNDERS
Lisa Glazer
Hevis LLESHI
Kate CORBETT
Annie DOOKHAN
Elizabeth O'BRIEN
Shirley SPRAGUE
Janice ZANOLI
Gloria PHILLIPS
Peter PIRO
Dan RENCZOWSKI
Nicole MEDINA

In addition, it shall include the Mass Spectrometry Machine

This also authorizes the above personnel to either image or logically copy files of interest to this case off the two servers on site. It is my understanding that all the above listed computers will be imaged and then the hard drives cloned. The cloned hard drives will be put into the machines which will then make them available to be sent to Sudbury. The originals will be retained by the Office of the Attorney General's Computer Forensics Laboratory.

Sincerely,

Curtis Wood
Undersecretary of Forensic Science
and Technology
Executive Office of Public Safety
and Security

ATTACHMENT

#2

NOT TO SCALE

SOUTH CORRIDOR — WEST

FILE CABS

356

355

354

353

358A
358C
358
358 B

359

361 A

361

MAIN ENTRANCE TO 3RD FLOOR

363

ENTRANCE →

362

39 B

391

N
W E
S